**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FREDDY GONZALES ARENCIBIA,** *et al.*,<br><br>**Plaintiffs,**<br><br>*v.*<br><br>**2401 RESTAURANT CORPORATION<br>d/b/a/ MARCEL'S RESTAURANT,** *et al*.,<br>**Defendants.** | **No. 1:09-cv-00165-CKK-DAR** |

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Defendants 2401 Restaurant Corporation, d/b/a Marcel's Restaurant, and Robert Wiedmaier, individually, move for summary judgment on the remaining claims in this case, there being no disputed material facts and Defendants being entitled to judgment as a matter of law. In particular, based on the undisputed facts, the remaining Plaintiffs[1] cannot show that Defendants violated the Fair Labor Standards Act, 29 U.S.C. §201, *et seq*., the District of Columbia Minimum Wage Act, D.C. Code §32-1011, *et seq.,* or the Distinct of Columbia Wage Payment and Collection Law, D.C. Code 32-1310, *et seq.*

In support thereof, Defendants submit their accompanying Memorandum of Law in Support of Defendants' Motion for Summary Judgment with attached Exhibit 1; their Local Rule 7(h) Statement of Material Facts As To Which There Is No Genuine Issue, together with Exhibits 1 through 5 thereto; and the Court's entire record in this case.

WHEREFORE, Defendants respectfully request that the Court grant this motion, and enter an Order specifying that there is no genuine dispute as to any material fact in this case and

---

[1] Counsel for Plaintiff has informed counsel for Defendants that she is filing a consent motion to withdraw all claims as to named Plaintiff Farzad Pazhwak. Accordingly, Defendants in support of this Motion do not address additional arguments that they may have to dismiss his claims beyond those generally applicable to the other Plaintiffs, in particular that his claims should be dismissed because he was not available for his deposition, but reserve the right to do so should the consent motion not be granted.

that the case is resolved in Defendants' favor as a matter of law. An appropriate Order is attached.

Respectfully submitted,

_____/s/ Brian Steinbach_____
Frank C. Morris, Jr., Bar No. 211482
Brian Steinbach, Bar No. 256727
Epstein, Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendants, 2401 Restaurant Corporation, d/b/a Marcel's Restaurant, and Robert Wiedmaier, individually

DATED: June 3, 2011

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Defendants' Motion for Summary

Judgment was served this 3rd day of June, 2011, by electronic service, on the following:

>Denise M. Clark, Bar No. 424080
>1250 Connecticut Ave., NW
>Suite 220
>Washington, DC 20036
> (202) 293-0015
>
>Attorney for Plaintiffs,
>Freddie Gonzales Arencibia, *et al*.


>_____    /s/ Brian Steinbach_____
>Brian Steinbach

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FREDDY GONZALES ARENCIBIA, et al.,** | |
| **Plaintiffs,** | |
| *v.* | **No. 1:09-cv-00165-CKK-DAR** |
| **2401 RESTAURANT CORPORATION d/b/a/ MARCEL'S RESTAURANT, et al.,** | |
| **Defendants.** | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Frank C. Morris, Jr,
D.C. Bar No. 211482
Brian Steinbach
D.C. Bar No. 256727
Epstein, Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendants,
2401 Restaurant Corporation, d/b/a Marcel's
DATED: June 3, 2011                    Restaurant, and Robert Wiedmaier, individually

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................................ 3

    A.    THE PARTIES ...................................................................................................... 3

    B.    BASIC OPERATION OF THE RESTAURANT ............................................... 3

    C.    DUTIES OF THE CAPTAINS, FOOD RUNNERS AND BUSSERS............................ 4

    D.    DUTIES AND AUTHORITY OF THE MAÎTRE D' ...................................... 5

    E.    FACTS REGARDING THE HIRING AND TERMINATION OF PLAINTIFFS ......... 6

    F.    PAYROLL SYSTEM BASICS AND OVERTIME FOR TIPPED EMPLOYEES ....... 7

    G.    NOTICE OF THE TIP POOL .......................................................................... 8

    H.    THE OPERATION OF THE TIP POOL ......................................................... 9

    I.    SPECIFIC FACTS PERTAINING TO THE MARTINEZ CLAIM.............................. 13

    J.    SPECIFIC FACTS REGARDING ARENCIBIA'S RETALIATION CLAIM............. 13

III.   THE STANDARD FOR SUMMARY JUDGMENT ........................................... 16

IV.   PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS UNDER THE FLSA AND
    DCMWA ...................................................................................................................... 18

    A.    THE TIP CREDIT STATUTORY SCHEME.................................................. 18

    B.    THE MARCEL'S TIP POOL QUALIFIES FOR THE TIP CREDIT .......................... 21

        1.    ALL THE PARTICIPANTS IN THE TIP POOL ARE PROPERLY
            CONSIDERED TIPPED EMPLOYEES................................................... 22

        2.    MR. KEBAIER'S PARTICIPATION IN THE TIP POOL DOES NOT
            INVALIDATE ITS USE FOR THE TIP CREDIT ..................................... 23

        3.    THE TIP POOL IS OTHERWISE PROPERLY ADMINISTERED ......................... 26

        4.    TO THE EXTENT THE ISSUE IS PROPERLY RAISED, THE SERVICE
            EMPLOYEES HAD PROPER NOTICE OF THE TIP POOL.................................. 29

    C.    PLAINTIFF HAVE NO BASIS FOR CLAIMING ANY UNPAID OVERTIME ....... 31

V.   RECOVERY UNDER THE FLSA AND DCMWA IS LIMITED TO THE DIFFERENCE BETWEEN THE WAGE PAID AND THE REGULAR MINIMUM WAGE.................................................................................................................... 32

VI.  PLAINTIFFS CANNOT RECOVER ANY AMOUNTS UNDER THE DCWPCL ........... 37

VII. THERE IS NO BASIS FOR ANY CLAIM BY PLAINTIFF MARTINEZ ........................ 38

VIII.PLAINTIFF ARENCIBIA CANNOT ESTABLISH A CLAIM OF RETALIATION UNDER THE FLSA ............................................................................................................ 39

   A.   PLAINTIFF ARENCIBIA CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATION UNDER THE FLSA ............................................................................ 40

   B.   AS PLAINTIFF HAS ADMITTED LEGITIMATE NONDISCRIMINATORY REASONS FOR TERMINATING HIM, HE CANNOT SHOW THAT THOSE REASONS ARE PRETEXTUAL................................................................................. 43

IX.  CONCLUSION...................................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................17

*Baird v. Kessler*,
    172 F. Supp. 2d 1305 (E.D. Cal. 2001)................................................................25

*Baloch v. Norton*,
    355 F. Supp. 2d 246 (D.D.C. 2005) .....................................................................30

*Bonham v. Copper Cellar Corp.*,
    476 F. Supp. 98 (E.D. Tenn. 1979)......................................................................34

*Carter v. Dutchess Community College*,
    735 F.2d 8 (2d Cir. 1984).....................................................................................21

*Caryck v. Coupe*,
    663 F. Supp. 1243 (D.D.C. 1987) ..................................................................39, 40

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................17

*Chan v. Sung Yue Tung Corp.*,
    No. 03 Civ. 6048 (GEL), 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007)............35, 37

*Clark County School Dist. v. Breeden*,
    532 U.S. 268 (2001).............................................................................................42

*Cooke v. Rosenker*,
    601 F. Supp. 2d 64 (D.D.C. 2009) .................................................................39, 40

*Cumbie v. Woody Woo, Inc.*,
    596 F.3d 577 (9th Cir. 2010) ...................................................................... passim

*Davis v. B & S, Inc.*,
    38 F. Supp. 2d 707 (N.D. Ind. 1998) ...............................................19, 25, 30, 31

*Dole v. Continental Cuisine, Inc.*,
    751 F. Supp. 799 (E.D. Ark. 1990)....................................................21, 22, 25, 29

*Dole v. Simpson*,
    784 F. Supp. 538 (S.D. Ind. 1991) ......................................................................25

*Donovan v. Agnew*,
    712 F.2d 1509 (1st Cir. 1983)..............................................................................25

iv

*Donovan v. Grim Hotel Co.*,
  747 F.2d 966, 972 (5th Cir. 1984) ........................................................................25

*Fischbach v. District of Columbia Department of Corrections*,
  86 F.3d 1180 (D.C. Cir. 1996)..............................................................................44

*Fundali v. Pivotal Corp.*,
  310 F. Supp. 2d 22 (D.D.C. 2004) ...................................................................37, 38

*Globalaw Limited v. Carmon & Carmon Law Office*,
  452 F. Supp. 2d 1 (D.D.C. 2006) ...........................................................................44

*Herman v. RSR Security Services Ltd.*,
  172 F.3d 132 (2d Cir. 1999)...................................................................................21

*Hernandez v. City Wide Insulation of Madison, Inc.*,
  No. 05-C-303, 2006 WL 1993552 (E.D. Wis. July 14, 2006)..........................21, 25

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
  131 S.Ct. 1325 (2011).............................................................................................40

*Kilgore v. Outback Steakhouse of Florida*,
  160 F.3d 294 (6th Cir. 1998) ...................................................................22, 29, 31

*Long v. First Union Corp. of Virginia*,
  894 F. Supp. 933 (E.D. Va. 1995), *aff'd per curiam*, 86 F.3d 1151 (4th Cir. 1996)...............44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................................17

*Mayers v. Laborers' Health & Safety Fund of North America*,
  478 F.3d 364 (D.C. Cir. 2007) ...............................................................................42

*McDermott v. Continental Airlines, Inc.*,
  No 2:06-cv-0785, 2008 WL 1766892, (S.D. Ohio April 11, 2008), *aff'd* 339 F. App'x
  552 (6th Cir. 2009)...................................................................................................42

*Miller v. Health Services for Children Foundation*,
  630 F. Supp. 2d 44 (D.D.C. 2009) .........................................................................40

*Morgan v. Speakeasy, LLC*,
  625 F. Supp. 2d 632 (N.D. Ill. 2007) ................................................21,22, 26, 31

*Myers v. Copper Cellar Corp.*,
  192 F.3d 546 (6th Cir. 1999) ..................................................................................26

*National Mining Ass'n v. Dep't of Labor*,
  292 F.3d 849 (D.C. Cir. 2002)................................................................................36

*Paul v. Judicial Watch, Inc.*,
    543 F. Supp. 2d 1 (D.D.C. 2008) ...................................................................29

*Riordan v. Kempiners*,
    831 F. 2d 690 (7th Cir. 1987) .......................................................................24

*Rudy v. Consolidated Restaurant Companies, Inc.*,
    No. 3:08-CV-0904-L (BF), 2010 WL 3565418 (N.D. Tex. Aug. 18, 2010) ..........24

*Wang v. Metropolitan Life Ins. Co.*,
    34 F. Supp. 2d 853, 869-70 (D. Md. 2004) ........................................................43

*Williams v. Jacksonville Terminal Co.*,
    315 U.S. 386 (1942) ......................................................................................32

### STATUTES

29 U.S.C. §201, *et seq.* ..................................................................................1

29 U.S.C. §202(a) ...........................................................................................35

29 U.S.C. §203(d) ...........................................................................................18

29 U.S.C. §203(m) ...............................................................................20, 32, 34

29 U.S.C. §203(m)(1) .....................................................................................20

29 U.S.C. §203(t) ............................................................................................19

29 U.S.C. §206(a)(1) .......................................................................................18

29 U.S.C. §207(a)(1) .......................................................................................19

29 U.S.C. §215(a)(3) .......................................................................................40

29 U.S.C. §255(a) ...........................................................................................18

D.C. Code §2-1401.01, *et seq.* .........................................................................1

D.C. Code §12-301(8) .....................................................................................18

D.C. Code §32-1001*, et seq.* ............................................................................1

D.C. Code §32-1002(3) ...................................................................................18

D.C. Code §32-1002(4) ...................................................................................19

D.C. Code §32-1002(g) ...................................................................................20

D.C. Code §32-1003(a) ...................................................................................................18

D.C. Code §32-1003(c) ...................................................................................................19

D.C. Code §32-1003(f) ...................................................................................................20

D.C. Code §32-1003(f)-(g) .......................................................................................19, 32

D.C. Code §32-1013 .......................................................................................................18

D.C. Code §32-1301, *et seq.* ...........................................................................................1

D.C. Code §32-1302 .......................................................................................................37

D.C. Code §32-1304 ..................................................................................................37, 38

D.C. Code §32-1308 .......................................................................................................37

NY Labor Law §196-d .....................................................................................................35

Pub. L. 110-28, Title VIII, §§ 1802(a), 8103(c)(1)(B), 121 Stat. 188, 189 (2007) ......19

## OTHER AUTHORITIES

29 C.F.R. §4.167 ............................................................................................................20

29 C.F.R. §516.28(a)(3) ..................................................................................................20

29 C.F.R. §531.50(a)(1) ..................................................................................................20

29 C.F.R. §531.52 ...........................................................................................................35

29 C.F.R. §531.54 ...........................................................................................................29

29 C.F.R. §531.59(b) ......................................................................................................20

76 Fed. Reg. 18,832, *et seq.* (April 5, 2011) .................................................................20

76 Fed. Reg. at 18,841-42 ...............................................................................................35

76 Fed. Reg. at 18,841 ....................................................................................................35

76 Fed. Reg. at 18,844-45 ...............................................................................................29

Fed. R. Civ. P. 56(c) .......................................................................................................17

Local Rule 7(h)(1) .............................................................................................................3

Senate Report No. 93-690, 93rd Cong., 2d Sess. (Feb. 22, 1974) .................................34

Wage and Hour Opinion Letter WH-410.................................................................................26, 28

Wage and Hour Opinion Letter FLSA-2006-1 .............................................................................26

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants 2401 Restaurant Corporation d/b/a Marcel's Restaurant ("Marcel's") and Robert Wiedmaier ("Chef Wiedmaier") ("Defendants"), submit this Memorandum of Law in support of their Motion for Summary Judgment on the remaining claims in this case brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.* (First Claim); the District of Columbia Minimum Wage Act ("DCMWA"), D.C. Code §32-1001, *et seq.* (Second Claim); and the District of Columbia Wage Payment and Collection Law ("DCWPCL"), D.C. Code §32-1301, *et seq.* (Third Claim).[1]

## I.    INTRODUCTION

The remaining Plaintiffs, former service employees (a Captain, or waiter; a food runner, and 3 bussers) at Marcel's, primarily assert claims for certain allegedly unpaid wages.[2] In particular, they allege that a tip pool in which they participated was not properly run so as to entitle Defendants to claim a tip credit under the FLSA and the DCMWA against the statutory minimum wage otherwise applicable, specifically because a management employee allegedly participated in the tip pool. Accordingly, in their First and Second Claim they seek to recover unpaid wages under the FLSA and DCMWA, assertedly consisting of both the amount of the tip credit allegedly improperly taken plus at least a share of tips paid to the alleged management employee, and in their Third Claim they apparently seek to recover the same amounts as unpaid

---

[1] On March 31, 2010, this Court dismissed in its entirety the Fourth Claim, alleging violations of the District of Columbia Human Rights Act, D.C. Code §2-1401.01, *et seq.,* and also dismissed the DCWPCL claims against Defendant Wiedmaier. (D.E. 19.) For the purposes of this Motion only, Defendants do not dispute that Chef Wiedmaier potentially may be liable under the First and Second Claims.

[2] An additional former Captain, Farzad Pazhwak, was a named Plaintiff, but counsel for Plaintiffs has informed counsel for Defendants that she is filing a consent motion to withdraw all claims as to him. Accordingly, Defendants do not herein address additional arguments they may have to dismiss his claims beyond those generally applicable to the other Plaintiffs, in particular that his claims should be dismissed because he was not available for his deposition, but reserve the right to do so should the consent motion not be granted.

wages under the DCWPCL.[3] The First Claim also alleges that Defendants retaliated against Plaintiff Arencibia by terminating him when he allegedly sought to enforce his rights under the FLSA by questioning tip calculations, in violation of the FLSA.

Defendants now seek summary judgment against the Plaintiffs as to the remaining claims against them because the undisputed facts show that as a matter of law the Plaintiffs cannot establish their claims. To the contrary, (1) all of the participants in the tip pool are properly considered tipped employees; (2) no member of management participates in the tip pool; (3) the manner in which the tip pool is administered and distributed is otherwise proper; and (4) to the extent that the issue properly has been raised, the Plaintiffs were properly informed of the operation of the tip pool. Consequently, Defendants were entitled to take the tip credit and there is no violation of the FLSA or the DCMWA. As a consequence, there also is no basis for any recovery under the DCWPCL. Alternatively, there can be no recovery under the DCWPCL because there was a bona fide dispute concerning the amount of wages due and the amount conceded due was provided to the employees in writing. In addition, even if there was sufficient evidence to find the tip pool invalid and that as a result Defendants may not claim the tip credit, as a matter of law any recovery under the FLSA and the DCMWA is limited to the amount of the tip credit allegedly improperly taken. Furthermore, there is no possible basis for any recovery by Plaintiff Martinez, as he was paid in excess of the minimum wage and never worked any overtime. Finally, Plaintiff Arencibia cannot establish a claim of retaliatory termination because he has conceded that he was terminated for reasons unrelated to any complaints about the tip pool system.

---

[3] Although the Amended Complaint also makes reference to allegedly unpaid overtime, there is no evidence of any overtime for which no payment was made. At most any overtime claim is limited to the amount of the tip credit taken for that overtime work, which as discussed below is the same as the amount of tip credit taken for regular hourly work. See parts IV(B)(4) and C, below.

Accordingly, the Plaintiffs' claims must fail, and summary judgment should be granted in Defendants' favor.

## II.   FACTUAL BACKGROUND

The facts material to the issues raised in this motion are not in dispute, and are all set forth in detail in Defendants' separate Local Rule 7(h)(1) Statement Of Material Facts As To Which There Is No Genuine Issue ("SMF"), filed and served concurrently with Defendants' Motion.[4] The following summarizes the facts in the SMF.

### A.   THE PARTIES

Defendant Marcel's is a fine dining restaurant located at 2401 Pennsylvania Avenue, NW, Washington, DC. Defendant Chef Wiedmaier is its principal owner. (SMF 1-2.)

Plaintiffs Freddy Gonzalez Arencibia ("Arencibia") and Farzad C. Pazhwak ("Pazhwak") were employed by Marcel's as waiters, or Captains. At all relevant times they were paid at the rate of $2.77 per hour, plus tips. Plaintiffs Hamid Guerch ("Guerch"), Carlos Parra ("Parra") and Khalid Chabar ("Chabar") were employed by Marcel's as bussers (busboys), also known as Service Attendants. At all relevant times they were paid at the rate of $6.15 per hour, plus tips (except Plaintiff Parra was paid $7.00 per hour for his first day of work.) Opt-in Plaintiff Wilson A. Martinez ("Martinez") was employed by Marcel's as a food runner. At all relevant times he was paid at the rate of $12.00 per hour, plus tips. (SMF 3-17.)

### B.   BASIC OPERATION OF THE RESTAURANT

At all relevant times Thomas Burke was the general manager and director of operations of Marcel's, but had no ownership interest. As such, he was responsible for hiring, firing, suspensions, scheduling, handling emergency calls from employees, overseeing the processing of

---

[4] Although for the purpose of their Motion for Summary Judgment Defendants treat many of the Plaintiffs' factual assertions as uncontested, Defendants reserve the right to contest these factual assertions at trial should their Motion be denied.

workers' compensation claims, and overseeing the maître d', sommelier and kitchen staff. Decisions to hire, fire or discipline have to come to Mr. Burke, the Executive Chef de Cuisine, or Chef Wiedmaier, but Mr. Burke may tell someone to deliver the message. The Executive Sous Chef and the Sommelier also have the authority to suspend, fire and discipline on their own. Mr. Burke makes the decision to hire, even when there is a recommendation from other employees. He also determines the hourly wage to be paid to the Maître d', Captains, runners and bussers. (SMF 18-24.)

During the relevant period, the typical composition of management staff during regular afternoon/evening of operation at Marcel's consisted of one Executive Chef de Cuisine, one Executive Sous Chef, and 1 Wine Sommelier. In addition, prior to April 2007 Mr. Burke and Chef Wiedmaier generally were present most of the time. Thereafter, Mr. Burke was present 3-4 afternoons/evenings per week and Chef Wiedmaier was present at least 2 afternoons/evenings per week. (SMF 25-28.)

Also during the relevant period, the service staff at the beginning of a shift normally consisted of the Maître d', and a minimum of four Captains, four bussers, one food runner, and one bartender. However, the number of Captains, bussers and food runners could vary up and down, and on Thursday, Friday and Saturday there often were as many as seven captains, five bussers, two food runners and two bartenders. (SMF 29-30.)

## C.   DUTIES OF THE CAPTAINS, FOOD RUNNERS AND BUSSERS

Captains greet guests, answer the phone, take coats, escort guests to the table, provide menus, take and serve beverage orders, explain the food, take food orders, enter the order into the computer so the chefs can prepare it, open the wine, converse with the guests, make sure the food gets delivered, serve the food from trays brought out by the food runners, change silverware as needed, deliver the check and process payment, and generally guide the service through the

evening making sure that the guests get whatever they need. Although Captains are assigned tables, Marcel's operates such that all tables are the responsibility of all of the service staff. Captains can direct food runners and bussers as to what they should and should not be doing, but have no authority to hire, fire or discipline. (SMF 31-33.)

Food runners are the link between the kitchen and the floor. They make sure all plates are polished; run the food to a tray by the table and notify the Captains that it is ready to be put on the table; do some of the same things as the bussers; pick up the table and notify the Chef that the table is ready for the next course; and sometimes explain the food to the patrons. (SMF 34.)

Bussers bring water from the bar and keep it filled; serve the bread; pick up the plates; clean the table, crumbs and any leftover on the tablecloths; change tablecloths; move tables and chairs around as needed; bring wine from the cellar; refill freezers; keep the bread hot; notify the Captains of any requirements and problems; serve the table and help Captains and runners with whatever they need; and generally make sure that everything flows for the service. (SMF 35.)

## D.   DUTIES AND AUTHORITY OF THE MAÎTRE D'

At all relevant times, Adnane Kebaier was employed at Marcel's as the Maître d'. As Maître d', he does everything that the Captains do. He has two regular tables, handles up to 4 tables in an evening and also has a number of personal customers. In addition, he is responsible for organizing the reservations, making sure regulars get the tables they ask for, and accommodating every guest with every need. He supervises the floor, makes sure staff is clean and wearing proper uniforms, ensures tables are being attended and if not assists in doing so, assists in cleaning and all aspects of service as a resource to all the Captains, and ensures that the bussers and food runners are doing their job. Like the Captains, Mr. Kebaier directs runners and bussers. He asks the Captains to assist him and they ask him to assist them. During the relevant period Mr. Kebaier was paid at the rate of $8.00 per hour, plus tips. (SMF 36-40, 55.)

Mr. Kebaier has no authority to hire, fire, suspend or discipline. He cannot suspend an employee without approval of the Chef or Mr. Burke. He has never informed anyone that he was terminated without first checking with Mr. Burke. He has never sent anyone home without consulting with Mr. Burke or another member of management. Similarly, he has never disciplined an employee, although he has signed discipline forms as a witness and has written up incidents at the direction of management. Although Mr. Kebaier does interview applicants and take applications, the decision to hire is made by Mr. Burke. Similarly, while he may inform an employee that he is hired or suspended, he does so only on the instruction of Mr. Burke or other members of management. He does not do the paperwork after someone is hired. (SMF 41-47.)

Although Mr. Kebaier prepares draft schedules, he does so based on a standard schedule, including regular days off, and historic needs. Furthermore, Mr. Burke reviews and often modifies those schedules, and either Mr. Burke or another member of management must approve the final schedule as well as any leave requests and subsequent schedule changes. (SMF 48-51.)

Mr. Kebaier has nothing to do with setting hourly wages or with the design and implementation of the tip pool system. He has no ownership interest in Marcel's. (SMF 53-54.)

### E.   FACTS REGARDING THE HIRING AND TERMINATION OF PLAINTIFFS

The undisputed evidence confirms that Mr. Kebaier did not make the decisions to hire or fire any of the Plaintiffs. Thus, Mr. Burke hired Plaintiff Guerch after Mr. Kebaier took his application and either gave it to Mr. Burke or told him what was in it. Mr. Burke also had to approve his rehire when he sought to come back to work after serving a jail sentence. Although Plaintiff Chabar testified that Mr. Kebaier took his application and later called him to tell him he was hired, he conceded that he did not know if Mr. Kebaier had the authority on his own to hire, or whether he set the wages, controlled the payroll or controlled the method of operations. Thus, it is undisputed that Mr. Kebaier obtained Mr. Burke's approval before informing Mr. Chabar

that he was hired. Similarly, although Plaintiff Parra testified that he thought he applied with Mr. Kebaier, he did not state who actually hired him. Mr. Kebaier testified without contradiction that although he suggested to Mr. Parra that he apply for a position, he did not interview him and only learned that he was hired when he saw him there at work. In addition, although Plaintiff Arencibia testified that Mr. Kebaier hired him on a referral, Mr. Kebaier explained that although Mr. Arencibia came recommended by another employee, it was Mr. Burke who approved his hire, as Mr. Burke confirmed. Mr. Kebaier also did not terminate any of the Plaintiffs; they either quit or were disciplined/terminated by the Sommelier, Executive Chef de Cuisine or Chef Wiedmaier. Similarly, when Plaintiff Arencibia was briefly suspended and then terminated in 2006, a decision later reversed, Plaintiff Arencibia states it was Chef Wiedmaier who sent him home and who later told Mr. Kebaier that Mr. Arencibia was fired. (SMF 41, 44, 56-70.) As discussed below, Mr. Arencibia also contends that Chef Wiedmaier terminated him.

## F.   PAYROLL SYSTEM BASICS AND OVERTIME FOR TIPPED EMPLOYEES

Employees record their hours worked by entering their time in and out every day on the Micros system. Neither Plaintiffs Chabar, nor Guerra, nor Parra were aware of any discrepancy between the time they entered and the total hours ultimately reflected on their paychecks. Service employees received their share of credit card tips in cash each Friday for the week ending the previous Sunday. Service employees were paid their wages every two weeks on a Friday for the two weeks ending the previous Sunday. They received a biweekly payroll statement that showed wages earned, credit card tips paid and appropriate tax deductions for the relevant pay period. (SMF 71-76.)

As Captains are paid a wage of only $2.77 per hour and payroll tax deductions are based on the combined total of the hourly wage and credit card tips paid, the amount of payroll tax deductions usually exceeds their total hourly wages for the pay period, resulting in a zero

paycheck for these employees. As bussers are paid a wage of $6.15 per hour, food runners are paid $10.00 per hour or more, and their share of the tip pool is smaller, the amount of payroll tax deductions for these employees usually does not exceed their total hourly wages for the pay period and they usually do not receive a zero paycheck. The pay stubs for all show both their total hourly wages and total tips paid for the relevant period. (SMF 77-78.)

Tipped employees who work more than 40 hours per week receive overtime pay. The overtime rate is determined by calculating the normal minimum overtime rate, *i.e.*, one and one-half times the standard applicable minimum wage, and then deducting from this amount the allowable tip credit. Thus, during the period from January 29, 2006 to July 24, 2008, when the District of Columbia minimum wage was $7.00 per hour, the overtime rate for a Captain was $6.27 per hour and for a busser was $9.65 per hour. During the period from July 24, 2008 through September 16, 2008, when the District of Columbia minimum wage was $7.55 per hour, the overtime rates were $6.55 and $9.93, respectively. As the food runners always received more than the minimum wage, their overtime rate was the same as the regular overtime rate for their base pay. Plaintiffs Arencibia, Guerch and Parra all admit that they have no basis for contending that there were any errors in the overtime they were paid, and Plaintiff Parra expressly disclaimed any claim for unpaid overtime. (SMF 81-90.)

### G.   NOTICE OF THE TIP POOL

Posters outlining what the Fair Labor Standards Act and the D.C. Minimum Wage Act say are, and at all relevant times were, posted on a cork board on one of the walk-ins where all employee-related material is posted. These posters include reference to the requirement that tipped employees receive a cash wage of at least $2.13 per hour (federal) or $2.77 (D.C.) and that the totals of tips plus the cash wage must equal the minimum hourly wage. (SMF 91-92.)

Service employees also are informed and aware that Marcel's is a tip pool house and that

they will be paid an hourly rate plus a share of tips. The tip pool policy is verbally explained at hire and from time to time during employee meetings or one on one conversations. At least one Plaintiff, Mr. Parra, also learned about it from a fellow employee. In addition, service employees are informed and are aware that 3.5% is deduced from the tips accrued each night for credit card charges. Mr. Arencibia conceded that he had no issue with the 3.5% deduction. (SMF 93-102.)

## H.   THE OPERATION OF THE TIP POOL

The vast majority of tips are generated through credit card charges, either by amounts voluntarily added to the bill by customers or by mandatory service charges imposed upon large parties and/or private dining. (SMF 104.)

At the end of each shift each Captain prints out two copies of a receipt summarizing the sales for the tables that he served during the shift. This also shows the total charged tips for these tables. One copy is stapled to the Captain's closed sales checks for the shift and turned in to the Maître d'. The other copy is stapled to a document headed "Marcel's Daily Tip Sheet" that contains a roster of service employees (Maître d', Captain/waiter, runners, bussers, bartender). The date is written on this document along with some indication (circles, checks, etc.) of the names of service staff who worked that night. Also noted on this document are special instructions for distribution of certain charged tips, in particular extra payments to food runners and/or bussers, any payments that a Captain directs be paid from his own share to a kitchen employee, or payments that the customer specifically has directed be made to certain individuals, as discussed below. The Maître d' (or whoever is acting in his place) prints out a summary receipt of all sales for the day, including total sales and charged tips, and attaches to that anything unusual, such as a gift certificates, complimentary meals, and/or private dining. This is placed with the "Marcel's Daily Tip Sheet." All of this data also goes into the computer system, which generates a "Daily System Sales Detail" that, among other things, shows the total amount

of credit card tips received. (SMF 105-110.)

These documents are then transferred to the office, where Office Manager Lauren Nelligan, or a person working under her direction, calculates the amount of credit card tips to be paid out to each tipped employee. First, a 3.5% credit card processing fee is deducted from the total amount of credit card tips. As the bartender does not participate in the tip pool, all tips and service charges on the bartenders' receipts are then deducted. In addition, at times a customer specifically requests that a portion of his/her credit card tip be paid directly to individuals such as the Maître d', a Captain, or the Sommelier. When this occurs, this amount is deducted from the pool and paid as directed. (SMF 111-13, 117.)

Marcel's periodically hosts private parties. In that connection it employs a Director of Sales, Julie Albert. Ms. Albert is responsible for, among other things, selling, booking and planning all private parties, including negotiating the price, discussing menus, collecting both a deposit and final payment, and often attending the event itself. Despite her title, Ms. Albert has no managerial authority, supervises no employees, has no authority to hire, fire, discipline, or schedule employees, and has no ownership interest in Marcel's. When there is a private party, the customer is informed that there will be a mandatory 20% service charge. Of this, 3% is paid as a commission to the private dining director. The remaining 17% is distributed to service employees participating in the tip pool. When the customer asks, the customer is informed of this allocation, although the meeting planners with whom Ms. Albert arranges most parties also knows this is standard practice. Customers also are frequently told that they are free to leave an additional tip if they so desire. (SMF 114-16.)

The resulting amount is then generally split 70% to the Maître d' and Captains working that evening, and 30% to the runners and bussers working that evening; as noted, the bartender

does not participate in this distribution. At times a small portion of the 70%, typically $10-$20, is distributed to one or more of the runners and busboys for good performance, or for doing extra work. Sometimes certain runners and/or bussers have regularly received such an extra amount. Mr. Burke must approve the payment of such extra amounts. On rarer occasions a Captain may direct a small amount of his share be given to a dishwasher, *e.g.,* who stays to handle a late party. (SMF 119-20.)

These calculations are set forth on the pertinent "Marcel's Daily Tip Sheet" for the particular day. After the completion of a full pay week, the office prepares an Excel spreadsheet, titled "Marcel's Weekly Tip Out Sheet," showing the amount of tip money due each service employee for each day of the week (including the bartender(s), whose tip as noted above is calculated separately) and the total amount of tips to be paid. This spreadsheet usually is completed by the Wednesday following the end of the pay week ending the previous Sunday, and employees can then call to find out how much tip money they are to receive on the coming Friday. The total amount of tips for each day is entered into the accounting software and a check generated for the total amount of tips due. A copy of the check stub, an Account Quick Report showing appropriate journal entries for each day's tip receipts and the check, and a copy of the "Marcel's Weekly Tip Out Sheet," is retained for recordkeeping purposes. The check is cashed and the money, along with a copy of the "Marcel's Weekly Tip Out Sheet," is delivered to the restaurant. The Maître d' or his substitute then uses this sheet to determine the amount due each service employee, divides the money accordingly, and generally puts the appropriate amount in an envelope with the person's name and the amount written on the outside. He then hands out the envelopes on Friday. On occasion, due to considerations of time, the Maitre d' or his substitute may distribute the money directly without first putting it in envelopes. (SMF 121-28.)

11

The Maître d's copy of the "Marcel's Weekly Tip Out Sheet" is available for inspection by the service employees. The office also keeps a copy with the "Daily Tip Sheets" for that week. Two weeks of these documents are kept with an "Employee Time Card And Job Detail" for the two week pay period. Notation is made on the "Marcel's Weekly Tip Out Sheet" for the second week of the total tips for each employee for the two week period. The office then adds to these documents a worksheet provided by Marcel's payroll service, Paychex, on which hours, overtime hours and tip amounts are entered, and bands and stores these records by two week pay period. The amount of tips paid to each employee is also reported to Paychex, and along with regular wages appears on the biweekly payroll statements distributed to all employees as well as on payroll journals provided to Marcel's by Paychex for the particular pay period. (SMF 129-32.)

On the rare occasions when a customer leaves a cash tip, the Captain (or Maître d' if it is his table) decides whether to keep all of it or share it with others. Marcel's encourages, but does not require, sharing such cash tips with the others involved in providing service to the table. Marcel's keeps no records of such tips unless they are reported to it by the Captain or Maître d'. Finally, if a mandatory service charge is paid in cash, it is placed in the tip pool. (SMF 132-36.)

When Marcel's first opened in 2000, Mr. Burke was the Maître d'. By late 2003 or early 2004 he functioned as both the general manager and as Maître d'. As Maître d' he participated in the tip pool. At that time Marcel's did not know that a tip credit could not be taken if management participated in the tip pool. However, Marcel's learned this as one of the consequences of a 2003 audit by the District of Columbia Department of Employment Services ("DC-DOES"). Due to this and other findings Marcel's agreed without formal adjudication to make back wage payments to approximately 13 employees. Mr. Burke then ceased participating

in the tip pool, and in consultation with Corrine Price of DC-DOES made other changes in the operation of the tip pool to ensure that it met the requirements for being able to take the tip credit. This included not allowing any member of management to participate in the tip pool. (SMF 137-40.)

## I.   SPECIFIC FACTS PERTAINING TO THE MARTINEZ CLAIM

As noted above, opt-in Plaintiff Martinez worked as a food runner. During the relevant period of January 29, 2006 through his last day of work on February 8, 2007, he was paid at the rate of $12.00 per hour. Time and payroll records show that he was paid at this rate for all hours that he worked during the relevant period. These same time and payroll records also show that there was no week in the relevant period in which Mr. Martinez worked more than 40 hours. (SMF 141-43.)

## J.   SPECIFIC FACTS REGARDING ARENCIBIA'S RETALIATION CLAIM

On or about October 6, 2007, Mr. Arencibia was sent home by Chef Wiedmaier because of an incident involving his failure to deliver to a table an "amuse bouche" (a small pre-appetizer course delivered without being ordered while the customer is waiting for the appetizer). He asserts that Chef Wiedmaier then initially terminated him. He returned to work the following Saturday. Even before this, there were other incidents where Mr. Arencibia claims to have noticed that Chef Wiedmaier did not like him personally, would scream and yell at him and would call him stupid. (SMF 144-47.)

Mr. Arencibia asserts that he regularly commented that he went home without knowing how much he made in tips that night, that when he asked for documentation it was refused, and/or that he felt the service employees had the right to know how much they were making every night. He also asserts that in several meetings he had with Mr. Burke, in front of other employees, he always brought up the issue of an allegedly unfair pooling system. However, he

13

allegedly was told that there was nothing that could be done, that was the way it is, and that Chef Wiedmaier in particular told him "it's my way or the highway." He further asserts that 10-20 times in the years that he worked at Marcel's, the employees addressed that they wanted to see how much was the total tip per person each night, how many nights they worked and how that tip was broken down into the final daily number, but they never received the information. (SMF 147-51.)

At a daily briefing on or about September 8, 2008, attended by all the floor staff and Chef Wiedmaier, one of the subjects was the ironing of tablecloths. According to Mr. Arencibia, Chef Wiedmaier said that Marcel's was not going to pay a company to iron the tablecloths and that the Captains would have to do so. He then allegedly said that because of this task, they would have to come 30 minutes earlier and that anyone who was even one minute late would be sent home. Mr. Arencibia then asked if Marcel's would give them a light family meal or let them have 15-minute breaks before the restaurant opens in order for them to buy something and eat it in the back. Chef Wiedmaier allegedly first laughed, and then screamed that if Mr. Arencibia and the others wanted a lunch, they would have to be there at 1:00. When Mr. Arencibia responded that this was impossible, Chef Wiedmaier responded then there is no lunch, "it's my way or the highway." He sounded mad or angry at Mr. Arencibia; his voice was rude, and his tone got louder. Fellow Captain Theo Delony's testimony confirmed that Mr. Arencibia made this request, that Chef Wiedmaier said they would have to come in at 1:00 if they wanted to have that kind of family meal, and that Chef Wiedmaier was upset with Mr. Arencibia. (SMF 152-57.)

Thereafter, Mr. Delony noticed that Chef Wiedmaier's attitude toward Mr. Arencibia had changed, that he was not happy with Mr. Arencibia and that he wanted to replace him. He heard Chef Wiedmaier say that he wanted to get rid of Mr. Arencibia. On September 11, 2008, Mr.

14

Arencibia allegedly called to notify that he was running late but was told to go home. Although he had previously been given off for September 12, 2008, he decided to work that day because he felt Marcel's was looking for a reason to fire him. According to him, as early as September 14, 2008 he heard a rumor that he would be terminated. In particular, fellow Captain, Ernesto Cabo told him on September 14 or 15 that he had heard Marcel's wanted to get rid of him. (SMF 158-63.)

According to Mr. Arencibia, after he came to work on September 17, 2008, Mr. Cabo asked him if he was being fired or if someone fired him. Mr. Arencibia said no, why, and Mr. Cabo said that he had met a new employee who told him that he was Mr. Arencibia's replacement. A few minutes later, Mr. Delony came in and told him that Chef Wiedmaier had just approached him at the bar and told him that they needed to get rid of Mr. Arencibia. Next, around 4, the new waiter, Josh Gonzalez, came in and they shook hands. According to both, Mr. Gonzalez said he was Puerto Rican, Mr. Arencibia responded that he was Cuban and they switched to Spanish. Mr. Gonzalez said he was amazed to meet him because a chef at a sister restaurant where he had been working, Brasserie Beck's, had told him that Mr. Arencibia was fired and that was why Marcel's needed him, but he now guessed this had just been rumor and innuendo. While they were talking Chef Wiedmaier allegedly approached Mr. Gonzales and told him "no Spanish in this restaurant." (SMF 164-67.)

According to Mr. Arencibia, both he and Mr. Gonzalez went back to their work areas, but Chef Wiedmaier started looking for mistakes and "it was evident that he want [sic] to fire me."[5] So he approached Chef Wiedmaier and asked, "after four years that I have been working for you, you want to fire me? And he said yes, and what's the problem with that?" Mr. Arencibia then

---

[5] Mr. Arencibia alternatively has stated that a few minutes later Mr. Delony and Mr. Gonzales "told him that Chef Wiedmaier wanted to fire him; and he was fired that day." (SMF 168 n.3.)

thanked him for the opportunity, took off his tie and left the restaurant. (SMF 168-69.)

At his December 4, 2008 unemployment hearing, Mr. Arencibia testified that the reason Chef Wiedmaier became mad at him was because he requested the family meal or a sandwich break. He also testified that he knew after the September 8 meeting based on Chef Wiedmaier's mood that they were looking to fire him. Specifically, he testified that Chef Wiedmaier "never told me why he was firing me, but I knew because of my co-workers and I knew it that he was probably mad at me, his mood, because of the meeting when I mentioned that we need a family meal or a 15-minute break for lunch." He also testified that he "knew that there was a hostile environment over my person since the September the 8th because I was sent home." (SMF 170-73.)

Following the unemployment hearing, the Administrative Law Judge found that Mr. Arencibia reasonably concluded that he had been terminated based on Chef Wiedmaier becoming angry at him following the discussion concerning having a meal tor a meal break and being told by colleagues that Chef Wiedmaier wanted to, was going to, or had fired him. This decision was later upheld by the D.C. Court of Appeals. (SMF 174-75.)

At his deposition nearly two years later, Mr. Arencibia changed his testimony somewhat, testifying first Chef Wiedmaier fired him because he was speaking Spanish, but then adding that he felt there were additional reasons, such as the fact that he had asked for a light meal; the fact that he was always wanting to know the "real" tips numbers; the fact that he was the only person not afraid of Chef Wiedmaier; and "some other facts that he may only know himself." (SMF 176.)

## III.   THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be entered where the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists where the non-moving party fails to make a sufficient showing as to the existence of an essential element of his case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is not a "disfavored procedural shortcut," but is "an integral part of the Federal Rules as a whole, which are designed `to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327 (citation omitted).

Although a court should draw all reasonable inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

"If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (internal citations omitted). Further, the adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, once the movant identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with `specific facts showing that there is a genuine issue for trial.'" Id. at 587 (citing Fed. R. Civ. P. 56(e) (emphasis in original).

For the reasons set forth below, based on the undisputed facts Plaintiffs lack sufficient evidence to support any of their claims. Defendants ask this Court to look beyond the Plaintiffs' unsupported speculation, and with the foregoing principles in mind, grant Defendants summary judgment.

## IV.   PLAINTIFFS CANNOT ESTABLISH THEIR CLAIMS UNDER THE FLSA AND DCMWA

Plaintiffs assert that during the relevant period[6] the tip pool was not properly run so as to entitle defendants to claim a tip credit under the FLSA and DCMWA against the applicable statutory minimum wage applicable. In particular, they contend that Mr. Kebaier meets the statutory definition of an employer and therefore his participation in the pool was improper. In addition, it appears that they may claim other aspects of the operation of the tip pool disqualify it for the purposes of the tip credit and/or that they did not have proper notice of the tip pool. They further allege, but have no evidence, that they were not paid all overtime due them. For the reasons set forth below, the undisputed evidence shows that Mr. Kebaier is not an employer within the meaning of the FLSA and therefore that his participation in the tip pool was proper; that there are no other disqualifying aspects of the tip pool; that the issue of notice was not properly raised, but to the extent it was, proper notice was given; and that all overtime was paid.

### A.   THE TIP CREDIT STATUTORY SCHEME

Both the FLSA and the DCMWA require employers to pay their employees a minimum wage for all work performed in a work week. 29 U.S.C. §206(a)(1); D.C. Code §32-1003(a). The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d). The DCMWA similarly defines an "employer" as "any individual, partnership, association, corporation, business trust or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee…." D.C. Code §32-1002(3). Both statutes provide for overtime pay in the amount of

---

[6] The statute of limitation under the FLSA and the DCMWA is two years, or three years for a willful violation. 29 U.S.C. §255(a); D.C. Code §32-1013. Thus, although Defendants strongly disagree that any violation might be found to be willful, the maximum period for which a recovery is possible is the three years prior to the filing of the original Complaint on January 29, 2009, or from January 29, 2006. The same is true for Plaintiff's DCWPCL claims. D.C. Code §12-301(8). The relevant period ends on September 17, 20078, the last day worked by Mr. Arencibia, the last of the Plaintiffs to be employed by Marcel's. (SMF 3-13.)

at least 1-1/2 times the minimum hourly rate for all hours worked in workweek in excess of 40 hours. 29 U.S.C. §207(a)(1); D.C. Code §32-1003(c).

As of January 1, 2006, the DCMWA set the minimum wage in the District of Columbia at $7.00 per hour, or the minimum rate set pursuant to the FLSA plus $1.00, whichever is greater. D.C. Code §1003(a)(2). Prior to July 24, 2008, the FLSA minimum wage was $5.85 per hour or less,[7] and therefore the DCMWA minimum wage from January 1, 2006 to July 24, 2008 was $7.00 per hour. From July 24, 2008 to July 24, 2009, the FLSA minimum wage was $6.55 per hour, and therefore the DCMWA minimum wage during this period was $7.55 per hour. Employees subject to both statutes are entitled to the greater benefit.

Despite these provisions, an employer may pay less than the minimum wage to a "tipped employee," defined by the FLSA as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. §203(t). The DCMWA similarly provides for payment of less than the minimum wage to 'any employee who receives gratuities," defined as "voluntary monetary contributions received by an employee from a guest, patron or customer for services rendered." D.C. Code §32-1002(4) and §32-1003(f)-(g). The theory behind this "tip credit" is that an employer may "use a portion of the employee's tip income to supplement its minimum wage obligation to the employee, so long as the employee's combined cash wage and tip income meets or exceeds the minimum wage." *Davis v. B & S, Inc.,* 38 F. Supp. 2d 707, 711 (N.D. Ind. 1998). At all relevant times, in the District of Columbia an employer could pay a tipped employee a cash wage of $2.77 per hour, so long as the employee received sufficient tips to meet the difference between the applicable minimum wage and $2.77

---

[7] Prior to July 24, 2007, the FLSA minimum wages was $5.15. The FLSA was amended by Pub. L. 110-28, Title VIII, §§ 1802(a), 8103(c)(1)(B), 121 Stat. 188, 189 (2007), to provide for an increase to $5.85 per hour beginning on the 60th day after May 25, 2007, *i.e.*, July 24, 2007; for an increase to $6.55 beginning 12 months after that 60th day, *i.e.*, July 24, 2008; and for an increase to $7.15 per hour beginning 24 months after that 60th day, *i.e.*, July 24, 2009. As the last of the plaintiffs left Marcel's on September 17, 2008, the 2009 increase is irrelevant to this proceeding.

per hour. D.C. Code §32-1003(f).[8] However, during the relevant period this "tip credit" was not available unless (1) the employee has been informed that the tip credit is being claimed, and (2) "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. §203(m); *accord*, D.C. Code §32-1002(g).[9] Under the law as it existed at all relevant times and as discussed in greater detail in part IV(B)(4), below, this required that employees be informed that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation, but does not require a detailed explanation of the tip credit or how it is determined.

The use of a tip credit in connection with a tip pooling arrangement is valid so long as the pool includes only those employees who "customarily and regularly receive tips." 29 U.S.C. § 203(m); *Garcia v. La Revise Associates LLC.*, No. 08 Civ 9356(LTS)(THK), 2011 WL 1350009, *5 (S.D.N.Y. Jan. 13, 2011).[10] In determining whether an employee meets this standard, courts focus on whether the employee is "part of an occupation that customarily and regularly receives tips," or whether they have more than "*de minimis*" interaction with customers as part of their employment. *Garcia,* 2011 WL 1350009, *5 and cases cited therein. Further, an employer is prohibited from participating in an employee tip pool, and where management employees

---

[8] Under the FLSA, an employer could pay a tipped employee a cash wage of only $2.13 per hour. 29 U.S.C. §203(m)(1). *See also* 29 C.F.R. §4.167, §516.28(a)(3) and §531.50(a)(1), as amended effective May 5, 2011 by 65 Fed. Reg. 18,832, *et seq.* (April 5, 2011) (explaining same). Again, employees are entitled to the higher amount provided by D.C. law.

[9] The Department of Labor recently issued new regulations requiring for the first time that an employer may not take the tip credit unless it has informed the employees in advance of the amount of cash wage to be paid, the additional amount by which wages are increased by the tip credit, that all tips received must be retained by the employee except for a valid tip pooling arrangement, and that the tip credit shall not apply to any employee not so informed. 29 C.F.R. §531.59(b), as amended May 5, 2011. These new requirements have no application to the issues raised in this case, which involve events occurring on or prior to September 17, 2008. Notably, the prior regulations did not address the issue of notice at all.

[10] Copies of this and other cited cases available only on Westlaw are attached as Exhibit 1.

participate in a tip pool, the pool is invalid for tip credit purposes. *See Morgan v. Speakeasy, LLC*, 625 F. Supp. 2d 632, 652 (N.D. Ill. 2007) and cases cited therein.

However, merely exercising some supervisor duties over other employees does not make a person an "employer" within the meaning of the FLSA. *See Morgan,* 625 F. Supp. 2d at 653 (authority to send employees home, request additional staff and supervise work did not make senior servers "employees" where no authority to hire fire, schedule, determine rates or method of employee payment or maintain employment records beyond certain clerical duties); *Hernandez v. City Wide Insulation of Madison, Inc.,* No. 05-C-303, 2006 WL 1993552, at *3 (E.D. Wis. July 14, 2006) (supervisor not an "employer" even though he could hire employees and had some control over work schedules but did not determine the rate or method of payment and only performed clerical duties related to employment records); *Dole v. Continental Cuisine, Inc.,* 751 F. Supp. 799, 802 (E.D. Ark. 1990) (rejecting argument that "any person who has any supervisory duties over other employees, no matter how minimal, becomes an 'employer' within the meaning" of the FLSA).

Rather, the courts apply an "economic reality" test that examines the totality of the circumstances to determine whether the alleged employer possessed the power to supervise and control the workers in question. *See, e.g., Herman v. RSR Security Services Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999); *Garcia,* 2011 WL 135009, at *5-6. While no single factor is dispositive, courts consider whether the alleged employer had the power to hire and fire employees, supervise and control their work schedules or conditions of employment, determine their rates and methods of payment, or maintain their employment records. *See, e.g., Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984); *Garcia,* 2011 WL 135009, at *6.

**B.   THE MARCEL'S TIP POOL QUALIFIES FOR THE TIP CREDIT**

The operation of the Marcel's tip pool undisputedly qualifies for the tip credit. Plaintiffs'

contentions to the contrary, particularly with regard to Mr. Kebaier's participation in the tip pool, are simply not supported by the evidence. Plaintiffs do not otherwise allege (nor could they in light of the evidence) that they did not make enough in tips for Defendants to qualify for the tip credit, or that Defendants' recordkeeping was inadequate.[11] Accordingly, their claims regarding the operation of the tip pool must be rejected.

### 1.    ALL THE PARTICIPANTS IN THE TIP POOL ARE PROPERLY CONSIDERED TIPPED EMPLOYEES

The participants in Marcel's tip pool are the Maître d, the Captains, the food runners and the bussers. Each of these individuals is part of an occupation that customarily and regularly receives tips, and as set forth above each had more than "de minimis" interaction with customers as part of their employment. Thus, all of these employees, including Mr. Kebaier, regularly interacted with customers in connection with core restaurant functions such as seating and talking with customers, taking orders, serving, clearing tables, addressing customer requests, assisting each other in serving customers, and generally attempting to satisfy customers. While Mr. Kebaier may have had some additional duties beyond those of the Captains, his duties indisputably included considerable customer interaction. As such, he was a tipped employee whose inclusion in the tip pool was presumptively proper. *See Dole v. Continental Cuisine,* 751 F. Supp. at 800-801 (upholding participation in a tip pool by a Maître d' whose responsibilities included setting up the dining room, greeting and eating customers, serving the first drink, and assisting servers in serving customers as needed); *accord, Kilgore v. Outback Steakhouse of Florida,* 160 F.3d 294, 301-02 (6th Cir. 1998) (same as to "host" with similar duties); *Morgan,* 625 F. Supp. 2d at 653 (same as to "senior servers" with similar duties).

---

[11] In this regard, it is undisputed that hours worked were properly recorded and that every two weeks pay stubs were issued showing the total hours, including overtime, for which employees were being paid a wage. (SMF 71-73, 75-76.) Plaintiffs have also been provided with copies of their time and payroll records and have not claimed that these are inaccurate. (SMF 79-80, 88-90.)

###### 2.    MR. KEBAIER'S PARTICIPATION IN THE TIP POOL DOES NOT INVALIDATE ITS USE FOR THE TIP CREDIT

Despite the fact that Mr. Kebaier's duties otherwise qualify him as a tipped employee, Plaintiffs apparently contend that he also is a management employee who qualifies as an "employer"" and that therefore his participation in the tip pool invalidates it, at least as to the Captains, (Amended Complaint, ¶¶24, 26, 69.)[12] Contrary to their assertion, however, Mr. Kebaier is not a management employee. He has no authority to hire, fire, control work schedules or conditions of employments, or determine rates and methods of payments, and does not maintain employment records. Rather, this authority rests with the General Manager, Mr. Burke; the Sommelier; the Executive Chef de Cuisine; and/or Chef Wiedmaier. The same group also determines staffing needs both in general and on a particular shift, and makes the decision on whether extra amounts from the share of the Maître d' and Captains should be allocated to individual food runners and/or bussers. Mr. Kebaier's involvement in the operation of the tip pool is limited to two essentially clerical functions: (1) printing out a summary receipt of all sales for the day and transmitting this to the office, along with copies of each individual Captain's summary receipt and closed sales checks and the "Marcel's Daily Tip Sheet," which lists all the service employees and on which he (or his substitute) indicates who worked that night and any special instructions approved by management for distribution of certain charged tips, *i.e.,* extra payments for food runners and/or bussers and payments the customer specifically has directed be made to certain individuals; and (2) distributing the tip money in cash every Friday based on an Excel spreadsheet prepared by the office. (SMF 106-09, 127-29.)

---

[12] The Amended Complaint makes reference to Mr. Burke, who concededly is a manager, also receiving money from the tip pool. (Amended Complaint ¶24.) It is undisputed, however, that although this was true during the first few years the restaurant was open, as a consequence of a prior investigation by the D.C. Department of Employment Services, Marcel's ended this practices and Mr. Burke has not participated in the tip pool since well before the relevant period, which as noted above begins at its earliest on January 29, 2007. (SMF 137-40.)

Defendants anticipate that Plaintiffs will contend that there is evidence that Mr. Kebaier hired and terminated employees. However, as set forth in the SMF, the evidence as to hiring shows at most only that on occasion Mr. Kebaier interviews applicants for service positions, takes applications, and informs individuals that they are hired, but that in all cases Mr. Burke makes the decision to hire. Similarly, as to discipline and termination, the evidence shows only that Mr. Kebaier may inform employees of, and/or witness, discipline and termination, or advise them that if they engage in certain actions (such as not coming to work as scheduled) they may be subject to termination, but does not make the decision to do so. That authority is reserved to Mr. Burke, the Sommelier, the Executive Chef de Cuisine and/or Chef Wiedmaier. (SMF 21-23, 41-44, 46-47, 56-70.) There is no evidence that Mr. Kebaier actually had authority to hire, discipline or terminate; indeed, Plaintiff Chabar conceded as much. (SMF 59.) As the court in *Garcia* stated in response to a similar argument that so-called captains, whose duties in that case were similar to those of Mr. Kebaier, had the authority to hire and fire:

> Plaintiff's assertions to the contrary, which are based solely on their interactions with [Mr. Kebaier] rather than any personal knowledge of [Marcel's] decision-making process, are too speculative to frame genuine issues of material fact as to [Mr. Kebaier's] possession or exercise of management authority.

*Garcia,* 2011 WL 1350009, at *7. In other words, whatever individual Plaintiffs may have believed was Mr. Kebaier's authority is irrelevant; rather, what is relevant is his actual authority, of which they had no personal knowledge.

Moreover, the ultimate question facing the court in the "economic reality" inquiry is whether the individual had both "supervisory authority over the complaining employee" and is also "responsible in whole or part for the alleged FLSA violation." *Riordan v. Kempiners*, 831 F. 2d 690, 694 (7th Cir. 1987). *Accord, Rudy v. Consolidated Restaurant Companies, Inc.*, No. 3:08-CV-0904-L (BF), 2010 WL 3565418, at *5-6 (N.D. Tex. Aug. 18, 2010), *citing Donovan v.*

24

*Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984), and *Riordan*; *Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 715-16 (N.D. Ind. 1998); *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ind. 1991). *See also Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) (FLSA's broad definition should not be taken literally because "it would make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees"); *Baird v. Kessler*, 172 F. Supp. 2d 1305, 1311-12 (E.D. Cal. 2001) ("Congress could not have intended to hold individuals personally liable for alleged violations of the FLSA when those individuals cannot even control crucial aspects of the work environment such as when paychecks will issue, how many employees are necessary and whether or not more employees could be hired"); *Dole v. Continental Cuisine, Inc.,* 751 F. Supp. at 802 (rejecting argument that "any person who has any supervisory duties over other employees, no matter how minimal, becomes an 'employer" within the meaning of the FLSA").

There is no evidence that Mr. Kebaier had any authority over the rate or method of payment or the establishment and operation of the tip pool system. To the contrary, the tip pool system was established by Mr. Burke and Chef Wiedmaier. Any allocations of additional amounts to food runners or bussers from the share of the Maître d'/Captains had to be approved by Mr. Burke. Mr. Kebaier's involvement in maintaining employer records was limited to clerical duties such as printing out the summary receipt of all sales for the day and transmitting this to the office with the daily tip sheet and noting on that sheet who worked that day and any approved special allocations. Accordingly, even if he could be found to have some supervisory authority, it was not sufficient to find him to be an "employer" within the meaning of the FLSA or the DCMWA. *See, e.g., Hernandez,* 2006 WL 1993552, at *2-3 (supervisor not an "employer" although he could hire and had some control over work schedules but did not determine the rate

or method of payment and only performed clerical duties related to employment records); *Morgan*, 625 F. Supp. 2d at 653 (senior servers who exercised some control over employees but did not determine rate or method of employee payment, or maintain employment records beyond certain clerical duties, were not employers under the FLSA).

### 3.   THE TIP POOL IS OTHERWISE PROPERLY ADMINISTERED

Although Plaintiffs' primary contention appears to be that the tip pool is invalid because of Mr. Kebaier's participation, it appears from their general allegations that they may also contend that the tip pool is otherwise improperly operated. (*See, e.g.*, Amended Complaint ¶69.) This contention is without any evidentiary support. To the contrary, the manner in which the tip pool is divided and distributed is unquestionably proper.

First, it is well-established that before distributing a tip pool created through credit card tips, the employer may deduct the service charge imposed by the credit card company. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 553-556 (6th Cir. 1999); Wage and Hour Opinion Letter FLSA-2006-1, Wage Hour Manual (BNA) 99:8554 (Jan. 13, 2006); Wage and Hour Opinion Letter WH-410, Wage Hour Manual (BNA) (March 28, 1977). Indeed, Plaintiff Arencibia has conceded that he has no issue with the 3.5% taken out for the credit card fees and that this was explained to the service staff. (SMF 96.)

Second, the separate deduction for the bartender is proper because he is only entitled to receive those tips and service charges that were charged to the receipts for customers he directly serves. In other words, the bartender does not participate in the tip pool and instead receives only his own tips. The fact that this deduction is taken from the entire amount of credit card tips is irrelevant; the amount deducted is still only the amount that was left on his checks.

Third, any contention the Plaintiffs now may attempt to make that the tip pool somehow is invalid because the Director of Sales receives a payment of 3% of the net sales (including a

mandatory 20% service charge) on a private party check, and because this amount is paid from the service charge prior to distribution of the remainder of the service charge to the service employees through the tip pool, would be wholly unfounded.[13] Customers are informed, when they ask, and the service staff is well aware, that Ms. Albert receives part of the 20% service charge as a commission and that it is only the remainder that constitutes a gratuity for the service staff. All of this gratuity portion (less the 3.5% credit card service charge) goes to the tip pool. Thus, all of the gratuity portion goes to the service staff. Furthermore, Ms. Albert has no managerial authority. Thus, Defendants keep none of the service charge for themselves. Private party customers also are informed that they may leave an additional tip beyond the 20% should they so desire, or, like all customers, may direct additional tip money to specific individuals.[14]

Fourth, there is no question that the general 70%-30% split between the Maître d'/Captains and the food runners and bussers is proper. There are no restrictions on how the money in a tip pool may be allocated among the eligible participants, so long as the participants receive enough to make up the difference between the tip credit wage of $2.77 per hour and the regular minimum wage. For the same reason, the fact that additional amounts may from time to time be given to some of the food runners or bussers from the share of the Maître d' and Captains is irrelevant to the validity of the tip pool.

Fifth, there is nothing improper about the manner in which the employees actually received their tips. As set forth above, every Friday each service employee received cash

---

[13] Plaintiffs made no such contention in the Amended Complaint and did not suggest any problem with this procedure in discovery, and therefore should be barred from now raising it. See part IV(B)(4), below. However, Defendants suspect from certain post-discovery discussions that Plaintiffs now may attempt to make such a contention, so it is addressed here as a matter of precaution, without waiving the position that it is untimely raised.

[14] Even if the payment of the commission of the Director of Sales' from the service charge did invalidate the operation of the tip pool, which Defendants emphatically deny, it would only do so on the occasions on which she received this payment.

representing his share of the tip pool for the week ending the previous Sunday. Usually this was by an envelope bearing the employee's name and the amount, although at times it was simply counted out directly. In either event, the employee always knew the amount of tip money he was receiving and the week in which he earned it. Moreover, when he received his biweekly paycheck, the amount of tips paid out for the relevant two week period also was reflected on his pay stub. This provided further written evidence of the amount of tip money paid and demonstrates that at all relevant times the employees received enough tip money to meet the requirements of the tip credit.[15] There is nothing in the law that requires that employees receive their tip money each day or any faster than they way in which Marcel's paid it. To the contrary, the DOL has indicated that credit card tips due an employee need only be paid no later than the regular pay day. *See* Wage and Hour Opinion Letter WH-410, *supra.*

Sixth, it is irrelevant that certain additional tip money – normally amounts that a customer specifically requests be paid directly to particular individuals such as the Captain assigned to the customer's table, or the Sommelier, or the Maître d' – is distributed to those individuals before the remaining portion of the credit card tips is split. By definition these tips are not part of the general pool to be shared by all the service personnel working a given shift. Distributing these amounts directly to the designated person(s) is merely fulfilling the request of the customer. Similarly, the fact that on occasion the recipient of one of these directed amounts that are not part of the tip pool may decide to share this tip with others, including the bartender or kitchen staff, in no way affects the validity of the operation of the tip pool.

Finally, it also is irrelevant that tips left in the form of physical cash, other than mandatory service charges, are not included in the tip pool. There is no requirement that all tips

---

[15] Tipped employees also easily could compare the cash amounts of tips received with the number reflected on their pay stub to make sure there were no discrepancies in that regard.

received must go into a tip pool; indeed, there are a number of reported cases in which service staff was only required to contribute a portion of received tips into a tip pool, yet the tip pool was found lawful. *See, e.g., Kilgore,* 160 F.3d at 296-97, 302-04 (37.5%); *Dole v. Continental Cuisine,* 751 F. Supp. at 801 (40% of tips to tip pool).[16] Nor is there any requirement that such cash tips be shared with anyone, although as noted above Marcel's does encourage the individual Maître d' and Captains to share such cash tips with others involved in providing service to the table. It likewise is irrelevant that Marcel's does not track the payment of cash tips unless reported by the employee, as it does not rely on such tips to fulfill the tip credit.

Accordingly, based on the undisputed facts, as a matter of law there is no basis for finding any impropriety in the manner in which the tip pool is calculated and distributed.

### 4.   TO THE EXTENT THE ISSUE IS PROPERLY RAISED, THE SERVICE EMPLOYEES HAD PROPER NOTICE OF THE TIP POOL

Nowhere in their Amended Complaint do the Plaintiffs assert that they had no notice that a tip credit was being claimed, much less that the tip pool system was invalid due to a lack of proper notice. Rather, their allegations are directed either toward the allegedly invalid operation of the tip pool by, *e.g.*, improper participation in the tip pool by Mr. Kebaier, alleged lack of transparency in the operation of the tip pool and allegedly inaccurate records. (*See* Amended Complaint ¶¶1-2, 4, 24-37, 58-59, 66-69.) Accordingly, they should be barred from now attempting to assert a lack of proper notice. It is improper to assert in summary judgment new theories of liability that were not raised in the Amended Complaint. *See Paul v. Judicial Watch, Inc.,* 543 F. Supp. 2d 1, 10 (D.D.C. 2008) (refusing to consider acts denoting a continuing

---

[16] Indeed, the DOL previously contended that contributions in excess of 15% of tips or 2% of daily gross sales were improper, a contention rejected by the courts, *see Kilgore*, 160 F.3d at 302-03, and recently abandoned by the DOL in issuing its new rules. *See* 76 Fed. Reg. at 18,844-45 and revised 29 C.F.R. §531.54 (as amended May 5, 2011.)

violation first raised in opposition to a motion to dismiss); *Baloch v. Norton*, 355 F. Supp. 2d 246, 261 (D.D.C. 2005) and cases cited therein (claims "not raised in compliant not properly before the Court.)

However, based on certain questions asked in depositions, it appears Plaintiffs may attempt belatedly to raise this issue. However, even assuming, solely *arguendo*, that they are not barred from asserting that they did not have notice that the tip credit was being claimed, such an assertion is entirely without foundation. First, as noted above, posters outlining the requirements of the FLSA and DCMWA at all relevant times were posted on a cork board where all employee-related material is posted. The FLSA poster included a reference to the requirement that tipped employees must receive a cash wage of at least $2.13 per hour and that the total of tips plus the cash wage must equal the minimum hourly wage. Similarly, the DCMWA poster included a reference to the requirement that tipped employee receive a "service rate" of $2.77 and that the total of tips plus the service rate must equal the minimum wage. Notice by way of a poster is sufficient. *Davis v. B & S Inc.,* 38 F. Supp. 2d 707, 718-19 (N.D. Ind. 1998).

Second, every service employee received not only weekly tips in cash, but also a bi-weekly pay check containing a statement of the wages paid as well as the tips paid for the relevant two week period, with taxes deducted from the wages paid based on the total amount of wages and tips paid. This demonstrated that the employee's total wages consisted of both the hourly rate plus tips.

Third, it is undisputed that the Plaintiffs admittedly knew that they were receiving an hourly wage plus tips from a pool, whether by being told at hire, by other employees, by posters, or by receiving their tips and paychecks. (SMF 91-102.)  Indeed, this was regularly explained to them, including the 3.5% credit card charge deduction. (*Id.*) It is irrelevant that employees may

not have been informed of the details of how the system worked, or did not learn of the tip credit directly from management; the law only requires that they be in some way informed that tips will be satisfying part of the employer's minimum wage obligation. *See Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d at 298 (details not required); *Davis,* 38 F. Supp. 2d at 718-19 (notice conveyed by co-worker or by written materials, including DOL poster, sufficient); *Morgan*, 625 F. Supp. 2d at 654 (details not required and written materials sufficient).[17]

### C.  PLAINTIFF HAVE NO BASIS FOR CLAIMING ANY UNPAID OVERTIME

As noted above, Plaintiffs do not dispute that hours worked were properly recorded and that every two weeks pay stubs were issued showing the total hours, including overtime, for which employees were being paid a wage. They also have been provided with copies of their time and payroll records and have not claimed that these are inaccurate. To the contrary, Plaintiffs Arencibia, Guerch and Parra each conceded that they have no basis for contending there were any errors in the overtime they were paid, and Plaintiff Parra expressly disclaimed any claim for unpaid overtime. (SMF 88-90.) Accordingly, Plaintiffs have no basis for claiming that there are any overtime hours for which they have not been paid.[18] Further, it is undisputed that all overtime was paid at the rate of time and one-half the applicable minimum wage, less, in the case of Captains and bussers, the amount of the tip credit. Only if the tip pool is found improper for purposes of the tip credit do any Plaintiffs have any claim for unpaid overtime, and then, as discussed below, only for the same amount of tip credit taken for straight time. Accordingly, Plaintiffs' claims for allegedly unpaid overtime are without merit.

---

[17] As noted above, recently promulgated regulations that for the first time require more detailed notice do not apply to this case.

[18] In addition, as discussed below, Plaintiff Martinez never worked any overtime at all during the relevant period.

## V.   RECOVERY UNDER THE FLSA AND DCMWA IS LIMITED TO THE DIFFERENCE BETWEEN THE WAGE PAID AND THE REGULAR MINIMUM WAGE

Assuming, *arguendo,* that the Court finds insufficient basis to enter summary judgment against Plaintiffs on their claim that the tip pool is invalid for the purposes of the tip credit and that as a result Defendants may not claim the tip credit, there remains an issue as to the scope of possible recovery under the FLSA and DCMWA. Although logic dictates that if the tip credit cannot be claimed, the proper recovery is the difference between the wage actually paid and the applicable minimum wage (or overtime rate), Defendants anticipate that Plaintiffs may claim that there should be a reallocation of all the tips that Mr. Kebaier received from the tip pool (and possibly the portion of the service charge that Director of Sales Julie Albert received as well). For the reasons discussed below, such a contention has no statutory support and is contrary to the recent holding in *Cumbie v. Woody Woo, Inc.,* 596 F.3d 577 (9th Cir. 2010).

In *Williams v. Jacksonville Terminal Co*., 315 U.S. 386 (1942), the U.S. Supreme Court held: "In businesses where tipping is customary, the tips, in the absence of an explicit contrary understanding, belong to the recipient. [Citations omitted.] Where, however, an arrangement is made by which the employee agrees to turn over the tips to the employer, in the absence of statutory interference, no reason is perceived for its invalidity." 315 U.S. at 397. Accordingly, the default rule is that an agreement to turn over or to redistribute tips is presumptively valid. *Cumbie*, 596 F.3d at 579. Nothing in the FLSA or the DCMWA changes this presumption.

As discussed above, 29 U.S.C. §203(m), and the DC equivalent at D.C. Code §32-1003(f)-(g), set forth the circumstances under which an employer may claim a tip credit: the employer must pay the tipped employee a cash wage of at least $2.13 ($2.77 under the DCMWA) and actual tips received must be sufficient to make up the difference between the cash wage and the minimum wage. Further, the tip credit may be taken only if the employees are

given notice and the employee is allowed to keep all the tips, except when participating in a tip pool with other customarily tipped employees. Nothing in this language states, however, that an employee <u>must</u> be allowed to retain all tips, except in the case of a "valid" tip pool involving only customarily tipped employees, <u>regardless</u> of whether the employer claims a tip credit. To the contrary, as the *Cumbie* Court noted, the plain text of the statute imposes conditions on taking the tip credit but <u>does not state freestanding requirements pertaining to all tipped employees</u>. *Cumbie*, 596 F.3d at 580-81. In other words, if a tip pool includes non-customarily tipped employees (as would be true if, as Plaintiffs assert, Mr. Kebaier was part of management), and as a consequence the tipped employees did not receive all of their tips, this only means that the tip credit is then not available. *Id.* at 581.

While, if the tip credit is not available, Defendants may then be liable to the Plaintiffs for the difference between the wage paid and the regular minimum wage, this does not mean that all money contributed to the tip pool must be paid to them. Indeed, by definition the money paid to the tip pool does not belong solely to the servers who collect it; rather, by virtue of the tipping arrangement of which all servers were aware, there was an agreement to redistribute the tips that was not barred by the FLSA. Only the tips actually given to the Plaintiffs actually belonged to them. As the Ninth Circuit stated: "The FLSA does not restrict tip pooling when no tip credit is taken. Therefore, only the tips redistributed to Cumbie from the pool ever belonged to her…" *Id.* at 582.

It is irrelevant, in this context, that in *Cumbie* the employer had not sought to take the tip credit, as it was forbidden to do under Oregon law. The effect of an "invalid" tip pool is to bar the use of the tip credit, not to bar the use of a tip pool – in effect to place an employer in the same position as if it were in a state such as Oregon that bars the tip credit. The statutory purpose

of the FLSA is to guarantee a minimum wage (and overtime payments where applicable).

Nothing in the statute creates an entitlement to tip money, certainly not tips that, as is the case

with the money in Marcel's tip pool, were not paid directly to the employee. The statute states

only that if the requirements for the tip credit are not met, then the tip credit "shall not apply." It

says nothing about who may be entitled to the money contributed to the tip pool. "If Congress

wanted to articulate a general principal that tips are the property of the employee absent a "valid"

tip pool, it could have done so without reference to the tip credit." *Id.* at 581.

      This is also consistent with the legislative history of the tip credit provisions of 29 U.S.C.

§203(m). In particular, Senate Report No. 93-690, 93rd Cong., 2d Sess. (Feb. 22, 1974), states:

> The tip provision applies on an individual employee basis, and the employer may
> thus claim the tip credit for some employees even though the employer does not
> meet the requirements of this section with respect to other employees. Nor is the
> requirement that the tipped employee retain such employee's own tips intended to
> discourage the practice of pooling, splitting or sharing tips with employees who
> customarily and regularly receive tips – *e.g.*, waiters, bellhops, waitresses,
> countermen, busboys, service bartenders, etc. On the other hand, <u>the employer
> will lose the benefit of this exception if tipped employees are required to share
> their tips with employees who do not customarily and regularly receive tips</u> – *e.g.*,
> janitors, dishwashers, chefs, laundry room attendants, etc.

*Id.* at 43 (emphasis added). Thus, under the legislative history the only consequence of pooling

tips with non-tipped employees was to be the loss of the tip credit "exception" to the duty to pay

minimum wage. Congress intended nothing with respect to the distribution of pooled tips

otherwise.

      Furthermore, Defendants have located no reported case in which a court found a tip pool

invalid for tip credit purposes because unqualified individuals participated and then held that the

FLSA <u>required</u> redistribution of the tip pool money to the qualified individuals. To the contrary,

in *Bonham v. Copper Cellar Corp.*, 476 F. Supp. 98 (E.D. Tenn. 1979), the court held that

disqualification of the tip credit meat that tips received could not be considered wages paid for

the purpose of satisfying the minimum wage, and therefore the plaintiffs were entitled to compensatory damages in the amount of the difference between wages paid and the minimum wage. 476 F. Supp. at 101-02. There was no mention of redistributing tips.[19]

Notwithstanding the above, Defendants recognize that in the Department of Labor's recently issued new regulations, the DOL has asserted that "tips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA." 29 C.F.R. §531.52, as amended effective May 5, 2011. With all due respect to the DOL, this Court should not give any deference to the DOL's action. Notably, the DOL has promulgated this new regulation despite the fact that in *Cumbie*, in which the Secretary of Labor filed an amicus brief, the Ninth Circuit expressly rejected this position and the arguments made to support it. Indeed, in promulgating its rule the DOL recognized that the Ninth Circuit already had rejected its position. *See* 76 Fed. Reg. at 18,841. Instead, it asserted a right to fill an alleged "gap" in the statutory scheme with a regulation implementing a policy of its choosing, not that of Congress. 76 Fed. Reg. at 18,841-42. This is largely based on the fallacious reasoning that allowing an employer to redistribute part of an employee's tips to non-tipped employees somehow <u>improperly</u> allows an employer to profit from the employee's tips to a greater extent than if the employer utilized the tip credit. *Id.* Again, the Ninth Circuit already rejected such an argument, noting that the purpose of the FLSA is to protect workers from substandard wages and oppressive working hours, *see* 29 U.S.C. §202(a), and <u>not</u> to create an additional entitlement where no tip credit is taken (or, in the present case, allegedly cannot be taken): "Absent an ambiguity or an irreconcilable conflict with

---

[19] Notably, in New York – unlike the District of Columbia or under the FLSA – the law specifically bars an employer from keeping any portion of an employee's tips or gratuities, regardless of whether or not the tip credit is claimed. NY Labor Law §196-d. Accordingly, in New York cases involving an invalid tip pool, under state law plaintiffs can recover these amounts. *See, e.g., Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 313843, at *17-19, 25 (S.D.N.Y. Feb. 1, 2007). Certainly had Congress wished to impose the same requirement under the FLSA, it could have done so expressly.

another statutory provision, 'we will not alter the text in order to satisfy the policy preferences' of Cumbie and amici [including the DOL]." *Cumbie*, 596 F.3d at 583, *citing Barnhart v. Signmon Coal Co.*, 534 U.S. 438, 462 (2002).

Quite clearly, the DOL is attempting to aggregate to itself the responsibility of Congress. In these circumstances its new regulation is due no deference, particularly in the present case where none of the tip pool money was allocated to general revenue. Alternatively, as the new regulation quite clearly represents a change in the law, it cannot be applied retroactively to the events in this case. *See generally National Mining Ass'n v. Dep't of Labor,* 292 F.3d 849, 859-60 (D.C. Cir. 2002) (retroactive rules may not be promulgated absent express congressional authority, and a rule is retroactive if it creates a new obligation, imposes a new duty or attaches a new disability with respect to past actions, *e.g.,* attaches new legal consequences to events completed before its enactment).

Accordingly, it is evident that even if it is somehow found that Defendants were not entitled to take the tip credit, their sole obligation under the FLSA and the DCMWA is to pay the Plaintiffs the full minimum wage to which they would have been entitled in the absence of a tip credit, and not to pay them some additional amount in tips that were redistributed through the tip pool.[20] In other words, Plaintiffs would not be entitled to any reallocation of money paid from the tip pool to Mr. Kebaier. Accordingly, to the extent summary judgment is not otherwise entered against Plaintiffs on the FLSA and DCMWA claims, partial summary judgment should be entered limiting any recovery to the amount of the tip credit taken.[21]

---

[20] As the overtime rate paid to the Plaintiff for work in excess of 40 hours per week was the equivalent of time and one-half the minimum wage, less the claimed tip credit, the only amount that would be due them for such overtime hours would be the amount claimed as the tip credit for those hours.

[21] Moreover, even assuming, *arguendo*, that reallocation of tips were a proper remedy, (1) only those tips Mr. Kebaier received from the pool would be subject to reallocation, not any additional amounts that he received as directed payments from customers or from others who shared with him a portion of such directed payments; (2) as

## VI.   PLAINTIFFS CANNOT RECOVER ANY AMOUNTS UNDER THE DCWPCL

Plaintiffs also appear to seek to recover unpaid wages under the DCWPCL, which requires employers to pay employees all wages earned at least twice a month on regular designated paydays, and provides a cause of action for employees to recover "unpaid wages." D.C. Code §32-1302 and §32-1308; *Fundali v. Pivotal Corp.*, 310 F. Supp. 2d 22, 26 (D.D.C. 2004).

As discussed above with respect to Plaintiffs' FLSA and DCMWA claims, the tip pool was valid and Plaintiffs properly received all amounts due them. Accordingly, they are owed no wages. For this reason alone there is no basis for them to have any recovery under the DCWPCL.

Moreover, even assuming, solely *arguendo*, that the tip pool was not valid for tip credit purposes and that as a result Plaintiffs under the FLSA and/or DCMWA are owed additional wages beyond those already paid, they still cannot recover under the DCWPCL. D.C. Code §32-1304 expressly provides that, when there is a bona fide dispute over the <u>amount</u> of wages owed, an employer may comply with the wage payment requirements of the DCWPCL by notifying the employee of the amount of wages which he concedes to be due and paying this undisputed amount within the time required. Specifically, "[p]ayment in accordance with this subsection shall constitute payment for the purposes of complying with §§32-1302 and 32-1303." If these requirements are fulfilled, then the employee has no claim under the DCWPCL. *See Fudali v.*

---

his pool tips were part of the share of the Maître d' and Captains, none of these tips are subject to reallocation to food runners or bussers, and thus only a Plaintiff who was a Captain – *i.e.*, after dismissal of Mr. Pazhwak, only Mr. Arencibia – would receive any such reallocation; and (3) a Plaintiff who was a Captain would only be entitled to receive a <u>share</u> of any reallocation and only for shifts that he worked, *e.g.*, if he was one of four Captains who worked with Mr. Kebaier on a given night, he would only be entitled to one-fourth of the pool tips given to Mr. Kebaier for that night, and if he did not work at all, he would be entitled to nothing. This is because under the tip pool system, a service employee is only entitled to a share of the tips for a shift that he worked. *See Chan*, 2007 WL 313483 at 25-27 (awarding each plaintiff his or her share of improperly retained tips based on formula that takes into account number of shares per night and dates plaintiffs worked).

*Pivotal*, 310 F. Supp. 2d at 26-29.

There is no question that, at least from the Defendants' perspective, there is a bona fide dispute over whether additional amounts are due the Plaintiffs. As discussed above, the tip pool system at issue was created precisely in an effort to comply with the requirements for the valid operation of a tip pool; indeed, it was done with guidance from the DC DOES. (SMF 139-40.) In contrast to the prior situation in which a conceded manager had participated in the pool, all those included in the tip pool were intended to be non-management. If the tip pool is now to be found to be invalid, it will be solely because management was wrong in believing that Mr. Kebaier's duties did not make him a member of management and permitted him to participate in the tip pool.[22] There is simply no evidence that management's belief in this regard was anything but bona fide. Furthermore, it is undisputed that the Plaintiffs received all amounts conceded to be due, *i.e.* the applicable minimum wage and tips sufficient to constitute the required tip credit, as well as their additional shares in the tip pool. They also received written notice that they were receiving these amounts, in the form of their bi-weekly pay statements showing wages and their share of credit card tips, as well as weekly envelopes containing their names and the amount of cash being given to them as their share of credit card tips.

As there was a bona fide dispute concerning the amount of wages due and the amount conceded due was provided to the employees in writing, the safe harbor of DC Code §32-1304 applies and Plaintiffs cannot obtain any recovery under the DCWPCL. *Fudali v. Pivotal*, 310 F. Supp. 2d at 26-29.

## VII.   THERE IS NO BASIS FOR ANY CLAIM BY PLAINTIFF MARTINEZ

Assuming, solely *arguendo*, that the tip pool is somehow found invalid for the purposes

---

[22] The same is true if the tip pool is to be found invalid for tip credit purposes because of the payments made to the Sales Manager from the mandatory service charge imposed on group functions.

of taking the tip credit, and/or that there can be recovery under the DCWPCL for tips beyond

those already paid, there nonetheless is no basis for any claim by Plaintiff Martinez under the

FLSA, DCMWA or the DCWPCL. It is undisputed that at all relevant times Mr. Martinez was

paid at the rate of $12.00 per hour, which was substantially more than the minimum wage. (SMF

141-42.) Consequently, as to him no tip credit needed to be taken. Therefore as to Mr. Martinez

it is entirely irrelevant whether or not the tip pool was valid for the purposes of taking the tip

credit.[23] See *Cumbie, supra*. It also is undisputed that during the relevant period there was no

week in which Mr. Martinez worked more than 40 hours. (SMF 143.) Therefore, there can be no

week for which any overtime pay is due him. Consequently, in the alternative all claims by Mr.

Martinez should be dismissed and judgment entered in favor of Defendants and against him.

## VIII.   PLAINTIFF ARENCIBIA CANNOT ESTABLISH A CLAIM OF RETALIATION UNDER THE FLSA

Plaintiff Arencibia's allegation that he was terminated in retaliation for seeking to enforce

his rights under the FLSA is entirely unsupported, and indeed is contrary to his own testimony.

Even if one accepts for purposes of this motion that Arencibia was discharged and did not quit,

he cannot establish that the motivation for any such alleged discharge was unlawful retaliation.

In order to establish a retaliation claim, a plaintiff must first establish a prima facie case

by showing (1) that he engaged in protected activity of which defendants were aware; (2) that

defendants took adverse employment action against him; and (3) that a causal connection exists

between the protected activity and the adverse action. *See Cooke v. Rosenker*, 601 F. Supp. 2d

64, 72 (D.D.C. 2009); *Caryck v. Coupe*, 663 F. Supp. 1243, 1253 (D.D.C. 1987). Defendants

may rebut this prima facie case by articulating legitimate, non-retaliatory reasons for the adverse

---

[23] This is true even assuming, solely *arguendo,* both (1) the tip pool was invalid for tip credit purposes and (2) as a remedy, money paid from the tip pool to Mr. Kebaier should be reallocated. As Mr. Kebaier received a Captain's share, therefore such reallocation would only increase the amounts due to the Captains, not the amount due food runners and bussers. *See* part V, above.

action. A plaintiff then bears the ultimate burden of proving retaliation by showing that that defendants' proffered reasons are pretextual. He must demonstrate that his engaging in the protected activity was the "motivating part" in the employer's adverse action against him. *Cooke*, 601 F. Supp. 2d at 73-74; *Caryck,* 663 F. Supp. at 1254.

For the reasons stated below: (a) Plaintiff Arencibia cannot establish a prima facie case; (b) even if he could establish a prima facie case, Defendants have shown legitimate non-retaliatory reasons for his termination; and (c) Plaintiff Arencibia cannot show that these reasons are a pretext for unlawful retaliation. Accordingly, the retaliation claim should be dismissed.

## A.    PLAINTIFF ARENCIBIA CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATION UNDER THE FLSA

The FLSA makes it unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. *See* 29 U.S.C. §215(a)(3). Furthermore, even though an informal complaint is protected, such a complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp*., 131 S.Ct. 1325, 1335 (2011). Accordingly, the employee must in some way file or threaten to file an action adverse to the employer, "actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed toward the assertion of rights protected by the FLSA." *See Miller v. Health Services for Children Foundation*, 630 F. Supp. 2d 44, 49 (D.D.C. 2009) (citations omitted); *accord, Kasten*, 131 S. Ct. at 1335.

As an initial matter, Plaintiff Arencibia cannot establish that he ever engaged in protected activity while employed by Defendants. No suit was threatened, instituted or caused to be

instituted until long after his employment at Marcel's ended. The Amended Complaint alleges only that he "questioned the tip <u>calculations</u>" (Amended Complaint, ¶35) (emphasis added), not that he complained that the tip pool was improperly operated for the purposes of claiming the tip credit. Similarly, the undisputed facts show that he and others allegedly complained – throughout the entire course of his employment – about not knowing <u>how much</u> he/they made in tips on each evening or about <u>how</u> the tips were broken down to reach the final number, and that the system was in some way "unfair" (SMF 48-51). This in no way establishes that he complained the tip system was unlawful or that he was otherwise asserting rights under the FLSA. As noted, there is no requirement that tipped employees be informed of their tip earnings each night or how tips in a tip pool are broken down to reach the final numbers. Accordingly, complaints in this regard did not assert rights under the FLSA. A general complaint of unfairness similarly is simply too amorphous to put an employer on notice of an assertion of rights under the FLSA.

Assuming, solely *arguendo*, that there is sufficient evidence Plaintiff Arencibia made an oral complaint protected by the FLSA,[24] there is no evidence of a causal connection between such alleged longstanding complaints and his alleged discharge.[25]

First, there is no evidence of differential treatment of anyone similarly situated who did not allegedly engage in protected activity. To the contrary, although Plaintiff Arencibia asserts that all the employees complained about the lack of a daily breakdown of the tip distribution (SMF 51), there is no evidence anyone else suffered any adverse consequences for doing so. Second, Plaintiff Arencibia identified a number of incidents in the days before his alleged

---

[24] The U.S. Supreme Court in *Kasten* explicitly left open the question of whether an oral complaint made to an employer rather than an outside agency is protected. *Kasten*, 131 S. Ct. at 1336. Accordingly, while Defendants do not contest for the purposes of the instant motion that such internal complaints may be protected, they expressly reserve the right to argue otherwise should their motion not be granted.

[25] Should their motion not be granted, Defendants reserve the right to present evidence and argue that Plaintiff Arencibia was not terminated by Defendant and that he in fact resigned his position.

discharge that caused the discharge, none of which related to FLSA-protected activity. Indeed, the mere fact that he allegedly had made these complaints for years without any negative consequences indicates a lack of animus for making them. In particular, there is no evidence that Chef Wiedmaier had any animus toward him for this reason (as opposed to the other reasons discussed below), or even knew of these alleged complaints.

Third, to the extent one considers temporal proximity to determine the reason for a discharge, that analysis leads to the conclusion that Plaintiff Arencibia was discharged for events occurring in the prior two weeks, not for his longstanding inquiries related to tip calculations. To the extent temporal proximity may sometimes be sufficient to establish the requisite causal connection for a retaliation claim, the proximity must be "very close," and even three to four months has often been held insufficient. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing with approval cases holding that gaps of only three and four months between the protected activity and the alleged retaliatory action were too far apart to support an inference of causation); *Mayers v. Laborers' Health & Safety Fund of North America*, 478 F.3d 364, 369 (D.C. Cir. 2007) (acknowledging *Clark*'s holding and finding that an eight to nine month gap could not establish causation in a retaliation context). Indeed, this legal conclusion is based on common sense: it is inherently incredible that if Defendants wished to retaliate against Plaintiff Arencibia for longstanding complaints about alleged FLSA violations, even if he did so repeatedly, they would have waited months, if not years, before taking any action. There also is no evidence that he made any such complaint between September 8 and September 17, much less that Chef Wiedmaier was aware that he did so. *See also McDermott v. Continental Airlines, Inc.*, No 2:06-cv-0785, 2008 WL 1766892, at *15 (S.D. Ohio April 11, 2008), *aff'd* 339 F. App'x 552 (6th Cir. 2009) (mere fact of numerous complaints over three year period insufficient proof of

causation where no complaint made close enough in temporal proximity to infer a causal link, and no evidence of retaliatory animus arising out of complaints; to contrary, it suggests complaints were tolerated and not the cause of termination, else he would have been terminated sooner); *Wang v. Metropolitan Life Ins. Co.*, 34 F. Supp. 2d 853, 869-70 (D. Md. 2004) (temporal proximity alone insufficient to establish causal connection where Plaintiff made numerous another prior formal complaint and numerous informal complaints.)

Finally, there is no evidence of any connection between the issues for which Plaintiff himself states he was terminated – his request for a family meal and/or breaks before the restaurant opened and/or his speaking in Spanish to another employee – and his alleged protected activity. To the contrary, at his unemployment hearing he admitted in sworn testimony that the reason Chef Wiedmaier became mad at him was because he requested the family meal or a break and that he knew after this that Defendants were looking to fire him. (SMF 170-73.) He cannot be heard to speculate a different reason now.

Accordingly, Plaintiff Arencibia cannot establish a prima facie case of retaliation under the FLSA.

**B.      AS PLAINTIFF HAS ADMITTED LEGITIMATE NONDISCRIMINATORY REASONS FOR TERMINATING HIM, HE CANNOT SHOW THAT THOSE REASONS ARE PRETEXTUAL**

Aside from Plaintiff's inability to establish a prima facie case, it is indisputable that Plaintiff Arencibia has himself established legitimate, nondiscriminatory reasons for his alleged termination, as set forth above and in the SMF: specifically, that Chef Wiedmaier became angry at him because he requested a family meal or a break for sandwiches at the September 8, 2008 meeting at which the Captains were told that they would have to come in earlier to iron

43

tablecloths, and perhaps also for speaking Spanish during working time.[26] There is nothing unlawful about wanting to terminate someone because they make a request for a family meal or break for sandwiches. Nor, for that matter, is it unlawful to terminate an employee for violating a non-discriminatorily applied rule requiring employees to speak only English during working time, *see, e.g.*, *Long v. First Union Corp. of Virginia,* 894 F. Supp. 933 (E.D. Va. 1995), *aff'd per curiam,* 86 F.3d 1151 (4th Cir. 1996) (table), and in any event Plaintiff has not brought any claim that such a rule was unlawful. In this regard it is irrelevant that Plaintiffs may argue, or even that the Court may feel, that these were insufficient reasons to terminate Plaintiff Arencibia. Plaintiff Arencibia was an employee at-will who could be terminated for any reason or no reason at all, so long as it was not for a reason prohibited by law. This Court does not sit as a super-personnel department that reexamines an entity's business decision. *Fischbach v. District of Columbia Department of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996)

Plaintiff, having testified that this was the reason for his alleged termination, and also having obtained a ruling in his unemployment compensation proceeding that he was terminated because Chef Wiedmaier became angry at him following the discussion concerning have a meal or a meal break, cannot now contend that this reason is pretextual. To do so would require him to present new testimony that his prior testimony was false. A party cannot avoid summary judgment by presenting a declaration that contradicts his prior testimony. *See, e.g., Globalaw Limited v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 8-9 (D.D.C. 2006) (Kollar-Kotelly, J.) and cases cited therein. In addition, as already noted, there is nothing to connect his asserted long-term and regular complaints about the failure to provide detailed calculations of tips with

---

[26] For the purposes of this motion, Defendants do not dispute Plaintiff Arencibia's account of the events leading to this departure from Marcel's. However, in the event their motion is not granted, they reserve the right to do so, in particular to present evidence that Plaintiff Arencibia was not fired, but rather voluntarily quit.

the alleged decision to terminate him in September 2008. There also is no evidence of any animus toward him for making those complaints; indeed there is no evidence that Chef Wiedmaier – who Plaintiff Arencibia asserts made the decision to terminate him – even had knowledge of those complaints. Under these circumstances no reasonable jury could find the reasons articulated by Plaintiff Arencibia himself for his termination were a pretext for retaliation. To find otherwise would require the jury to ignore not only Plaintiff Arencibia's testimony, but also that of the witnesses he called at his unemployment hearing, Captains Delony and Gonzalez.

Accordingly, Plaintiff Arencibia cannot establish that he was terminated in retaliation for engaging in activity protected by the FLSA, and his claim in that regard should be dismissed.

## IX.   <u>CONCLUSION</u>

For the reasons stated above, and based on the accompanying SMF and the record as a whole, Plaintiffs cannot establish their claims for unpaid wages or overtime, and Plaintiff Arencibia cannot establish his claim of retaliatory discharge. Accordingly, Defendants respectfully submit that no genuine issues of material fact exist to be tried with respect to Plaintiffs' claims, and that they are entitled to judgment as a matter of law.

Respectfully submitted,


_____/s/ Brian Steinbach_____
Frank C. Morris, Jr., Bar No. 211482
Brian Steinbach, Bar No. 256727
Epstein, Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendants, 2401 Restaurant
Corporation, d/b/a Marcel's Restaurant, and
DATED: June 3, 2011                    Robert Wiedmaier, individually

45

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Memorandum in Support of Defendants' Motion for Summary Judgment was served this 3rd day of June, 2011, by electronic service, on the following:

> Denise M. Clark, Bar No. 424080
> 1250 Connecticut Ave., NW
> Suite 220
> Washington, DC 20036
>  (202) 293-0015
>
> Attorney for Plaintiffs,
> Freddie Gonzales Arencibia, *et al*.

> _____/s Brian Steinbach_____
> Brian Steinbach

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FREDDY GONZALES ARENCIBIA,** *et al.*,

**Plaintiffs,**

*v.*

**2401 RESTAURANT CORPORATION
d/b/a/ MARCEL'S RESTAURANT,** *et al*.,

**Defendants.**

No. 1:09-cv-00165-CKK-DAR

### STATEMENT OF MATERIAL FACTS AS TO
### WHICH THERE IS NO GENUINE ISSUE

Frank C. Morris, Jr., Bar No. 211482
Brian Steinbach, Bar No. 256727
Epstein, Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendants,
2401 Restaurant Corporation, d/b/a Marcel's
Restaurant, and Robert Wiedmaier, individually

DATED: June 3, 2011

## TABLE OF CONTENTS

A.    THE PARTIES ................................................................................................. 1

B.    BASIC OPERATION OF THE RESTAURANT ............................................................ 3

C.    DUTIES OF THE CAPTAINS, FOOD RUNNERS AND BUSSERS............................ 4

D.    DUTIES AND AUTHORITY OF THE MAÎTRE D' .................................................... 5

E.    FACTS REGARDING THE HIRING AND TERMINATION OF PLAINTIFFS ........ 8

F.    PAYROLL SYSTEM BASICS ...................................................................................... 10

G.    OVERTIME FOR TIPPED EMPLOYEES ................................................................. 12

H.    NOTICE OF THE TIP POOL ....................................................................................... 13

I.    THE OPERATION OF THE TIP POOL ....................................................................... 14

J.    SPECIFIC FACTS PERTAINING TO MARTINEZ CLAIM ...................................... 21

K.    SPECIFIC FACTS REGARDING ARENCIBIA RETALIATION CLAIM ................ 21

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7(h)(1), Defendants 2401 Restaurant Corporation d/b/a Marcel's

Restaurant ("Marcel's) and Robert Wiedmaier ("Wiedmaier"), hereby submit this Statement of

Material Facts As To Which There Is No Genuine Issue, in support of the Motion for Summary

Judgment they have filed against Plaintiffs Freddy Gonzales Arencibia, *et al.*[1]

### A. THE PARTIES

1.      Defendant Marcel's is a fine dining restaurant located at 2401 Pennsylvania

Avenue, NW, Washington, DC. *(*Arencibia 27:4-17; Chabar 29:16-19; Parra 38:18-20; Guerch

30:9-14.)[2]

2.      Defendant Robert Wiedmaier is the principal owner of Defendant Marcel's.

(Burke 4:18-5:6; Declaration of Thomas Burke, attached as Ex. 2 ("Burke Dec.), *¶2.)*

3.      Plaintiff Freddy Gonzalez Arencibia ("Arencibia"), misidentified in the Amended

Complaint as "Freddy Gonzales Arencibia," was employed by Defendant Marcel's from August

2, 2005 through September 17, 2008. (Declaration of Lauren Nelligan, attached as Ex. 3

("Nelligan Dec."), *¶2;* Arencibia 25:7-9; 144:1-149:10.)

4.      At all relevant times, Plaintiff Arencibia was paid at the rate of $2.77 per hour,

plus tips. (Nelligan Dec. ¶3; Nelligan 9:11-10:1; Arencibia 62:6-12, 65:3-67:2 and Arencibia Ex.

6.)

---

[1] Although for the purpose of their Motion for Summary Judgment and this Statement of Material Facts Defendants treat many of Plaintiffs' factual assertions as uncontested, Defendants reserve the right to contest these factual assertions at trial should their motion be denied.

[2] Relevant excerpts from depositions and deposition exhibits and from the transcript of the hearing and subsequent decisions on Plaintiff's unemployment compensation claim cited herein are attached as Exs. A through H to the accompanying Declaration of Brian Steinbach ("Steinbach Dec."), attached as Ex. 1. Deposition testimony is cited by the surname of the deponent followed by the page and line numbers. Citations to exhibits marked in the depositions are shown as "[Name] Ex. _," followed where appropriate by reference to a specific page or pages. Unemployment Compensation hearing testimony is cited as "UC [page][line] (witness name). Finally, relevant excerpts from the Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories are attached to the Steinbach Dec. as Ex. K and are cited as "Interrogatory Response No. [#] at [page]

5.      Plaintiff Farzad C. Pazhwak ("Pazhwak"), misidentified in the Amended Complaint as "Farzad C. Pazawak" was employed by Defendant Marcel's from October 1, 2006 through November 3, 2007. (Nelligan Dec. ¶4.)

6.      At all relevant times, Plaintiff Pazhwak was paid at the rate of $2.77 per hour, plus tips. (Nelligan Dec. ¶5; Nelligan 9:11-10:1.)

7.      Plaintiff Hamid Guerch ("Guerch") was employed by Defendant Marcel's from April 23, 2007 through May 24, 2007, and from September 4, 2007 through October 11, 2007. (Nelligan Dec. ¶6; Guerch 29:3-22.)

8.      At all relevant times Plaintiff Guerch was paid at the rate of $6.15 per hour, plus tips. (Nelligan Dec. ¶6; Nelligan 9:11-10:1; Guerch 39:7-12, 44:17-22.)

9.      Plaintiff Carlos Parra ("Parra") was employed by Defendant Marcel's from October 4, 2007 through December 23, 2007. (Nelligan Dec. ¶8; Parra 34:18-23, 65:5-8.)

10.     Plaintiff Parra was paid at the rate of $7.00 per hour for the one day that he worked in his first week of employment, the week ending October 7, 2007, and thereafter was paid at the rate of $6.15 per hour, plus tips. Nelligan Dec. ¶9; Nelligan 9:11-10:1; Parra 49:3-14, 50:14-51:24.)

11.     Plaintiff Khalid Chabar ("Chabar") was employed by Defendant Marcel's from October 13, 2007 through December 19, 2007. (Nelligan Dec. ¶10; Chabar 15:3-8.)

12.     At all relevant times Plaintiff Chabar was paid at the rate of $6.15 per hour, plus tips. (Nelligan Dec. ¶11; Nelligan 9:11-10:1 Chabar 39:9-12, 41:6-7.)

13.     Opt-in Plaintiff Wilson A. Martinez ("Martinez") was employed by Defendant Marcel's from October 30, 2002 through February 8, 2007. (Nelligan Dec. ¶12.)

14.     At all relevant times opt-in Plaintiff Martinez was paid at the rate of $12.00 per hour, plus tips. (Nelligan Dec. 13.)

15.     Plaintiffs Arencibia and Pazhwak were employed as waiters, or Captains. (Nelligan Dec. ¶¶2,4; Arencibia 27:21-24.)

16.     Plaintiffs Guerch, Parr and Chabar were employed as bussers (busboys), also known as Service Attendants. (Nelligan Dec. ¶¶ 6, 8, 10; Parra 38:21-22; Burke 30:16-17; Chabar 29:14-15.)

17.     Opt-In Plaintiff Martinez was employed as a Food Runner. (Nelligan Dec. ¶12.)

## B. BASIC OPERATION OF THE RESTAURANT

18.     At all relevant times Thomas Burke was the general manager and director of operations of Marcel's. (Burke 10:17-18; UC 13:14-16, 24:7-8 (Burke); Burke Dec. ¶1.)

19.     Mr. Burke is responsible for hiring, firing, suspensions, handling emergency calls from employees, and overseeing the processing of workers' compensation claims, overseeing the maître d', sommelier and kitchen staff. (Burke 10:20-11:12; UC 19:17-19 (Burke).)

20.     Mr. Burke has no ownership interest in Marcel's. (Burke Dec. ¶3.)

21.     Decisions to hire, fire or discipline have to come to Mr. Burke, the Executive Chef de Cuisine, or Chef Wiedmaier, but Mr. Burke may tell someone to deliver the message. (Burke 17:7-20, 18:18-19:9, 44:10-15.)

22.     The Executive Sous Chef and the Sommelier also have the authority to suspend, fire and discipline on their own. (Burke 44:10-45:8; UC 19:17-19 (Burke).)

23.     Mr. Burke makes the decision to hire, even when there is a recommendation from other employees. (Burke 15:19-22.)

24.     Mr. Burke determines the hourly wage to be paid to the Maître d', Captains, runners and bussers. (Burke 72:11-72:3; Nelligan 38:14-39:5.)

3

25.     During the relevant period, the typical composition of management staff during regular afternoon/evening of operation at Marcel's consisted of one Executive Chef de Cuisine, one Executive Sous Chef, and 1 Wine Sommelier, although they did not work every day. (Interrogatory Response No. 7 at 9*;* Burke 43:16-44:2, 45:12-46:2.)

26.     In addition, prior to April 2007 General Manager Burke and Chef Wiedmaier generally were present most of the time. (Burke 41:17-43:11*;* Kebaier 45:78-12; (Burke Dec. ¶5.)

27.     Starting in approximately early May 2007, General Manager Burke was present 3-4 afternoons/evenings per week. (Burke 41:21-42:2, 43:10-15; Kebaier 45:13-46:3.)

28.     Starting in approximately late April 2007, Chef Wiedmaier was present at least 2 afternoons/evenings per week. (Burke Dec. ¶6.)

29.     During the relevant period, the service staff at the beginning of a shift normally consisted of the Maître d', and a minimum of four Captains, four bussers and one food runner, and one bartender. (Interrogatory Response No. 7 at 9; Burke 35:10-19, 28:10-14.)

30.     However, the number of Captains, bussers and food runners could vary up and down, and on Thursday, Friday and Saturday there often were as many as seven captains, five bussers, two food runners and two bartenders. (Interrogatory Response No. 7 at 9; Burke 35:10-37:3.)

### C. DUTIES OF THE CAPTAINS, FOOD RUNNERS AND BUSSERS

31.      Captains greet guests, answer the phone, take coats, escort guests to the table, provide menus, take and serve beverage orders, explain the food, take food orders, enter the order into the computer so the Chefs can prepare it, open the wine, converse with the guests, make sure the food gets delivered, serve the food from trays brought out by the food runners, change silverware as needed, deliver the check and process payment, and generally guide the

4

service through the evening making sure that the guests get whatever they need. (Burke 251-6, 29:3-18; Arencibia 30:9-33:21).)

32.     Although Captains are assigned tables, Marcel's operates such that all tables are the responsibility of all of the service staff. (Burke 33:10-22.)

33.     Captains can direct food runners and bussers as to what they should and should not be doing, but have no authority to hire, fire or discipline. (Burke Dec. ¶7.)

34.     Food runners are the link between the kitchen and the floor. They make sure all plates are polished. They run the food to a tray by the table and notify the Captains that it is ready to be put on the table. They also do some of the same things as the bussers, pick up the table and notify the Chef that the table is ready for the next course, and sometimes explain the food to the patrons. (Arencibia 183:6-24; Kebaier 14:10-16:4.)

35.     Bussers bring water from the bar and keep it filled; serve the bread; pick up the plates; clean the table, crumbs and any leftover on the tablecloths; change tablecloths; move tables and chairs around as needed; bring wine from the cellar; refill freezers; keep the bread hot; notify the Captains of any requirements and problems; serve the table and help Captains and runners with whatever they need; and generally make sure that everything flows for the service. (Arencibia 182:3-23; Guerch 32:6-23; Chabar 29:20-30:23; Parra 38:24-40:1.)

### D. DUTIES AND AUTHORITY OF THE MAÎTRE D'

36.     At all relevant times Adnane Kebaier was employed at Marcel's as the Maître d'. (Kebaier 4:14-20.)

37.     As Maître d', Mr. Kebaier does everything that the Captains do. In addition, he is responsible for organizing the reservations, making sure regulars get the tables they ask for, and accommodating every guest with every need. He supervises the floor, makes sure staff is clean and wearing proper uniforms, ensures tables are being attended and if not assists in doing so,

assists in cleaning and all aspects of service as a resource to all the captains, and ensures that the bussers and food runners are doing their job. (Burke 24:12-19, 46:15-2; Kebaier 18:14-19:2.)

38.     Mr. Kebaier has two regular tables and also a number of personal customers. (Burke 94:20-95:4; 95:16-96:16; Kebaier 57:13-17.) He handles up to 4 tables in an evening (Kebaier 57:13-20.)

39.     Like the Captains, Mr. Kebaier directs runners and bussers. (Kebaier 19:6-8; Burke 46:22-47:3.)

40.     Mr. Kebaier asks the Captains to assist him and they ask him to assist them (Kebaier 19:9-17; Burke 46:22-47:3.)

41.     Mr. Kebaier has no authority to hire, fire, suspend or discipline. (Burke 17-19, 24:17-19; Declaration of Paul Stearman, attached as Ex. 4 ("Stearman Dec."), ¶8.)

42.     Mr. Kebaier, cannot suspend an employee without approval of the Chef or Mr. Burke. (Burke 44:17-19.)

43.     Mr. Kebaier has never informed anyone that he was terminated without first checking with Mr. Burke. (Burke 9:10-15.)

44.     Although Mr. Kebaier does interview applicants and take applications, the decision to hire is made by the General Manager, Mr. Burke. Similarly, while he may inform an employee that he is hired or suspended, he does so only on the instruction of Mr. Burke or other members of management. (Burke 17-19; Kebaier 19-22, 24-25, 69, 76-77)

45.     Mr. Kebaier does not do the paperwork after someone is hired. (Kebaier 65:18-22.)

46.      Similarly, Mr. Kebaier has never disciplined an employee, although he has signed discipline forms as a witness and has written up incidents at the direction of management. (Kebaier 29:4-33:2, 68:11-2, 70:19-76:7.)

47.      Mr. Kebaier has never sent anyone home without consulting with Mr. Burke or another member of management. (Burke 47:13-48:3; Kebaier 32:17-21.)

48.      Mr. Burke is responsible for the weekly scheduling of the service employees. (Burke 37:4-39:9; Burke Dec. ¶8.)

49.      Prior to May 2007, Mr. Burke personally on his own prepared, reviewed, decided on requests for time off and made available to staff all schedules, including review of the kitchen staff schedules. (Burke Dec. ¶8.)

50.      Starting in May 2007, Mr. Burke asked Mr. Kebaier to prepare draft schedules based on a standard schedule (including regularly scheduled weekly days off) and taking into account anticipated needs as reflected by such considerations as advance reservations and historical patronage for the days and time of year. He sends these drafts to Mr. Burke. Mr. Burke makes make any adjustments that I believe are necessary, which I often do, and then approve the final schedule. (Burke Dec. ¶9.)

51.      Either Mr. Burke or another member of management, not Mr. Kebaier, must approve the final schedule. The same is true for all requests for days off (other than those regularly scheduled), for vacations, for emergency leave, and for subsequent changes in the schedules. (Burke Dec. ¶10.)

52.      Mr. Kebaier does not have anything to do with setting hourly wages for the employees. (Arencibia 113:20-22.)

53. Mr. Kebaier also had nothing to do with the design and implementation of the tip pool system. (Burke 81:15-82:15; Kebaier 42:2-15.)

54. Mr. Kebaier has no ownership interest in Marcel's. (Burke Dec. ¶4.)

55. During the relevant period Mr. Kebaier was paid at the rate of $8.00 per hour, plus tips. (Kebaier 9:20-11:1.)

### E. FACTS REGARDING THE HIRING AND TERMINATION OF PLAINTIFFS

56. Plaintiff Guerch testified that Mr. Burke hired him (Guerch 30:2-8).

57. Mr. Kebaier confirmed that he talked to Plaintiff Guerch, took an application, and either told Mr. Burke what was in it and/or gave him a copy. Mr. Kebaier recommended him to Mr. Burke who was in the restaurant at that time and Mr. Burke told him to tell Plaintiff Guerch that he was hired. (Kebaier 23:17-25:18, 69:21-70:10.)

58. In addition, when Mr. Guerch sought to come back to work after serving a jail sentence, Mr. Kebaier had to obtain Mr. Burke's approval. (Kebaier 37:13-38:7.)

59. Although Plaintiff Chabar testified that Mr. Kebaier took his application and later called him to tell him he was hired (Chabar 27:4-29:13), he also conceded that he did not know if Mr. Kebaier had the authority on his own to hire, or whether he set the wages, controlled the payroll or controlled the method of operations (Chabar 55:10-56:2.)

60. Mr. Kebaier testified that he interviewed Plaintiff Chabar at Mr. Burke's direction and took an application and sent it on to Mr. Burke. After Mr. Kebaier recommended him to Mr. Burke, Mr. Burke approved the hire and Mr. Kebaier informed Chabar. (Kebaier 20:2-21:22:6, 68:21-69:10, 76:8-77:14.)

61. Plaintiff Parra testified that he thought applied with Mr. Kebaier but did not state whether he actually had hired him. (Parra 37:18-25.) Mr. Kebaier testified that although he

suggested to Mr. Parra that he apply for a position, he did not interview him and only learned that Mr. Parra was hired when he saw him there at work. (Kebaier 23:7-23:16.)

62.    Plaintiff Arencibia testified that Mr. Kebaier hired him on a referral. (Arencibia 26:4-10.)

63.    However, Mr. Kebaier testified that although Mr. Arencibia came recommended by another employee, it was Mr. Burke who approved his hire. (Kebaier 28:16-29:3.)

64.    Mr. Burke confirmed that he hired Mr. Arencibia. (UC 14:9-15 (Burke).)

65.    Mr. Guerch claims Mr. Kebaier told him that if you keep asking for a day off I will let you go, and did. (Guerch 53:6-54:1.) However, Marcel's contemporaneous documentation by Executive Chef de Cuisine Paul Stearman and then-Sommelier Ramon Narvaez shows that Mr. Guerch quit when he was told on Thursday, October 11, 2007 that he would have to work that Saturday, for which he was scheduled. Mr. Kebaier did not tell him that he would be fired if he kept asking for the day off, only that he needed to work. Further, Mr. Kebaier had no authority on his own to hire, fire, suspend or discipline. (Kebaier 36:20-37:12; Stearman Dec. ¶¶5-7 and Ex. A; Declaration of Ramon Narvaez, attached as Ex. 5 ("Narvaez Dec."), ¶¶9-11 and Ex. B.)

66.    It was the Sommelier, Ramon Narvaez, not Mr. Kebaier, who sent Plaintiff Chabar home on his last day of work. Mr. Kebaier had no involvement in this incident. (Chabar 56:12-58:23; Kebaier 33:3-35:9; Narvaez Dec. ¶5-8 and Ex. A.)

67.    Plaintiffs Parra and Arencibia claim that Mr. Kebaier told Mr. Parra not to come in anymore if he did not come to work on December 24, 2007 a day that he asked allegedly asked to have off. (Parra 64:20-65:16; Arencibia 46:7-47:3.) However, Marcel's contemporaneous documentation by Executive Chef de Cuisine Paul Stearman shows that Mr.

9

Parra first failed to come to work on December 23 (a day before the day he allegedly asked to have off), and that when he came in to get his paycheck two weeks later, on January 8, 2008, he said that he quit, although by that point he would have been terminated anyway. (Stearman Dec. ¶9-11 and Exs. B-C; *accord* Kebaier 36:3-19.) Mr. Kebaier did not discipline him, however and had no authority to do so. (Stearman Dec. ¶12; Kebaier 36:3-19.)

68.     Plaintiff Pazhwak was sent home on November 3, 2007 at the direction of Mr. Stearman after Mr. Stearman witnessed him giving another server the finger, and subsequently resigned. He was not fired by Mr. Kebaier who had no authority to do so. Rather, Mr. Pazhwak resigned after the altercation on November 3. (Stearman Dec. ¶¶13-15 and Ex. D.)

69.     According to Plaintiff Arencibia, when he was briefly suspended and then terminated in 2007, a decision later reversed, it was Chef Wiedmaier who sent him home and Mr. Kebaier later told him that it was Chef Wiedmaier who said that he was fired. (Arencibia 36:12-38:12.)

70.     According to Plaintiff Arencibia, it was Chef Wiedmaier who terminated opt-in Plaintiff Wilson Martinez. (Arencibia 43:23-44:12.)

**F. PAYROLL SYSTEM BASICS**

71.      Employees record their hours worked by entering their time in and out every day on a system known as Micros. (Chabar 35:16-36:16; Guerch 57:5-22, 63:9-65:2; Parra 47:21-49:2; Nelligan 22:15-23:20; Interrogatory Response No. 9 at 10.)

72.     If necessary because an employee failed to clock in or out, this information is manually adjusted prior to transfer to the payroll service. (Nelligan 22:15-25:11.)

73.     Neither Plaintiff Chabar, nor Plaintiff Guerra, nor Plaintiff Parra were aware of any discrepancy between the time they entered and the total hours ultimately reflected on their paychecks. (Chabar 35:16-26:16; Guerch 37:5-22, 63:9-65:2; Parra 47:21-49:2.)

74.     Service employees received their share of credit card tips in cash each Friday for the week ending the previous Sunday. (Nelligan 18:7-19; Nelligan Dec. ¶14; UC 91:9-92:6 (Arencibia); Chabar 36:20-25; Parra 49:3-18.)

75.     Service employees were paid their wages every two weeks on a Friday for the two weeks ending the previous Sunday. (Nelligan Dec. ¶15.)

76.     Service employees received a biweekly payroll statement that showed wages earned, credit card tips paid and appropriate tax deductions for the relevant pay period. (Interrogatory Response Nos. 10 at 10 and 15 at 15; Nelligan Dec. ¶16 and Ex. A.)

77.     As Captains are paid a wage of only $2.77 per hour and payroll tax deductions are based on the combined total of the hourly wage and credit card tips paid, the amount of payroll tax deductions usually exceeds their total hourly wages for the pay period, resulting in a zero paycheck for these employees. However, their pay stubs show both the total hourly wages and the total tips paid for the relevant pay period. (Nelligan 22:15-19; 27:17-29:3; Nelligan Dec. ¶17.)

78.     As bussers are paid a wage of $6.15 per hour, food runners are paid $10.00 per hour or more, and their share of the tip pool is smaller, the amount of payroll tax deductions for these employees usually does not exceed their total hourly wages for the pay period and they usually do not receive a zero paycheck. As with the Captains, their pay stubs show both their total hourly wages and their total tips paid for the relevant period. (Nelligan Dec. ¶18; Parra 50:15-51:18; Chabar 41:8-18, 42:25-43:1; Guerch 45:1-5.)

79.     During discovery in this case, Defendants produced to Plaintiffs copies of, among other things, copies of their time card records ("Employee Time Card And Job Detail") for the relevant period, showing the time that they worked each day, and copies of the relevant portions

of payroll records ("Payroll Journals" and "Payroll Adjustment Journals") showing actual wages, including overtime, and tips paid to them. (Steinbach Dec. ¶13.)

80.     Plaintiffs have not claimed that either the time records or the payroll records so produced are inaccurate. (Steinbach Dec. ¶14.)

### G. OVERTIME FOR TIPPED EMPLOYEES

81.     Tipped employees who work more than 40 hours per week receive overtime pay. (Nelligan 33:20-34:5; Nelligan Dec. ¶19.)

82.     The overtime rate is determined by calculating the normal minimum overtime rate, *i.e.*, one and one-half times the standard applicable minimum wage, and then deducting from this amount the amount of the tip credit. (Nelligan Dec. ¶20.)

83.     For example, during the period from January 29, 2006 to July 24, 2008, when the District of Columbia minimum wage was $7.00 per hour, The normal minimum overtime rate was $10.50. The tip credit for a Captain was the difference between the regular minimum wage of $7.00 per hour and the allowable minimum wage with a tip credit of $2.77 per hour, or $4.23. Thus, the overtime rate for a Captain was $6.27 per hour. (Nelligan Dec. ¶21.)

84.     Similarly, during the period from July 24, 2008 through September 16, 2008, when the District of Columbia minimum wage was $7.55 per hour, the normal minimum overtime rate was $11.33, the tip credit for a Captain was the difference between $7.55 and $2.77, or $4.78, and thus the overtime rate for a Captain was $6.55. (Nelligan Dec. ¶22.)

85.     In the case of the bussers, prior to July 24, 2008 the tip credit was the difference between the regular District of Columbia minimum wage of $7.00 per hour and the $6.15 per hour actually paid to them, or $0.85 per hour. Thus, the overtime rate for a busser was $9.65 per hour. (Nelligan Dec. ¶23.)

86.     Similarly, from July 24, 2008 the tip credit for bussers was the difference between the regular District of Columbia minimum wage of $7.55 and the $6.15 per hour actually paid to them, or $1.40 per hour. Thus, the overtime rate for a busser was $9.93 per hour. (Nelligan Dec. ¶24.)

87.     Finally, as the food runners always received more than the minimum wage, their overtime rate was the same as the regular overtime rate for their base pay. (Nelligan Dec. ¶25.)

88.     Mr. Arencibia admits that he has no basis for contending that the number of overtime hours reflected on his pay stubs was right or wrong. (Arencibia 162:20-63:19.)

89.     Mr. Guerch is unaware of any errors in the amount of overtime that he was paid. (Guerch 63:23-64:6.)

90.     Mr. Parra expressly testified that he is not claiming that he was not paid all overtime wages that he should have received. (Parra 67:12-68:2.)

## H. NOTICE OF THE TIP POOL

91.     Posters outlining what the Fair Labor Standards Act and the D.C. Minimum Wage Act says are, and at all relevant times were, posted on a cork board on one of the walk-ins where all employee-related material is posted. (Burke 20:19-21:10; Burke Dec. ¶¶11-13 and Ex. A.)

92.     These posters include reference to the requirement that tipped employees must receive a cash wage of at least $2.13 per hour (federal) or at least $2.77 (D.C.) and that the totals of tips plus the cash wage must equal the minimum hourly wage. (Burke Dec. ¶¶13-14 and Ex. A.)

93.     Service employees are informed and aware that Marcel's is a tip pool house. (Burke 22:8-14, 96:15-97:21; *accord*, as set forth in the following paragraphs.)

94.     Thus, the tip pool policy is verbally explained at hire and from time to time during employee meetings or one on one conversations. (Interrogatory Response No. 21 at 21.)

13

95.     Service employees are informed and are aware that 3.5% is deduced from the tips accrued each night for credit card charges. (Burke 96:15-98:9; Arencibia 75:17-7:6, 187:19-24.)

96.     Mr. Arencibia conceded that the had no issue with the 3.5% deduction. (Arencibia 75:17-76:6.)

97.     Mr. Arencibia was aware that there was a tip pooling system. (Arencibia 198:14-24; UC 90:19-21 (Arencibia).)

98.     Mr. Chabar knew he was getting tips from the servers with whom he worked. (Chabar 43:20-44:1.)

99.     Mr. Chabar also knew from his pay stub the hourly wage he received. (Chabar 40:19-21.)

100.     Parra was told when he applied that he would be paid per hour plus tips, and was told the percent. (Parra 80:14-81:12.)

101.     Mr. Parra also learned from another server that there was a tip pool. (Parra 73:14-21.)

102.     Guerch knew he got a wage and a share of tips from the table. (Guerch 45:7-46:13.)

### I.  THE OPERATION OF THE TIP POOL

103.     The vast majority of tips are generated through credit card charges, either by amounts voluntarily added to the bill by customers or by mandatory service charges imposed upon large parties and/or private dining. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶27.)

104.     At the end of each shift each Captain prints out two copies of a receipt summarizing the sales for the tables that he served during the shift. This also shows the total charged tips for these tables. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶28 .)

105.    One copy is stapled to the Captain's closed sales checks for the shift and turned in to the Maître d'. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶29.)

106.    The other copy is stapled to a document headed "Marcel's Daily Tip Sheet" that contains a roster of service employees (Maître d', Captain/waiter, runners, bussers, bartender). (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶30 and Ex. B.)

107.    The date is written on this document along with some indication (circles, checks, etc.) of the names of service staff who worked that night. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶31 and Ex. B.)

108.    Also noted on this document are special instructions for distribution of certain charged tips, in particular extra payments to food runners and/or bussers, payments that a Captain directs be paid from his own share to a kitchen employee, or payments that the customer specifically has directed be made to certain individuals, as discussed below. (Nelligan 41:14-42:2; Nelligan Dec. ¶32; Burke Dec.¶¶15-17.)

109.    The Maître d' (or whoever is acting in his place) prints out a summary receipt of all sales for the day, including total sales and charged tips, and attaches to that anything unusual, such as a gift certificates, complimentary meals, and/or private dining. This is placed with the "Marcel's Daily Tip Sheet." (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶33.)

110.    All of this data also goes into the computer system, which generates a "Daily System Sales Detail" that, among other things, shows the total amount of credit card tips received; a "Credit Card Batch Detail" that, among other things, shows all credit card transactions, including charged tips; and other reports showing item and group sales information. (Interrogatory Response No. 15 at 13; Nelligan 15:8-15; Nelligan Dec. ¶34.)

111.    These documents are then transferred to the office, where Office Manager Lauren Nelligan, or a person working under her direction, calculates the amount of credit card tips to be paid out to each tipped employee. (Interrogatory Response No. 15 at 13; Nelligan 15:8-18:14; Nelligan Dec. ¶¶1, 26, 35.)

112.    First, a 3.5% credit card processing fee is deducted from the total amount of credit card tips. (Interrogatory Response No. 15 at 13; Burke 96:15-97:15; UC 32:11-12 (Burke); Nelligan 15:11-22; Nelligan Dec. ¶36.)

113.    As the bartender does not participate in the tip pool, all tips and service charges on the bartenders' receipts are then deducted. (Interrogatory Response No. 15 at 13; Nelligan 15:11-16:4; Nelligan Dec. ¶37.)

114.    Marcel's periodically hosts private parties. In that connection it employs a Director of Sales, Julie Albert. Ms. Albert is responsible for, among other things, selling, booking and planning all private parties, including negotiating the price, discussing menus, collecting both a deposit and final payment, and often attending the event itself. Despite her title, Ms. Albert has no managerial authority, supervises no employees, had no authority to hire, fire, discipline, or schedule employees, and has no ownership interest in Marcel's. (Burke Dec. ¶18.)

115.    When there is a private party, the customer is informed that there will be a mandatory 20% service charge. When the customer asks, the customer also is informed that 3% will be paid to the Director of Sales for her services and the remaining 17% will go to the service staff. The meeting planners with whom Ms. Albert arranges most parties also know that this is standard practice. Customers also are frequently told that they are free to leave an additional tip if they so desire. (Burke Dec. ¶19.)

116.    Accordingly, when there is a private party, 3% of the net sales (which is included in the mandatory 20% service charge) on the private party check is deducted as a commission for the private dining director. This leaves a service charge of 17% for distribution to service employees participating in the tip pool. (Interrogatory Response No. 15 at 13; Burke 94:7-19; Burke Dec. ¶19; Nelligan 42:3-18; Nelligan Dec. ¶38.)

117.    In addition, at times a customer specifically requests that a portion of his/her credit card tip be paid directly to individuals such as the Maître d', a Captain, or the Sommelier. When this occurs, this amount is deducted from the pool and paid as directed. (Burke Dec. ¶17; Nelligan Dec. ¶39.)

118.    The resulting amount is then generally split 70% to the Maître d' and Captains working that evening, and 30% to the runners and bussers working that evening; the bartender does not participate in this distribution. (Interrogatory Response No. 15 at 13; Burke 82:12-83:6, 83:19-84:8, 92:18-93:1; UC 32:12-19 (Burke); Kebaier 11:1-15; Nelligan 16:6-13, 41:3-13; Nelligan Dec. ¶20.)

119.    At times a small portion of the 70%, typically $10-$20, is distributed to one or more of the runners and busboys for good performance, or for doing extra work . At times certain runners and/or bussers have regularly received such an extra amount. The payment of such an extra amount must be approved by Mr. Burke. (Interrogatory No. 15 at 13; Burke 93:20-94:-94:6; Nelligan 41:14-42:2; Burke Dec. ¶14; Nelligan Dec. ¶41.)

120.    On rarer occasions a Captain may direct a small amount of his share be given to a dishwasher, *e.g.* if he stays late to handle a late party. (Interrogatory Response No. 15 at 13; Burke Dec. ¶10; Nelligan Dec. ¶42.)

121.    These calculations are set forth on the pertinent "Marcel's Daily Tip Sheet" for the particular day. (Interrogatory Response No. 15 at 13; Nelligan 19:6-9; Nelligan Dec. ¶43 and Ex. B.)

122.    After the completion of a full pay week (Monday through Sunday), the office prepares an Excel spreadsheet, titled "Marcel's Weekly Tip Out Sheet," showing the amount of tip money due each of the service personnel for each day of the week (including the bartender(s), whose tip as noted above is calculated separately) and the total amount of tips to be paid. (Interrogatory Response No. 15 at 13-14; Nelligan 19:10-16; Nelligan Dec. ¶44 and Ex. C.)

123.    This spreadsheet usually is completed by the Wednesday following the end of the pay week ending the previous Sunday, and employees can call at that time to find out how much tip money they are to receive on the coming Friday. (Interrogatory Response No. 15 at 14; Nelligan 10:4-9; Nelligan Dec. ¶45.)

124.    The total amount of tips for each day is entered into the accounting software and a check generated for the total amount of tips due. (Interrogatory Response No. 15 at 14; Nelligan 19:10-16; Nelligan Dec ¶46.)

125.    A copy of the check stub, an Account Quick Report showing appropriate journal entries for each day's tip receipts and the check, and a copy of the "Marcel's Weekly Tip Out Sheet," is retained for recordkeeping purposes.(Interrogatory Response No. 15 at 14; Nelligan Dec. ¶47.)

126.    The check is cashed and the money, along with a copy of the "Marcel's Weekly Tip Out Sheet," is delivered to the restaurant. (Interrogatory Response Nos. 14 at 12, 15 at 14; Nelligan Dec. ¶48.)

18

127.    The Maître d' or his substitute then uses the "Marcel's Weekly Tip Out Sheet" to determine the amount due each service employee, divides the money accordingly, and generally puts the appropriate amount in an envelope with the name of the person and the amount written on the outside. He then hands out the envelopes on Friday. (Interrogatory Response No. 15 at 14; Nelligan Dec. ¶49.)

128.    On occasion, due to considerations of time, the Maitre d' or his substitute may distribute the money directly without first putting it in envelopes. (Interrogatory Response No. 15 at 14; Nelligan Dec. ¶50.)

129.    The Maître d's copy of the "Marcel's Weekly Tip Out Sheet" is available for inspection by the service employees. (Interrogatory Response No. 15 at 14.)

130.    The office also keeps a copy of the "Marcel's Weekly Tip Out Sheet" with the "Daily Tip Sheets" for that week. (Interrogatory Response No. 15 at 14; Nelligan Dec. ¶51.)

131.    Two weeks of these documents are kept with an "Employee Time Card And Job Detail" for the two week pay period. Notation is made on the "Marcel's Weekly Tip Out Sheet" for the second week of the total tips for each employee for the two week period. The office then adds to these documents a worksheet provided by Defendant Marcel's payroll service, Paychex, on which hours, overtime hours and tip amounts are entered, and bands and stores these records by two week pay period. (Interrogatory Response No. 15 at 14-15; Nelligan 21:11-21; Nelligan Dec. ¶¶52-53 and Exs. D-E.)

132.    The amount of tips paid to each employee is also reported to Paychex, and along with regular wages appears on the biweekly payroll statements distributed to all employees as well as on the "Payroll Journal" and "Payroll Adjustment Journal" provided to Defendant Marcel's by Paychex for that particular payroll period. Beginning with the payroll period ending

August 24, 2008, the latter two documents were combined into a single "Payroll Journal." (Interrogatory Response No. 15 at 15; Nelligan 22:15-19, 37:7-16; Nelligan Dec. ¶54 and Ex. F.)

133.    On the rare occasions when a customer leaves a cash tip, it is up to the Captain (or Maître d' if it is his table) to decide whether to keep it for himself or share it with others. (Interrogatory Response No. 15 at 15; Burke 53:7-19, 54:11-57:14; Kebaier 9:14-16, 46:14-47:12, 51:6-22, 69:11-70:12; Burke Dec. ¶20.)

134.    Marcel's does encourage the Captain (or Maître d') to share such cash tips with the other persons involved in providing service to the table, but does not require they do so. (Burke 55:21-56:4; Kebaier 69:20-70:12, 77:14-20; Burke Dec. ¶20.)

135.    Marcel's keeps no records of such tips unless they are reported to it by the Captain or Maître d'. (Interrogatory Response No. 15 at 15; Burke 52:18-20; Kebaier 55:18-22, 56:17-57:12; Burke Dec. ¶20.)

136.    If a mandatory service charge is paid in cash, it is placed in the tip pool. (Burke Dec. ¶20; Kebaier 47:13-49:13, 50:15-52:13, 56:13-6.)

137.    When Marcel's first opened in 2000, Mr. Burke was the Maître d'. By late 2003 or early 2004 he functioned as both the general manager and as Maître d'. (Burke Dec. ¶21.)

138.    While Mr. Burke was Maître d' he initially participated in the tip pool. At that time Marcel's did not know that a tip credit could not be taken if management participated in the tip pool. (Burke Dec. ¶22.)

139.    However, in 2003 there was an audit by the District of Columbia Department of Employment Services ("DC-DOES"). As one of the consequences of that audit, Marcel's learned that a tip credit could not be taken if a member of management such as Mr. Burke participated in the tip pool. Due to this and other findings Marcel's agreed without formal adjudication to make

back wage payments to approximately 13 employees. (Burke Dec. ¶23 and Ex. B; Interrogatory Response No. 13 at 11-12.)

140.    Following this audit Mr. Burke ceased participating in the tip pool, and in consultation with Corrine Price of DC-DOES made other changes in the operation of the tip pool to ensure that it met the requirements for being able to take the tip credit. This included not allowing any member of management to participate in the tip pool. (Burke Dec. ¶24.)

## J.  SPECIFIC FACTS PERTAINING TO MARTINEZ CLAIM

141.    As set forth in paragraphs 13, 14 and 17, above, opt-in Plaintiff Martinez worked as a food runner and during the relevant period of January 29, 2006 through his last day of work on February 8, 2007 was paid at the rate of $12.00 per hour. (Nelligan Dec. ¶¶12-13 and Exs. G-H.)

142.    Time and payroll records show that Mr. Martinez was paid at this rate for all hours that he worked during the relevant period. (Nelligan Dec. ¶55 and Exs. G-H.)

143.    These same time and payroll records also show that there was no week in the relevant period in which Mr. Martinez worked more than 40 hours. (Nelligan Dec. ¶56 and Exs. G-H.)

## K.  SPECIFIC FACTS REGARDING ARENCIBIA RETALIATION CLAIM

144.    On or about October 6, 2007, Mr. Arencibia was sent home by Chef Wiedmaier because of an incident involving his failure to deliver to a table an "amuse bouche" (a small pre-appetizer course delivered without being ordered while the customer is waiting for the appetizer). (Arencibia 36:12-37:22 and Arencibia Ex. 13 p. 2.)

145.    Mr. Arencibia states that the following week Mr. Kebaier told him that Chef Wiedmaier said he was fired. (UC 100:4-13 (Arencibia) and Arencibia Ex. 13 p. 2.)

146.    Mr. Arencibia further states that he was told that Thursday that he could return to work the following Saturday. (Arencibia 39:24-40:5, 40:20-22 and Arencibia Ex. 13 p. 2; UC 100:14-20 (Arencibia).)

147.    Prior to this incident, there were other incidents where Mr. Arencibia noticed that Chef Wiedmaier did not like him personally, would scream and yell at him and would call him stupid. (Arencibia 40:23-41:4.)

148.    Mr. Arencibia asserts that he regularly (once a month, once every two or three months, on many occasions and/or every time he had a chance) commented about the fact that he went home without knowing how much he made in tips that night, that when he asked for documentation it was refused, and/or that he felt the service employees had the right to know how much they were making every night. (Arencibia 43:7-15 and Arencibia Ex. 13, p. 2; UC 91:4-8 (Arencibia).)

149.    Mr. Arencibia also asserts that in several meetings he had with Mr. Burke, in front of other employees, he always brought up the issue of an allegedly unfair pooling system. (Arencibia 54:14-55:3.)

150.    However, he allegedly was told that there wasn't nothing that could be done, that was the way it is, and that Chef Wiedmaier in particular told him it my way or the highway." (UC 92:13-19 (Arencibia).)

151.    Mr. Arencibia asserts that 10-20 times in the years that he worked at Marcel's, the employees addressed that they wanted to see how much was the total tip per person each night and how many nights they worked and how that tip was broken down into the final daily number, but they never received the information. (Arencibia 87:2-9.)

152.    At a daily briefing on or about September 8, 2008, attended by all the floor staff and Chef Wiedmaier, one of the subjects was the ironing of tablecloths. (Arencibia 128:5:-24; UC 93:11-14 (Arencibia).)

153.    According to Mr. Arencibia, Chef Wiedmaier said that Marcel's was not going to pay a company to iron the tablecloths and that the Captains would have to be there earlier to do so. He stated that instead of leaving the tables at the end of the day set up for the next day, when the tablecloths come in, they would iron them and then put place settings on top. (Arencibia 129:2-20, 130:14-17; UC 93:11-14 (Arencibia).)

154.    Chef Wiedmaier then allegedly said that because of this task, they would have to come 30 minutes earlier and that anyone who was even 1 minute late would be sent home. (Arencibia 130:18-131:1; UC 93:13-14 (Arencibia).)

155.    Mr. Arencibia then asked if Marcel's would give them a light family meal or let them have 15 minute breaks before the restaurant opens in order for them to buy something and eat it in the back. (Arencibia 131:3-9 and Arencibia Ex. 13, p. 2; UC 93:16-19 (Arencibia).)

156.    Chef Wiedmaier allegedly first laughed and then screamed that if Mr. Arencibia and the others wanted a lunch, they would have to be there at 1:00. When Mr. Arencibia responded that this was impossible, Chef Wiedmaier responded then there is no lunch, "it's my way or the highway." He sounded mad or angry at Mr. Arencibia; his voice was rude, and his tone got louder. (Arencibia 11:16-12:5, 131:10-12, 132:1-8, 134:19-24 and Arencibia Ex. 2, Plaintiff's Interrogatory Response No. 15 at 10; UC 93:19-94:1 (Arencibia).)

157.    In his testimony on behalf of Mr. Arencibia at Mr. Arencibia's unemployment compensation hearing, fellow Captain Theo Delony confirmed that Mr. Arencibia made this request, that Chef Wiedmaier said they would have to come in at 1:00 if they wanted to have that

23

kind of family meal, and that Chef Wiedmaier was upset with Mr. Arencibia. (UC 63:1-64:6 (Delony).)

158.    Thereafter, Mr. Delony noticed that Chef Wiedmaier's attitude toward Mr. Arencibia had changed, that he was not happy with Mr. Arencibia and that he wanted to replace him. (UC 65:15-66:14, 69:19-70:4 (Delony).)

159.    According to Mr. Delony's testimony, Chef Wiedmaier actually said that he wanted to get rid of Mr. Arencibia. (UC 72:3-10, 72:18-20 (Delony).)

160.    On September 11, 2008, Mr. Arencibia allegedly called to notify that he was running late, but was told to go home. (Arencibia 135:16-136:3; UC 94:10-18 (Arencibia).)

161.    Although he had previously been given off for September 12, 2008, Mr. Arencibia decided to work that day because he felt Marcel's was looking for a reason to fire him. (Arencibia 139:24-140:19; UC 94:19-20 (Arencibia).)

162.    According to Mr. Arencibia, as early as September 14, 2008 he had heard a rumor that he would be terminated. (UC 118:16-119:14 (Arencibia).)

163.    In particular, another Captain, Ernesto Cabo told him on September 14 or 15 that he had heard Marcel's wanted to get rid of him. (Arencibia 146:20-147:4 and Arencibia Ex. 13; UC 117:19-118:10 (Arencibia).)

164.    According to Mr. Arencibia's testimony, on September 17, 2008 he came to work and was ironing tablecloths in the back of the restaurant and getting the room ready when Mr. Cabo approached him and asked him if he was being fired or if someone fired him. Mr. Arencibia said no, why, and Mr. Cabo said that he had met a new employee who told him that he was Mr. Arencibia's replacement. (Arencibia 60:6-12, 144:1-15.)

24

165.    According to Mr. Arencibia's testimony, a few minutes later, Mr. Delony came in and told him that Chef Wiedmaier had just approached him at the bar and told him that they needed to get rid of Mr. Arencibia. (Arencibia 60:12-14,144:14-19 and Arencibia Ex. 13; UC 95:7-10, 108:5-8 (Arencibia).)

166.    Next, around 4, the new waiter, Josh Gonzalez, came in and they shook hands. Mr. Gonzalez said he was Puerto Rican, Mr. Arencibia responded that he was Cuban and they switched to Spanish. Mr. Gonzalez said he was amazed to meet him because a chef at a sister restaurant where he had been working, Brasserie Beck's, had told him that Mr. Arencibia was fired and that was why Marcel's needed him, but he now guessed this had just been rumor and innuendo. (Arencibia 57:24-58:8, 59:22-25, 60:4-6, 60:14-22, 144:20-25 and Arencibia Ex. 13 at 1; UC 79:10-81:21, 83:11-84:13 (Gonzalez); UC 95:1-6, 107:10-17, 108:9-11 (Arencibia).)

167.    While Mr. Arencibia was talking to Mr. Gonzalez, Chef Wiedmaier allegedly approached him and told him "no Spanish in this restaurant." (Arencibia 57:23-24, 60:22-23, 145:1-5.)

168.    According to Mr. Arencibia's testimony, both he and Mr. Gonzalez went back to their work areas, but Chef Wiedmaier started looking for mistakes and "it was evident that he want to fire me."[3] So he approached Chef Wiedmaier and asked, "after four years that I have been working for you, you want to fire me? And he said yes, and what's the problem with that?" Mr. Arencibia then thanked him for the opportunity, took off his tie and left the restaurant. (Arencibia 145:6-24, 148:18-149:5 and Arencibia Ex. 13 at 1; UC 95:11-22, 97:3-10, 112:12-21, 114:6-12 (Arencibia).)

---

[3] In his response to Defendant's Interrogatories, Mr. Arencibia stated that a few minutes later Mr. Delony and Mr. Gonzales "told him that Chef Wiedmaier wanted to fire him; and he was fired that day." (Arencibia Ex. 2, Plaintiff's Interrogatory Response No. 15 at 10.)

169.    On his way out the door, he told Mr. Kebaier that he was the worst person that he ever worked with. (Arencibia 146:4-13; UC 96:1-15, 112:22-113:3 (Arencibia).)

170.    At his unemployment hearing on December 4, 2008, Mr. Arencibia testified that the reason Chef Wiedmaier became mad at him was because he requested the family meal or a break for sandwiches. (UC 94:7-8 (Arencibia).)

171.    He also testified at his unemployment hearing that he knew after the September 8 meeting based on Chef Wiedmaier's mood that they were looking to fire him. (UC 96:15-17 (Arencibia).)

172.    Specifically, he testified that Chef Wiedmaier "never told me why he was firing me, but I knew because of my co-workers and I knew it that he was probably mad at me, his mood, because of the meeting when I mentioned that we need a family meal or a 15-minute break for lunch." (UC 104:17-22 (Arencibia).)

173.    Mr. Arencibia also testified at his unemployment hearing that he "knew that there was a hostile environment over my person since the September the 8th because I was sent home." (UC 113:17-29 (Arencibia).)

174.    Following the unemployment hearing, the Administrative Law Judge found that Mr. Arencibia reasonably concluded that he had been terminated based on Chef Wiedmaier becoming angry at him following the discussion concerning having a meal tor a meal break and being told by colleagues that Chef Wiedmaier wanted to, was going to, or had fired him. Final Order, *Freddy Gonzales Arencibia v. 2401 Restaurant Corp.*, Case No. ES-P-08-11719 at 6-7 (Office of Administrative Hearings, Dec. 11, 2008). (Steinbach Dec. ¶9 and Ex. I.)

175.    This decision was later upheld by the D.C. Court of Appeals. *2401 Restaurant Corp. v. Freddy Gonzales Arencibia*, No. 09-AA-19 (D.C. Court of Appeals June 30, 2010). (Steinbach Dec. ¶10 and Ex. J.)

176.    At his deposition nearly two years later, Mr. Arencibia changed his testimony somewhat, testifying first that Chef Wiedmaier fired him because he was speaking Spanish, but then speculating that he felt there were additional reasons, such as the fact that he had asked for a light meal; the fact that he was always wanting to know the real tips numbers; the fact that he was the only person not afraid of Chef Wiedmaier; and "some other facts that Chef Wiedmaier may only know himself." (Arencibia 162:10-17.)

Respectfully submitted,


_____/s Brian Steinbach_____
Frank C. Morris, Jr., Bar No. 211482
Brian Steinbach, Bar No. 256727
Epstein, Becker & Green, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendants, 2401 Restaurant
Corporation, d/b/a Marcel's Restaurant, and
DATED: June 3, 2011                    Robert Wiedmaier, individually

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Statement of Material Facts as to Which There is No Genuine Issue was served this 3rd day of June, 2011, by electronic service, on the following:

Denise M. Clark, Bar No. 424080
1250 Connecticut Ave., NW
Suite 220
Washington, DC 20036
 (202) 293-0015

Attorney for Plaintiffs,
Freddie Gonzales Arencibia, *et al.*

_____/s Brian Steinbach_____

28