### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____  )
                                                                )
FREDDY GONZALES ARENCIBIA, ET.AL.,  )
                                                                )
                                            Plaintiffs     )          Civil Action No. 09-cv-00165(CKK)
                    v.                                     )
                                                                )
2401 RESTAURANT CORPORATION                 )
d/b/a MARCEL'S RESTAURANT ET.AL.,           )
                        Defendants                       )
_____)

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs' [1] file this Opposition to Defendants' Summary Judgment pursuant to FRCP

56(a),  and LRvC 7.

## I.          INTRODUCTION

          Plaintiffs' Opposition to Defendants' Motion for Summary Judgment is limited to

those issues Plaintiffs' believe remain viable following discovery.  Specifically:

1. Challenge To Defendants' Tip-Pooling Arrangement—documentation of tip
   calculations and related record keeping; and the permissibility of certain
   employees To participate in Defendants' tip-pool;
2. Remedies Available Under The D.C. Wage Payment and Collection Law for an
   Improperly Administered Tip-Pool;
3. Retaliation Under the FLSA—Arencibia's Discharge

Plaintiffs concede that the overtime claim cannot be sustained following discovery.

Plaintiffs do not challenge Defendants' articulation of remedies under the FLSA and the

D.C. Minimum Wage Act for an invalid tip-pool, except that the additional statutory

damages (liquidated damages and attorneys' fees) would apply.  However, Plaintiffs

---

[1] At the time of the filing of this Opposition, Plaintiffs are Freddy Gonzales Arencibia, Khalid Chabar, Carlos Parra, and Hamid Guerch. A Motion to Withdraw As Plaintiff And Dismiss Claims With Prejudice will be filed on behalf of Farzad Pazhwak will be filed shortly.

submit that the remedies under the DCWPCL are also applicable where tips were not properly calculated and paid to an employee.  Finally, Plaintiffs'  submit that the Amended Complaint raises the notice issues concerning the tip-pool calculation—specifically notice to the employees about what amounts were going into the pool and how the tips were calculated each week.  Plaintiffs assert a recordkeeping violation as set forth in Paragraphs 66 though 70 of the Amended Complaint.  Plaintiffs do not challenge whether notice of the tip credit being claimed was violated.  See discussion below.

## II.       STATEMENT OF FACTS

### Plaintiff's Response to Defendants' Statement of Material Facts Not in Genuine Dispute

Plaintiff responds to Defendant's Rule 7 Statement of Material Facts Not in Genuine Dispute, as set forth below:

### A.       THE PARTIES

1.       Defendant Marcel's is a fine dining restaurant located at 2401 Pennsylvania Avenue, NW, Washington, DC. (Arencibia 27:4-17; Chabar 29:16-19; Parra 38:18-20; Guerch 30:9-14.)[2]   **Plaintiffs' Response: No Dispute**

2.       Defendant Robert Weidmaier is the principal owner of Defendant Marcel's. (Burke 4:18-5:6; Declaration of Thomas Burke, attached as Ex. 2 ("Burke

---

[2] Relevant excerpts from depositions and deposition exhibits and from the transcript of the hearing and subsequent decisions on Plaintiff's unemployment compensation claim cited herein are attached as Exs. A through H to the accompanying Declaration of Brian Steinbach ("Steinbach Dec."), attached as Ex. 1. Deposition testimony is cited by the surname of the deponent followed by the page and line numbers. Citations to exhibits marked in the depositions are shown as "[Name] Ex. _," followed where appropriate by reference to a specific page or pages. Unemployment Compensation hearing testimony is cited as "UC [page][line] (witness name). Finally, relevant excerpts from the Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories are attached to the Steinbach Dec. as Ex. K and are cited as "Interrogatory Response No. [#] at [page]

Dec.), ¶2.)     **Plaintiffs' Response: No Dispute**

3.      Plaintiff Freddy Gonzalez Arencibia ("Arencibia"), misidentified in the Amended Complaint as "Freddy Gonzales Arencibia," was employed by Defendant Marcel's from August 2, 2005 through September 17, 2008. (Declaration of Lauren Nelligan, attached as Ex. 3 ("Nelligan Dec."), ¶2; Arencibia 25:7-9; 144:1-149:10.)

         **Plaintiffs' Response: No Dispute**

4.      At all relevant times, Plaintiff Arencibia was paid at the rate of $2.77 per hour, plus tips. (Nelligan Dec. ¶3; Nelligan 9:11-10:1; Arencibia 62:6-12, 65:3-67:2 and Arencibia Ex. 6.)     **Plaintiffs' Response: No Dispute**

5.      Plaintiff Farzad C. Pazhwak ("Pazhwak"), misidentified in the Amended Complaint as "Farzad C. Pazawak" was employed by Defendant Marcel's from October 1, 2006 through November 3, 2007. (Nelligan Dec. ¶4.)

         **Plaintiffs' Response:          No Dispute**

6.      At all relevant times, Plaintiff Pazhwak was paid at the rate of $2.77 per hour, plus tips. (Nelligan Dec. ¶5; Nelligan 9:11-10:1.)

         **Plaintiffs' Response:          No Dispute**

7.      Plaintiff Hamid Guerch ("Guerch") was employed by Defendant Marcel's from April 23, 2007 through May 24, 2007, and from September 4, 2007 through October 11, 2007. (Nelligan Dec. ¶6; Guerch 29:3-22.)     **Plaintiffs' Response: No Dispute**

8.      At all relevant times Plaintiff Guerch was paid at the rate of $6.15 per hour, plus tips. (Nelligan Dec. ¶6; Nelligan 9:11-10:1; Guerch 39:7-12, 44:17-22.)

         **Plaintiffs' Response: No Dispute**

9.      Plaintiff Carlos Parra ("Parra") was employed by Defendant Marcel's

from October 4, 2007 through December 23, 2007. (Nelligan Dec. ¶8; Parra 34:18-23, 65:5-8.)          **Plaintiffs' Response: No Dispute**

10.     Plaintiff Parra was paid at the rate of $7.00 per hour for the one day that he worked in his first week of employment, the week ending October 7, 2007, and thereafter was paid at the rate of $6.15 per hour, plus tips. Nelligan Dec. ¶9; Nelligan 9:11-10:1; Parra 49:3-14, 50:14-51:24.)     **Plaintiffs' Response: No Dispute**

11.     Plaintiff Khalid Chabar ("Chabar") was employed by Defendant Marcel's from October 13, 2007 through December 19, 2007. (Nelligan Dec. ¶10; Chabar 15:3-8.)

          **Plaintiffs' Response: No Dispute**

12.     At all relevant times Plaintiff Chabar was paid at the rate of $6.15 per hour, plus tips. (Nelligan Dec. ¶11; Nelligan 9:11-10:1 Chabar 39:9-12, 41:6-7.)

          **Plaintiffs' Response: No Dispute**

13.     Opt-in Plaintiff Wilson A. Martinez ("Martinez") was employed by Defendant Marcel's from October 30, 2002 through February 8, 2007. (Nelligan Dec. ¶12.)     **Plaintiffs' Response: No Dispute**

14.     At all relevant times opt-in Plaintiff Martinez was paid at the rate of $12.00 per hour, plus tips. (Nelligan Dec. 13.)     **Plaintiffs' Response: No Dispute**

15.     Plaintiffs Arencibia and Pazhwak were employed as waiters, or Captains. (Nelligan Dec. ¶¶2,4; Arencibia 27:21-24.)   **Plaintiff's Response: No Dispute**

16.     Plaintiffs Guerch, Parr and Chabar were employed as bussers (busboys), also known as Service Attendants. (Nelligan Dec. ¶¶ 6, 8, 10; Parra 38:21-22; Burke 30:16-17; Chabar 29:14-15.)  **Plaintiffs' Response: No Dispute**

17.     Opt-In Plaintiff Martinez was employed as a Food Runner. (Nelligan

4

Dec. ¶12.*)* **Plaintiffs' Response: No Dispute**

**B. BASIC OPERATION OF THE RESTAURANT**

18.    At all relevant times Thomas Burke was the general manager and director of operations of Marcel's. (Burke 10:17-18; UC 13:14-16, 24:7-8 (Burke); Burke Dec. ¶1.)        **Plaintiffs' Response: Plaintiffs' do not dispute that this was Mr. Burke's title; however, Plaintiffs dispute whether he alone functioned in this capacity during Plaintiffs' employment.    (See generally,  Chabar, Gonzalez, Guerch, and Parra depositions and Almaraz affidavit).**

19.    Mr. Burke is responsible for hiring, firing, suspensions, handling emergency calls from employees, and overseeing the processing of workers' compensation claims, overseeing the maître d', sommelier and kitchen staff. (Burke 10:20-11:12; UC 19:17-19 (Burke).) **Plaintiffs' Response: Plaintiffs' do not dispute that Mr. Burke's title imputed these responsibilities; however, Plaintiffs dispute whether the maitre d' carried out one or more of these functions without input or approval from Mr. Burke.**

20.    Mr. Burke has no ownership interest in Marcel's. (Burke Dec. ¶3.)

        **Plaintiffs' Response: No Dispute**

21.    Decisions to hire, fire or discipline have to come to Mr. Burke, the Executive Chef de Cuisine, or Chef Wiedmaier, but Mr. Burke may tell someone to deliver the message. (Burke 17:7-20, 18:18-19:9, 44:10-15.)  **Plaintiffs' Response: Plaintiffs' dispute that hiring and firing was approved by Mr. Burke the Executive Chef de Cuisine, or Chef Wiedmaier, before it occurred as decisions of termination were communicated to employees in the absence of these individuals. (See Exhibits**

to  Stearman Declaration; and, Affidavit of Robert Almaraz, attached hereto as **Exhibit B).**

22.      The Executive Sous Chef and the Sommelier also have the authority to suspend, fire and discipline on their own. (Burke 44:10-45:8; UC 19:17-19 (Burke).)

**Plaintiffs' Response: Plaintiffs' restate their dispute as set forth in response to Paragraph 21.**

23.      Mr. Burke makes the decision to hire, even when there is a recommendation from other employees. (Burke 15:19-22.)  **Plaintiffs' Response: Plaintiffs' were never informed that their employment was subject to approval after Kebair informed them that they were hired and given a start date.  (See generally, Chabar, Gonzalez, Guerch, and Parra depositions and Almaraz affidavit).**

24.      Mr. Burke determines the hourly wage to be paid to the Maître d', Captains, runners and bussers. (Burke 72:11-72:3; Nelligan 38:14-39:5.)

      **Plaintiffs' Response:          No Dispute**

25.      During the relevant period, the typical composition of management staff during regular afternoon/evening of operation at Marcel's consisted of one Executive Chef de Cuisine, one Executive Sous Chef, and 1 Wine Sommelier, although they did not work every day. (Interrogatory Response No. 7 at 9*;* Burke 43:16-44:2, 45:12-46:2.)

      **Plaintiffs' Response: No Dispute**

26.      In addition, prior to April 2007 General Manager Burke and Chef Wiedmaier generally were present most of the time. (Burke 41:17-43:11*;* Kebaier 45:78-12; (Burke Dec. ¶5.)   **Plaintiffs' Response: Plaintiffs' dispute the amount of time Mr. Burke was in the restaurant.**

27.     Starting in approximately early May 2007, General Manager Burke was present 3-4 afternoons/evenings per week. (Burke 41:21-42:2, 43:10-15; Kebaier 45:13-46:3.)   **Plaintiffs' Response:  Plaintiffs' dispute the amount of time Mr. Burke was in the restaurant.  (See generally,  Chabar, Gonzalez, Guerch, and Parra depositions and Almaraz affidavit).**

28.     Starting in approximately late April 2007, Chef Wiedmaier was present at least 2 afternoons/evenings per week. (Burke Dec. ¶6.)

**Plaintiffs' Response:          No Dispute**

29.     During the relevant period, the service staff at the beginning of a shift normally consisted of the Maître d', and a minimum of four Captains, four bussers and one food runner, and one bartender. (Interrogatory Response No. 7 at 9; Burke 35:10-19, 28:10-14.)          **Plaintiffs' Response: No Dispute**

30.     However, the number of Captains, bussers and food runners could vary up and down, and on Thursday, Friday and Saturday there often were as many as seven captains, five bussers, two food runners and two bartenders. (Interrogatory Response No. 7 at 9; Burke 35:10- 37:3.)     **Plaintiffs' Response: No Dispute**


**C. DUTIES OF THE CAPTAINS, FOOD RUNNERS AND BUSSERS**

31.     Captains greet guests, answer the phone, take coats, escort guests to the table, provide menus, take and serve beverage orders, explain the food, take food orders, enter the order into the computer so the Chefs can prepare it, open the wine, converse with the guests, make sure the food gets delivered, serve the food from trays brought out by the food runners, change silverware as needed, deliver the check and process payment,

and generally guide the service through the evening making sure that the guests get whatever they need. (Burke 251-6, 29:3-18; Arencibia 30:9-33:21).)

**Plaintiffs' Response: No Dispute**

32.     Although Captains are assigned tables, Marcel's operates such that all tables are the responsibility of all of the service staff. (Burke 33:10-22.)

**Plaintiffs' Response: No Dispute**

33.     Captains can direct food runners and bussers as to what they should and should not be doing, but have no authority to hire, fire or discipline. (Burke Dec. ¶7.)

**Plaintiffs' Response: No Dispute**

34.     Food runners are the link between the kitchen and the floor. They make sure all plates are polished. They run the food to a tray by the table and notify the Captains that it is ready to be put on the table. They also do some of the same things as the bussers, pick up the table and notify the Chef that the table is ready for the next course, and sometimes explain the food to the patrons. (Arencibia 183:6-24; Kebaier 14:10-16:4.)     **Plaintiffs' Response: No Dispute**

35.     Bussers bring water from the bar and keep it filled; serve the bread; pick up the plates; clean the table, crumbs and any leftover on the tablecloths; change tablecloths; move tables and chairs around as needed; bring wine from the cellar; refill freezers; keep the bread hot; notify the Captains of any requirements and problems; serve the table and help Captains and runners with whatever they need; and generally make sure that everything flows for the service. (Arencibia 182:3-23; Guerch 32:6-23; Chabar 29:20-30:23; Parra 38:24-40:1.)     **Plaintiffs' Response: No Dispute**

## D. DUTIES AND AUTHORITY OF THE MAÎTRE D'

36.     At all relevant times Adnane Kebaier was employed at Marcel's as the

Maître d'. (Kebaier 4:14-20.) **Plaintiffs' Response: No Dispute**

As Maître d', Mr. Kebaier does everything that the Captains do. In addition, he is

responsible for organizing the reservations, making sure regulars get the tables they ask

for, and accommodating every guest with every need. He supervises the floor, makes sure

staff is clean and wearing proper uniforms, ensures tables are being attended and if not

assists in doing so, assists in cleaning and all aspects of service as a resource to all the

captains, and ensures that the bussers and food runners are doing their job. (Burke 24:12-

19, 46:15-2; Kebaier 18:14-19:2.)     **Plaintiffs' Response: Plaintiffs' dispute the**

**frequency regularity at which Kebaier was performing the work of captains versus**

**paying attention to specified tables or guests, and supervising the front of the house**

**during the dining service.  See** (Guerch 35:11-20); (Parra 45:12-46:5); (Chabar 35:9-23)

38.     Mr. Kebaier has two regular tables and also a number of personal

customers.  (Burke 94:20-95:4; 95:16-96:16; Kebaier 57:13-17.) He handles up to 4

tables in an evening (Kebaier 57:13-20.)     **Plaintiffs' Response: Plaintiffs' do not**

**dispute that Kebaier had two regular tables and certain personal customers.**

**Plaintiffs' dispute that he handled up to 4 tables and evening, as the number of**

**tables Kebaier handled each night was dependent on the number of personal**

**customers who made reservations.  There is no demonstrative evidence reflecting**

**what tables he served—no nightly tickets from tables Kebaier served were produced**

**by Defendants.**

39.     Like the Captains, Mr. Kebaier directs runners and bussers. (Kebaier 19:6-

8; Burke 46:22-47:3.) **Plaintiffs' Response: No Dispute**

40.    Mr. Kebaier asks the Captains to assist him and they ask him to assist

them (Kebaier 19:9-17; Burke 46:22-47:3.)   **Plaintiffs' Response: No Dispute**

41.    Mr. Kebaier has no authority to hire, fire, suspend or discipline. (Burke

17-19, 24:17-19; Declaration of Paul Stearman, attached as Ex. 4 ("Stearman Dec."), ¶8.)

   **Plaintiffs' Response: Plaintiffs' dispute to the extent that in his own**

**deposition Kebaier identified circumstances where he signed off on a disciplinary**

**matter.**

42.    Mr. Kebaier, cannot suspend an employee without approval of the Chef or

Mr. Burke. (Burke 44:17-19.)**Plaintiffs' Response: Plaintiffs' dispute to the extent**

**that in his own deposition Kebaier identified circumstances where he signed off on a**

**disciplinary matter.**

43.    Mr. Kebaier has never informed anyone that he was terminated without

first checking with Mr. Burke. (Burke 9:10-15.)      **Plaintiffs' Response:  Plaintiffs' do**

**not dispute that this was Burke's testimony.  Defendants' documentation suggest**

**that there are times that others are consulted.  See Stearman Declaration.**

44.    Although Mr. Kebaier does interview applicants and take applications, the

decision to hire is made by the General Manager, Mr. Burke. Similarly, while he may

inform an employee that he is hired or suspended, he does so only on the instruction of

Mr. Burke or other members of management. (Burke 17-19; Kebaier 19-22, 24-25, 69,

76-77) **Plaintiffs' Response:   Plaintiffs' dispute that Mr. Burke was involved in their**

**hiring and firing's directly or indirectly before the employee is informed of the**

**action, as Burke testified that he interviewed all potential candidates and then states**

**that some candidates are hired on recommendation of already hired waiters. (Burke 12). In contrast, Kebaier's testimony is that he conducts interviews of individuals without a recommendation (Kebaier 24-25). Similarly, Keibaier testified that he completed paperwork for the discipline of an employee as the reprimanding supervisore (Kebaier 30-31).**

45.   Mr. Kebaier does not do the paperwork after someone is hired. (Kebaier 65:18-22.)   **Plaintiffs' Response: No dispute**

46.   Similarly, Mr. Kebaier has never disciplined an employee, although he has signed discipline forms as a witness and has written up incidents at the direction of management. (Kebaier 29:4-33:2, 68:11-2, 70:19-76:7.)   **Plaintiffs' Response: Plaintiffs' dispute.  (See Kebair 30-31).**

47.   Mr. Kebaier has never sent anyone home without consulting with Mr. Burke or another member of management. (Burke 47:13-48:3; Kebaier 32:17-21.)

**Plaintiffs' Response:  Disputed**

48.   Mr. Burke is responsible for the weekly scheduling of the service employees. (Burke 37:4-39:9; Burke Dec. ¶8.)   **Plaintiffs' Response:      No dispute**

49.   Prior to May 2007, Mr. Burke personally on his own prepared, reviewed, decided on requests for time off and made available to staff all schedules, including review of the kitchen staff schedules. (Burke Dec. ¶8.) **Plaintiffs' Response:  No dispute**

50.   Starting in May 2007, Mr. Burke asked Mr. Kebaier to prepare draft schedules based on a standard schedule (including regularly scheduled weekly days off) and taking into account anticipated needs as reflected by such considerations as advance reservations and historical patronage for the days and time of year. He sends these drafts

to Mr. Burke. Mr. Burke makes make any adjustments that I believe are necessary, which I often do, and then approve the final schedule. (Burke Dec. ¶9.)

**Plaintiffs' Response:     No dispute**

51.     Either Mr. Burke or another member of management, not Mr. Kebaier, must approve the final schedule. The same is true for all requests for days off (other than those regularly scheduled), for vacations, for emergency leave, and for subsequent changes in the schedules. (Burke Dec. ¶10.) **Plaintiffs' Response: Plaintiffs' dispute the fact that management had to approve requests for days off, as the documentation with the Declaration of Paul Stearman demonstrates that Kebair already communicated to Guerch his request for time off was denied, before getting approval from Stearman.**

52.     Mr. Kebaier does not have anything to do with setting hourly wages for the employees. (Arencibia 113:20-22.) **Plaintiffs' Response: No dispute**

53.     Mr. Kebaier also had nothing to do with the design and implementation of the tip pool system. (Burke 81:15-82:15; Kebaier 42:2-15.)

**Plaintiffs' Response: No dispute**

54.     Mr. Kebaier has no ownership interest in Marcel's. (Burke Dec. ¶4.)

**Plaintiffs' Response: No dispute**

55.     During the relevant period Mr. Kebaier was paid at the rate of $8.00 per hour, plus tips. (Kebaier 9:20-11:1.) **Plaintiffs' Response: No dispute**

**E. FACTS REGARDING THE HIRING AND TERMINATION OF PLAINTIFFS**

56.     Plaintiff Guerch testified that Mr. Burke hired him (Guerch 30:2-8).

**Plaintiffs' Response: Plaintiffs' dispute.  More accurately, Plaintiff Guerch testified that he was hired by Burke for a position at Brasserie Becks, when there was no position at Marcel's.  (Guerch 30:17-31:8).**

57.     Mr. Kebaier confirmed that he talked to Plaintiff Guerch, took an application, and either told Mr. Burke what was in it and/or gave him a copy. Mr. Kebaier recommended him to Mr. Burke who was in the restaurant at that time and Mr. Burke told him to tell Plaintiff Guerch that he was hired. (Kebaier 23:17-25:18, 69:21-70:10.)

**Plaintiffs' Response: Disputed.  See (Guerch 28-32)**

58.     In addition, when Mr. Guerch sought to come back to work after serving a jail sentence, Mr. Kebaier had to obtain Mr. Burke's approval. (Kebaier 37:13-38:7.)

**Plaintiffs' Response: No dispute**

59.     Although Plaintiff Chabar testified that Mr. Kebaier took his application and later called him to tell him he was hired (Chabar 27:4-29:13), he also conceded that he did not know if Mr. Kebaier had the authority on his own to hire, or whether he set the wages, controlled the payroll or controlled the method of operations (Chabar 55:10-56:2.)

**Plaintiffs' Response: Plaintiffs' dispute the implication of the testimony as a concession, as the Plaintiff was asked what he had personal knowledge of; and, he responded that he was not aware of what authority Kebaier was given.**

60.     Mr. Kebaier testified that he interviewed Plaintiff Chabar at Mr. Burke's direction and took an application and sent it on to Mr. Burke. After Mr. Kebaier

recommended him to Mr. Burke, Mr. Burke approved the hire and Mr. Kebaier informed Chabar. (Kebaier 20:2-21:22:6, 68:21-69:10, 76:8-77:14.)   **Plaintiffs' Response:**

> **Plaintiffs' do not dispute Kebaier's testimony, but Chabar's testimony is contrary in that he testified that he was randomly passing Marcel's when he and a friend went into the restaurant to see if there were any positions, and applied with Kebaier. (Chabar 29-29).   Chabar's testimony makes no mention that he informed anyone at Marcel's that he was coming to the restaurant that day for an interview, in order for Kebair to tell Burke he was coming in advance and secure approval for to conduct the interview. (Kebaier 20).  See also ( Burke 15, and Chabar 29:12)**

61.    Plaintiff Parra testified that he thought applied with Mr. Kebaier but did not state whether he actually had hired him. (Parra 37:18-25.) Mr. Kebaier testified that although he suggested to Mr. Parra that he apply for a position, he did not interview him and only learned that Mr. Parra was hired when he saw him there at work. (Kebaier 23:7-23:16.)    **Plaintiffs' Response: Plaintiffs' do not dispute Kebaier's testimony, but note that he also testified that he believed that Ramon Narvez interviewed Parra for the job.**

62.    Plaintiff Arencibia testified that Mr. Kebaier hired him on a referral. (Arencibia 26:4-10.)   **Plaintiffs' Response: No dispute**

63.    However, Mr. Kebaier testified that although Mr. Arencibia came recommended by another employee, it was Mr. Burke who approved his hire. (Kebaier 28:16-29:3.)   **Plaintiffs' Response: No dispute**

64.    Mr. Burke confirmed that he hired Mr. Arencibia. (UC 14:9-15 (Burke).)

> **Plaintiffs' Response: No dispute**

14

65.     Mr. Guerch claims Mr. Kebaier told him that if you keep asking for a day

off I will let you go, and did. (Guerch 53:6-54:1.) However, Marcel's contemporaneous

documentation by Executive Chef de Cuisine Paul Stearman and then-Sommelier Ramon

Narvaez shows that Mr. Guerch quit when he was told on Thursday, October 11, 2007

that he would have to work that Saturday, for which he was scheduled. Mr. Kebaier did

not tell him that he would be fired if he kept asking for the day off, only that he needed to

work. Further, Mr. Kebaier had no authority on his own to hire, fire, suspend or

discipline. (Kebaier 36:20-37:12; Stearman Dec. ¶¶5-7 and Ex. A; Declaration of Ramon

Narvaez, attached as Ex. 5 ("Narvaez Dec."), ¶¶9-11 and Ex. B.)

> **Plaintiffs' Response:** **No dispute that the parties have conflicting facts.**

66.     It was the Sommelier, Ramon Narvaez, not Mr. Kebaier, who sent

Plaintiff Chabar home on his last day of work. Mr. Kebaier had no involvement in this

incident. (Chabar 56:12-58:23; Kebaier 33:3-35:9; Narvaez Dec. ¶5-8 and Ex. A.)

> **Plaintiffs' Response:** **No dispute that the parties have conflicting facts.**

67.     Plaintiffs Parra and Arencibia claim that Mr. Kebaier told Mr. Parra not to

come in anymore if he did not come to work on December 24, 2007 a day that he asked

allegedly asked to have off. (Parra 64:20-65:16; Arencibia 46:7-47:3.) However,

Marcel's contemporaneous documentation by Executive Chef de Cuisine Paul Stearman

shows that Mr. Parra first failed to come to work on December 23 (a day before the day

he allegedly asked to have off), and that when he came in to get his paycheck two weeks

later, on January 8, 2008, he said that he quit, although by that point he would have been

terminated anyway. (Stearman Dec. ¶9-11 and Exs. B-C; *accord* Kebaier 36:3-19.) Mr.

Kebaier did not discipline him, however and had no authority to do so. (Stearman Dec.

¶12; Kebaier 36:3-19.)            **Plaintiffs' Response: No dispute that the parties have conflicting facts.**

68.     Plaintiff Pazhwak was sent home on November 3, 2007 at the direction of Mr. Stearman after Mr. Stearman witnessed him giving another server the finger, and subsequently resigned. He was not fired by Mr. Kebaier who had no authority to do so. Rather, Mr. Pazhwak resigned after the altercation on November 3. (Stearman Dec. ¶¶13-15 and Ex. D.)      **Plaintiffs' Response: No dispute**

69.     According to Plaintiff Arencibia, when he was briefly suspended and then terminated in 2007, a decision later reversed, it was Chef Wiedmaier who sent him home and Mr. Kebaier later told him that it was Chef Wiedmaier who said that he was fired. (Arencibia 36:12-38:12.)      **Plaintiffs' Response: No dispute that the parties have conflicting facts.**

70.     According to Plaintiff Arencibia, it was Chef Wiedmaier who terminated opt-in Plaintiff Wilson Martinez. (Arencibia 43:23-44:12.)   **Plaintiffs' Response: No dispute**

## F. PAYROLL SYSTEM BASICS

71.     Employees record their hours worked by entering their time in and out every day on a system known as Micros. (Chabar 35:16-36:16; Guerch 57:5-22, 63:9-65:2; Parra 47:21- 49:2; Nelligan 22:15-23:20; Interrogatory Response No. 9 at 10.)

      **Plaintiffs' Response: No dispute**

72.     If necessary because an employee failed to clock in or out, this information is manually adjusted prior to transfer to the payroll service. (Nelligan 22:15-25:11.)      **Plaintiffs' Response: No dispute**

73.     Neither Plaintiff Chabar, nor Plaintiff Guerra, nor Plaintiff Parra were aware of any discrepancy between the time they entered and the total hours ultimately reflected on their paychecks. (Chabar 35:16-26:16; Guerch 37:5-22, 63:9-65:2; Parra 47:21-49:2.)  **Plaintiffs' Response: No dispute**

74.     Service employees received their share of credit card tips in cash each Friday for the week ending the previous Sunday. (Nelligan 18:7-19; Nelligan Dec. ¶14; UC 91:9-92:6 (Arencibia); Chabar 36:20-25; Parra 49:3-18.)

**Plaintiffs' Response: No dispute**

75.     Service employees were paid their wages every two weeks on a Friday for the two weeks ending the previous Sunday. (Nelligan Dec. ¶15.)

**Plaintiffs' Response: No dispute**

76.     Service employees received a biweekly payroll statement that showed wages earned, credit card tips paid and appropriate tax deductions for the relevant pay period. (Interrogatory Response Nos. 10 at 10 and 15 at 15; Nelligan Dec. ¶16 and Ex. A.)     **Plaintiffs' Response: Plaintiffs do not dispute that the payroll statement shows this information, Plaintiffs have and continue to dispute that the amounts paid were accurate.**

77.     As Captains are paid a wage of only $2.77 per hour and payroll tax deductions are based on the combined total of the hourly wage and credit card tips paid, the amount of payroll tax deductions usually exceeds their total hourly wages for the pay period, resulting in a zero paycheck for these employees. However, their pay stubs show both the total hourly wages and the total tips paid for the relevant pay period. (Nelligan 22:15-19; 27:17-29:3; Nelligan Dec. ¶17.)     **Plaintiffs' Response: Plaintiffs dispute the**

17

**accuracy of the tip calculations.**

78.     As bussers are paid a wage of $6.15 per hour, food runners are paid

$10.00 per hour or more, and their share of the tip pool is smaller, the amount of payroll

tax deductions for these employees usually does not exceed their total hourly wages for

the pay period and they usually do not receive a zero paycheck. As with the Captains,

their pay stubs show both their total hourly wages and their total tips paid for the relevant

period. (Nelligan Dec. ¶18; Parra 50:15-51:18; Chabar 41:8-18, 42:25-43:1; Guerch 45:1-

5.)              **Plaintiffs' Response: No dispute**

79.     During discovery in this case, Defendants produced to Plaintiffs copies of,

among other things, copies of their time card records ("Employee Time Card And Job

Detail") for the relevant period, showing the time that they worked each day, and copies

of the relevant portions of payroll records ("Payroll Journals" and "Payroll Adjustment

Journals") showing actual wages, including overtime, and tips paid to them. (Steinbach

Dec. ¶13.)     **Plaintiffs' Response: No dispute**

80.     Plaintiffs have not claimed that either the time records or the payroll

records so produced are inaccurate. (Steinbach Dec. ¶14.) **Plaintiffs' Response:
Disputed.  Plaintiffs have always maintained that the payroll records are inaccurate
to the extent that the tip calculations are not consistent with the enunciated tip pool
allocation. (Arencibia 163:11)**


### G. OVERTIME FOR TIPPED EMPLOYEES

81.     Tipped employees who work more than 40 hours per week receive

overtime pay. (Nelligan 33:20-34:5; Nelligan Dec. ¶19.) **Plaintiffs' Response: Disputed**

**(Arencibia 62:13)**

82.     The overtime rate is determined by calculating the normal minimum

overtime rate, *i.e.*, one and one-half times the standard applicable minimum wage, and

then deducting from this amount the amount of the tip credit. (Nelligan Dec. ¶20.)

**Plaintiffs' Response: Disputed (Nelligan 36:5)**

83.     For example, during the period from January 29, 2006 to July 24, 2008,

when the District of Columbia minimum wage was $7.00 per hour, The normal minimum

overtime rate was $10.50. The tip credit for a Captain was the difference between the

regular minimum wage of $7.00 per hour and the allowable minimum wage with a tip

credit of $2.77 per hour, or $4.23. Thus, the overtime rate for a Captain was $6.27 per

hour. (Nelligan Dec. ¶21.) **Plaintiffs' Response: No dispute**

84.     Similarly, during the period from July 24, 2008 through September 16,

2008, when the District of Columbia minimum wage was $7.55 per hour, the normal

minimum overtime rate was $11.33, the tip credit for a Captain was the difference

between $7.55 and $2.77, or $4.78, and thus the overtime rate for a Captain was $6.55.

(Nelligan Dec. ¶22.) **Plaintiffs' Response: No dispute**

85.     In the case of the bussers, prior to July 24, 2008 the tip credit was the

difference between the regular District of Columbia minimum wage of $7.00 per hour

and the $6.15 per hour actually paid to them, or $0.85 per hour. Thus, the overtime rate

for a busser was $9.65 per hour. (Nelligan Dec. ¶23.) **Plaintiffs' Response: No dispute**

86.     Similarly, from July 24, 2008 the tip credit for bussers was the difference

between the regular District of Columbia minimum wage of $7.55 and the $6.15 per hour

actually paid to them, or $1.40 per hour. Thus, the overtime rate for a busser was $9.93

per hour. (Nelligan Dec. ¶24.) **Plaintiffs' Response: No dispute**

87.     Finally, as the food runners always received more than the minimum wage, their overtime rate was the same as the regular overtime rate for their base pay. (Nelligan Dec. ¶25.) **Plaintiffs' Response: No dispute**

88.     Mr. Arencibia admits that he has no basis for contending that the number of overtime hours reflected on his pay stubs was right or wrong. (Arencibia 162:20-63:19.) **Plaintiffs' Response: No dispute**

89.     Mr. Guerch is unaware of any errors in the amount of overtime that he was paid. (Guerch 63:23-64:6.) **Plaintiffs' Response: No dispute**

90.     Mr. Parra expressly testified that he is not claiming that he was not paid all overtime wages that he should have received. (Parra 67:12-68:2.) **Plaintiffs' Response: No dispute**

## H. NOTICE OF THE TIP POOL

91.     Posters outlining what the Fair Labor Standards Act and the D.C. Minimum Wage Act says are, and at all relevant times were, posted on a cork board on one of the walk-ins where all employee-related material is posted. (Burke 20:19-21:10; Burke Dec. ¶¶11-13 and Ex. A.) **Plaintiffs' Response: Disputed (Para 77:20 and Chabar 53:14); Additionally these exhibits do not reflect a tip-pool formula.**

92.     These posters include reference to the requirement that tipped employees must receive a cash wage of at least $2.13 per hour (federal) or at least $2.77 (D.C.) and that the totals of tips plus the cash wage must equal the minimum hourly wage. (Burke Dec. ¶¶13-14 and Ex. A.) **Plaintiffs' Response: No dispute, but these exhibits do not reflect a tip-pool formula.**

93.     Service employees are informed and aware that Marcel's is a tip pool house. (Burke 22:8-14, 96:15-97:21; *accord*, as set forth in the following paragraphs.)

**Plaintiffs' Response: Plaintiffs have testified that they learned about the tip pool and the formula by word of mouth.  (Para 77:11 and Chabar 44-46).**

94.     Thus, the tip pool policy is verbally explained at hire and from time to time during employee meetings or one on one conversation. (Interrogatory Response No. 21 at 21.)  **Plaintiffs' Response: No dispute. (Burke 22-24)**

95.      Service employees are informed and are aware that 3.5% is deducted from the tips accrued each night for credit card charges. (Burke 96:15-98:9; Arencibia 75:17-7:6, 187:19-24.) **Plaintiffs' Response: Disputed (Para73:11 and Chabar 44-46)**

96.     Mr. Arencibia conceded that he had no issue with the 3.5% deduction. (Arencibia 75:17-76:6.) **Plaintiffs' Response: No dispute**

97.     Mr. Arencibia was aware that there was a tip pooling system. (Arencibia 198:14- 24; UC 90:19-21 (Arencibia).) **Plaintiffs' Response: No dispute**

98.     Mr. Chabar knew he was getting tips from the servers with whom he worked. (Chabar 43:20-44:1.) **Plaintiffs' Response: No dispute**

99.     Mr. Chabar also knew from his pay stub the hourly wage he received. (Chabar 40:19-21.) **Plaintiffs' Response: No dispute**

100.    Parra was told when he applied that he would be paid per hour plus tips, and was told the percent. (Parra 80:14-81:12.) **Plaintiffs' Response: Disputed**

101.    Mr. Parra also learned from another server that there was a tip pool. (Parra 73:14- 21.) **Plaintiffs' Response: No dispute**

102.    Guerch knew he got a wage and a share of tips from the table. (Guerch

45:7- 46:13.) **Plaintiffs' Response: No dispute**

## I. THE OPERATION OF THE TIP POOL

103.   The vast majority of tips are generated through credit card charges, either by amounts voluntarily added to the bill by customers or by mandatory service charges imposed upon large parties and/or private dining. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶27.)  **Plaintiffs' Response: No dispute**

104.   At the end of each shift each Captain prints out two copies of a receipt summarizing the sales for the tables that he served during the shift. This also shows the total charged tips for these tables. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶28 .) **Plaintiffs' Response: No dispute**

105.   One copy is stapled to the Captain's closed sales checks for the shift and turned in to the Maître d'. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶29.) **Plaintiffs' Response: No dispute**

106.   The other copy is stapled to a document headed "Marcel's Daily Tip Sheet" that contains a roster of service employees (Maître d', Captain/waiter, runners, bussers, bartender). (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶30 and Ex. B.) **Plaintiffs' Response: No Dispute**

107.   The date is written on this document along with some indication (circles, checks, etc.) of the names of service staff who worked that night. (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶31 and Ex. B.) **Plaintiffs' Response:  No Dispute**

108.   Also noted on this document are special instructions for distribution of certain charged tips, in particular extra payments to food runners and/or bussers, payments that a Captain directs be paid from his own share to a kitchen employee, or

payments that the customer specifically has directed be made to certain individuals, as discussed below. (Nelligan 41:14- 42:2; Nelligan Dec. ¶32; Burke Dec.¶¶15-17.)

**Plaintiffs' Response: Disputed.  These instructions were not made by the Captains. See Arencibia Deposition pps 89-153**

109.   The Maître d' (or whoever is acting in his place) prints out a summary receipt of all sales for the day, including total sales and charged tips, and attaches to that anything unusual, such as a gift certificates, complimentary meals, and/or private dining. This is placed with the "Marcel's Daily Tip Sheet." (Interrogatory Response No. 15 at 13; Nelligan Dec. ¶33.) **Plaintiffs' Response:    Disputed.  See Arencibia Deposition pps 89-153**

110.   All of this data also goes into the computer system, which generates a "Daily System Sales Detail" that, among other things, shows the total amount of credit card tips received; a "Credit Card Batch Detail" that, among other things, shows all credit card transactions, including charged tips; and other reports showing item and group sales information. (Interrogatory Response No. 15 at 13; Nelligan 15:8-15; Nelligan Dec. ¶34.) **Plaintiffs' Response: No Dispute**

111.   These documents are then transferred to the office, where Office Manager Lauren Nelligan, or a person working under her direction, calculates the amount of credit card tips to be paid out to each tipped employee. (Interrogatory Response No. 15 at 13; Nelligan 15:8-18:14; Nelligan Dec. ¶¶1, 26, 35.) **Plaintiffs' Response:     No Dispute**

112.   First, a 3.5% credit card processing fee is deducted from the total amount of credit card tips. (Interrogatory Response No. 15 at 13; Burke 96:15-97:15; UC 32:11-12 (Burke); Nelligan 15:11-22; Nelligan Dec. ¶36.) **Plaintiffs' Response:  No Dispute**

112.   As the bartender does not participate in the tip pool, all tips and service charges on the bartenders' receipts are then deducted. (Interrogatory Response No. 15 at 13; Nelligan 15:11-16:4; Nelligan Dec. ¶37.) **Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

113.   Marcel's periodically hosts private parties. In that connection it employs a Director of Sales, Julie Albert. Ms. Albert is responsible for, among other things, selling, booking and planning all private parties, including negotiating the price, discussing menus, collecting both a deposit and final payment, and often attending the event itself. Despite her title, Ms. Albert has no managerial authority, supervises no employees, had no authority to hire, fire, discipline, or schedule employees, and has no ownership interest in Marcel's. (Burke Dec. ¶18.) **Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

114.   When there is a private party, the customer is informed that there will be a mandatory 20% service charge. When the customer asks, the customer also is informed that 3% will be paid to the Director of Sales for her services and the remaining 17% will go to the service staff. The meeting planners with whom Ms. Albert arranges most parties also know that this is standard practice. Customers also are frequently told that they are free to leave an additional tip if they so desire. (Burke Dec. ¶19.) **Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

115.   Accordingly, when there is a private party, 3% of the net sales (which is included in the mandatory 20% service charge) on the private party check is deducted as a commission for the private dining director. This leaves a service charge of 17% for distribution to service employees participating in the tip pool. (Interrogatory Response

No. 15 at 13; Burke 94:7-19; Burke Dec. ¶19; Nelligan 42:3-18; Nelligan Dec. ¶38.)

**Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

116.    In addition, at times a customer specifically requests that a portion of

his/her credit card tip be paid directly to individuals such as the Maître d', a Captain, or

the Sommelier. When this occurs, this amount is deducted from the pool and paid as

directed. (Burke Dec. ¶17; Nelligan Dec. ¶39.)

**Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

117.    The resulting amount is then generally split 70% to the Maître d' and

Captains working that evening, and 30% to the runners and bussers working that evening;

the bartender does not participate in this distribution. (Interrogatory Response No. 15 at

13; Burke 82:12-83:6, 83:19-84:8, 92:18-93:1; UC 32:12-19 (Burke); Kebaier 11:1-15;

Nelligan 16:6-13, 41:3-13; Nelligan Dec. ¶20.)

**Plaintiffs' Response:          Disputed.  See Arencibia Deposition pps 89-153**

118.    At times a small portion of the 70%, typically $10-$20, is distributed to

one or more of the runners and busboys for good performance, or for doing extra work .

At times certain runners and/or bussers have regularly received such an extra amount.

The payment of such an extra amount must be approved by Mr. Burke. (Interrogatory No.

15 at 13; Burke 93:20- 94:-94:6; Nelligan 41:14-42:2; Burke Dec. ¶14; Nelligan Dec.

¶41.)  **Plaintiffs' Response:  Disputed.  See Arencibia Deposition pps 89-153**

119.    On rarer occasions a Captain may direct a small amount of his share be

given to a dishwasher, *e.g.* if he stays late to handle a late party. (Interrogatory Response

No. 15 at 13; Burke Dec. ¶10; Nelligan Dec. ¶42.)  **Plaintiffs' Response:  No dispute**

**that this is Defendants testimony**

120.    These calculations are set forth on the pertinent "Marcel's Daily Tip Sheet" for the particular day. (Interrogatory Response No. 15 at 13; Nelligan 19:6-9; Nelligan Dec. ¶43 and Ex. B.) **Plaintiffs' Response: Disputed.  See Arencibia Deposition pps 89-153**

122.    After the completion of a full pay week (Monday through Sunday), the office prepares an Excel spreadsheet, titled "Marcel's Weekly Tip Out Sheet," showing the amount of tip money due each of the service personnel for each day of the week (including the bartender(s), whose tip as noted above is calculated separately) and the total amount of tips to be paid. (Interrogatory Response No. 15 at 13-14; Nelligan 19:10-16; Nelligan Dec. ¶44 and Ex. C.) **Plaintiffs' Response:     No Dispute**

123.    This spreadsheet usually is completed by the Wednesday following the end of the pay week ending the previous Sunday, and employees can call at that time to find out how much tip money they are to receive on the coming Friday. (Interrogatory Response No. 15 at 14; Nelligan 10:4-9; Nelligan Dec. ¶45.)

**Plaintiffs' Response: No Dispute**

124.    The total amount of tips for each day is entered into the accounting software and a check generated for the total amount of tips due. (Interrogatory Response No. 15 at 14; Nelligan 19:10-16; Nelligan Dec ¶46.) **Plaintiffs' Response:No Dispute**

125.    A copy of the check stub, an Account Quick Report showing appropriate journal entries for each day's tip receipts and the check, and a copy of the "Marcel's Weekly Tip Out Sheet," is retained for recordkeeping purposes. (Interrogatory Response No. 15 at 14; Nelligan Dec. ¶47.) **Plaintiffs' Response:     No Dispute**

126.    The check is cashed and the money, along with a copy of the "Marcel's

26

Weekly Tip Out Sheet," is delivered to the restaurant. (Interrogatory Response Nos. 14 at

12, 15 at 14; Nelligan Dec. ¶48.) **Plaintiffs' Response:    No Dispute**

127.    The Maître d' or his substitute then uses the "Marcel's Weekly Tip Out

Sheet" to determine the amount due each service employee, divides the money

accordingly, and generally puts the appropriate amount in an envelope with the name of

the person and the amount written on the outside. He then hands out the envelopes on

Friday. (Interrogatory Response No. 15 at 14; Nelligan Dec. ¶49.) **Plaintiffs' Response:**

**Disputed. See Alamarz Affidavit and Arencibia's deposition**

128.    On occasion, due to considerations of time, the Maitre d' or his substitute

may distribute the money directly without first putting it in envelopes. (Interrogatory

Response No. 15 at 14; Nelligan Dec. ¶50.) **Plaintiffs' Response:  Disputed. See**

**Alamarz Affidavit and Arencibia's deposition**

129.    The Maître d's copy of the "Marcel's Weekly Tip Out Sheet" is available

for inspection by the service employees. (Interrogatory Response No. 15 at 14.)

**Plaintiffs' Response: Disputed. See Alamarz Affidavit and Arencibia's deposition**

130.    The office also keeps a copy of the "Marcel's Weekly Tip Out Sheet"

with the "Daily Tip Sheets" for that week. (Interrogatory Response No. 15 at 14; Nelligan

Dec. ¶51.) **Plaintiffs' Response:    No Dispute**

131.    Two weeks of these documents are kept with an "Employee Time Card

And Job Detail" for the two week pay period. Notation is made on the "Marcel's Weekly

Tip Out Sheet" for the second week of the total tips for each employee for the two week

period. The office then adds to these documents a worksheet provided by Defendant

Marcel's payroll service, Paychex, on which hours, overtime hours and tip amounts are

entered, and bands and stores these records by two week pay period. (Interrogatory Response No. 15 at 14-15; Nelligan 21:11-21; Nelligan Dec. ¶¶52-53 and Exs. D-E.)

**Plaintiffs' Response: No Dispute**

132.    The amount of tips paid to each employee is also reported to Paychex, and along with regular wages appears on the biweekly payroll statements distributed to all employees as well as on the "Payroll Journal" and "Payroll Adjustment Journal" provided to Defendant Marcel's by Paychex for that particular payroll period. Beginning with the payroll period ending August 24, 2008, the latter two documents were combined into a single "Payroll Journal." (Interrogatory Response No. 15 at 15; Nelligan 22:15-19, 37:7-16; Nelligan Dec. ¶54 and Ex. F.)  **Plaintiffs' Response:        No Dispute**

133.    On the rare occasions when a customer leaves a cash tip, it is up to the Captain (or Maître d' if it is his table) to decide whether to keep it for himself or share it with others. (Interrogatory Response No. 15 at 15; Burke 53:7-19, 54:11-57:14; Kebaier 9:14-16, 46:14- 47:12, 51:6-22, 69:11-70:12; Burke Dec. ¶20.)

> **Plaintiffs' Response:        However, according Kebaier's testimony, if a cash tip is left from a large party, it goes into the pool, although there is no tracking system that he could describe.  (Kebaier pp. 47-52)**

134.    Marcel's does encourage the Captain (or Maître d') to share such cash tips with the other persons involved in providing service to the table, but does not require they do so. (Burke 55:21-56:4; Kebaier 69:20-70:12, 77:14-20; Burke Dec. ¶20.)

> **Plaintiffs' Response:        No Dispute**

135.    Marcel's keeps no records of such tips unless they are reported to it by the Captain or Maître d'. (Interrogatory Response No. 15 at 15; Burke 52:18-20; Kebaier

55:18-22, 56:17-57:12; Burke Dec. ¶20.) **Plaintiffs' Response:      No Dispute**

136.    If a mandatory service charge is paid in cash, it is placed in the tip pool.

(Burke Dec. ¶20; Kebaier 47:13-49:13, 50:15-52:13, 56:13-6.)

   **Plaintiffs' Response:        No Dispute**

137.    When Marcel's first opened in 2000, Mr. Burke was the Maître d'. By late

2003 or early 2004 he functioned as both the general manager and as Maître d'. (Burke

Dec. ¶21.) **Plaintiffs' Response:       No Dispute**

138.    While Mr. Burke was Maître d' he initially participated in the tip pool. At

that time Marcel's did not know that a tip credit could not be taken if management

participated in the tip pool. (Burke Dec. ¶22.) **Plaintiffs' Response: No Dispute**

139.    However, in 2003 there was an audit by the District of Columbia

Department of Employment Services ("DC-DOES"). As one of the consequences of that

audit, Marcel's learned that a tip credit could not be taken if a member of management

such as Mr. Burke participated in the tip pool. Due to this and other findings Marcel's

agreed without formal adjudication to make back wage payments to approximately 13

employees. (Burke Dec. ¶23 and Ex. B; Interrogatory Response No. 13 at 11-12.)

**Plaintiffs' Response: No Dispute**

140.    Following this audit Mr. Burke ceased participating in the tip pool, and in

consultation with Corrine Price of DC-DOES made other changes in the operation of the

tip pool to ensure that it met the requirements for being able to take the tip credit. This

included not allowing any member of management to participate in the tip pool. (Burke

Dec. ¶24.) **Plaintiffs' Response:       No Dispute**

### J. SPECIFIC FACTS PERTAINING TO MARTINEZ CLAIM

141.    As set forth in paragraphs 13, 14 and 17, above, opt-in Plaintiff Martinez worked as a food runner and during the relevant period of January 29, 2006 through his last day of work on February 8, 2007 was paid at the rate of $12.00 per hour. (Nelligan Dec. ¶¶12-13 and Exs. G-H.) **Plaintiffs' Response: No Dispute**

142.    Time and payroll records show that Mr. Martinez was paid at this rate for all hours that he worked during the relevant period. (Nelligan Dec. ¶55 and Exs. G-H.)

143.    These same time and payroll records also show that there was no week in the relevant period in which Mr. Martinez worked more than 40 hours. (Nelligan Dec. ¶56 and Exs. G-H.) **Plaintiffs' Response:    No Dispute**

### K. SPECIFIC FACTS REGARDING ARENCIBIA RETALIATION CLAIM

144.    On or about October 6, 2007, Mr. Arencibia was sent home by Chef Wiedmaier because of an incident involving his failure to deliver to a table an "amuse bouche" (a small pre-appetizer course delivered without being ordered while the customer is waiting for the appetizer). (Arencibia 36:12-37:22 and Arencibia Ex. 13 p. 2.) **Plaintiffs' Response: No Dispute**

145.    Mr. Arencibia states that the following week Mr. Kebaier told him that Chef Wiedmaier said he was fired. (UC 100:4-13 (Arencibia) and Arencibia Ex. 13 p. 2.) **Plaintiffs' Response: No Dispute**

146.    Mr. Arencibia further states that he was told that Thursday that he could return to work the following Saturday. (Arencibia 39:24-40:5, 40:20-22 and Arencibia Ex. 13 p. 2; UC 100:14-20 (Arencibia).) **Plaintiffs' Response:        No Dispute**

147.    Prior to this incident, there were other incidents where Mr. Arencibia

noticed that Chef Wiedmaier did not like him personally, would scream and yell at him and would call him stupid. (Arencibia 40:23-41:4.) **Plaintiffs' Response:  No Dispute**

148.   Mr. Arencibia asserts that he regularly (once a month, once every two or three months, on many occasions and/or every time he had a chance) commented about the fact that he went home without knowing how much he made in tips that night, that when he asked for documentation it was refused, and/or that he felt the service employees had the right to know how much they were making every night. (Arencibia 43:7-15 and Arencibia Ex. 13, p. 2; UC 91:4-8 (Arencibia).) **Plaintiffs' Response:      No Dispute**

149.   Mr. Arencibia also asserts that in several meetings he had with Mr. Burke, in front of other employees, he always brought up the issue of an allegedly unfair pooling system. (Arencibia 54:14-55:3.) **Plaintiffs' Response:      No Dispute**

150.   However, he allegedly was told that there wasn't nothing that could be done, that was the way it is, and that Chef Wiedmaier in particular told him it my way or the highway." (UC 92:13-19 (Arencibia).) **Plaintiffs' Response:    No Dispute**

151.   Mr. Arencibia asserts that 10-20 times in the years that he worked at Marcel's, the employees addressed that they wanted to see how much was the total tip per person each night and how many nights they worked and how that tip was broken down into the final daily number, but they never received the information. (Arencibia 87:2-9.) **Plaintiffs' Response: No Dispute**

152.   At a daily briefing on or about September 8, 2008, attended by all the floor staff and Chef Wiedmaier, one of the subjects was the ironing of tablecloths. (Arencibia 128:5:-24; UC 93:11-14 (Arencibia).) **Plaintiffs' Response:      No Dispute**

153.   According to Mr. Arencibia, Chef Wiedmaier said that Marcel's was not

going to pay a company to iron the tablecloths and that the Captains would have to be there earlier to do so. He stated that instead of leaving the tables at the end of the day set up for the next day, when the tablecloths come in, they would iron them and then put place settings on top. (Arencibia 129:2-20, 130:14-17; UC 93:11-14 (Arencibia).)

**Plaintiffs' Response: No Dispute**

154.    Chef Wiedmaier then allegedly said that because of this task, they would have to come 30 minutes earlier and that anyone who was even 1 minute late would be sent home. (Arencibia 130:18-131:1; UC 93:13-14 (Arencibia).)

   **Plaintiffs' Response:        No Dispute**

155.    Mr. Arencibia then asked if Marcel's would give them a light family meal or let them have 15 minute breaks before the restaurant opens in order for them to buy something and eat it in the back. (Arencibia 131:3-9 and Arencibia Ex. 13, p. 2; UC 93:16-19 (Arencibia).)        **Plaintiffs' Response: No Dispute**

156.    Chef Wiedmaier allegedly first laughed and then screamed that if Mr. Arencibia and the others wanted a lunch, they would have to be there at 1:00. When Mr. Arencibia responded that this was impossible, Chef Wiedmaier responded then there is no lunch, "it's my way or the highway." He sounded mad or angry at Mr. Arencibia; his voice was rude, and his tone got louder. (Arencibia 11:16-12:5, 131:10-12, 132:1-8, 134:19-24 and Arencibia Ex. 2, Plaintiff's Interrogatory Response No. 15 at 10; UC 93:19-94:1 (Arencibia).)        **Plaintiffs' Response: No Dispute**

157.    In his testimony on behalf of Mr. Arencibia at Mr. Arencibia's unemployment compensation hearing, fellow Captain Theo Delony confirmed that Mr. Arencibia made this request, that Chef Wiedmaier said they would have to come in at

1:00 if they wanted to have that kind of family meal, and that Chef Wiedmaier was upset with Mr. Arencibia. (UC 63:1-64:6 (Delony).)        **Plaintiffs' Response: No Dispute**

158.   Thereafter, Mr. Delony noticed that Chef Wiedmaier's attitude toward Mr. Arencibia had changed, that he was not happy with Mr. Arencibia and that he wanted to replace him. (UC 65:15-66:14, 69:19-70:4 (Delony).)        **Plaintiffs' Response: No Dispute**

159.   According to Mr. Delony's testimony, Chef Wiedmaier actually said that he wanted to get rid of Mr. Arencibia. (UC 72:3-10, 72:18-20 (Delony).)

**Plaintiffs' Response: No Dispute**

160.   On September 11, 2008, Mr. Arencibia allegedly called to notify that he was running late, but was told to go home. (Arencibia 135:16-136:3; UC 94:10-18 (Arencibia).) **Plaintiffs' Response:  Arencibia was instructed to go home by Kebaier (Arencibia 135:16)**

161.   Although he had previously been given off for September 12, 2008, Mr. Arencibia decided to work that day because he felt Marcel's was looking for a reason to fire him. (Arencibia 139:24-140:19; UC 94:19-20 (Arencibia).)

**Plaintiffs' Response:        No Dispute**

162.   According to Mr. Arencibia, as early as September 14, 2008 he had heard a rumor that he would be terminated. (UC 118:16-119:14 (Arencibia).)

**Plaintiffs' Response:        No Dispute**

163.   In particular, another Captain, Ernesto Cabo told him on September 14 or 15 that he had heard Marcel's wanted to get rid of him. (Arencibia 146:20-147:4 and Arencibia Ex. 13; UC 117:19-118:10 (Arencibia).) **Plaintiffs' Response:  No Dispute**

164. According to Mr. Arencibia's testimony, on September 17, 2008 he came to work and was ironing tablecloths in the back of the restaurant and getting the room ready when Mr. Cabo approached him and asked him if he was being fired or if someone fired him. Mr. Arencibia said no, why, and Mr. Cabo said that he had met a new employee who told him that he was Mr. Arencibia's replacement. (Arencibia 60:6-12, 144:1-15.) **Plaintiffs' Response:    No Dispute**

165. According to Mr. Arencibia's testimony, a few minutes later, Mr. Delony came in and told him that Chef Wiedmaier had just approached him at the bar and told him that they needed to get rid of Mr. Arencibia. (Arencibia 60:12-14,144:14-19 and Arencibia Ex. 13; UC 95:7-10, 108:5-8 (Arencibia).) **Plaintiffs' Response: No Dispute**

166. Next, around 4, the new waiter, Josh Gonzalez, came in and they shook hands. Mr. Gonzalez said he was Puerto Rican, Mr. Arencibia responded that he was Cuban and they switched to Spanish. Mr. Gonzalez said he was amazed to meet him because a chef at a sister restaurant where he had been working, Brasserie Beck's, had told him that Mr. Arencibia was fired and that was why Marcel's needed him, but he now guessed this had just been rumor and innuendo. (Arencibia 57:24-58:8, 59:22-25, 60:4-6, 60:14-22, 144:20-25 and Arencibia Ex. 13 at 1; UC 79:10-81:21, 83:11-84:13 (Gonzalez); UC 95:1-6, 107:10-17, 108:9-11 (Arencibia).) **Plaintiffs' Response: No Dispute**

167. While Mr. Arencibia was talking to Mr. Gonzalez, Chef Wiedmaier allegedly approached him and told him "no Spanish in this restaurant." (Arencibia 57:23-24, 60:22-23, 145:1-5.) **Plaintiffs' Response:  No Dispute**

168. According to Mr. Arencibia's testimony, both he and Mr. Gonzalez went

back to their work areas, but Chef Wiedmaier started looking for mistakes and "it was evident that he want to fire me."[3] So he approached Chef Wiedmaier and asked, "after four years that I have been working for you, you want to fire me? And he said yes, and what's the problem with that?" Mr. Arencibia then thanked him for the opportunity, took off his tie and left the restaurant. (Arencibia 145:6-24, 148:18-149:5 and Arencibia Ex. 13 at 1; UC 95:11-22, 97:3-10, 112:12-21, 114:6-12 (Arencibia).)   **Plaintiffs' Response:**

**Arencibia also testified that he was fired by Chef Weidmaier**

**Unemployment Hearing Transcript page 93.**

169.    On his way out the door, he told Mr. Kebaier that he was the worst person that he ever worked with. (Arencibia 146:4-13; UC 96:1-15, 112:22-113:3 (Arencibia).)

**Plaintiffs' Response: No Dispute**

170.    At his unemployment hearing on December 4, 2008, Mr. Arencibia testified that the reason Chef Wiedmaier became mad at him was because he requested the family meal or a break for sandwiches. (UC 94:7-8 (Arencibia).)

**Plaintiffs' Response:        No Dispute**

171.    He also testified at his unemployment hearing that he knew after the September 8 meeting based on Chef Wiedmaier's mood that they were looking to fire him. (UC 96:15-17 (Arencibia).)    **Plaintiffs' Response: No Dispute**

172.    Specifically, he testified that Chef Wiedmaier "never told me why he was firing me, but I knew because of my co-workers and I knew it that he was probably mad

---

[3] In his response to Defendant's Interrogatories, Mr. Arencibia stated that a few minutes later Mr. Delony and Mr. Gonzales "told him that Chef Wiedmaier wanted to fire him; and he was fired that day." (Arencibia Ex. 2, Plaintiff's Interrogatory Response No. 15 at 10.)

at me, his mood, because of the meeting when I mentioned that we need a family meal or a 15-minute break for lunch." (UC 104:17-22 (Arencibia).) **Plaintiffs' Response: No Dispute.  However, Arencibia and Burke testified that Arencibia had expressed concerns over the calculation of wages in the month of or just prior to Arencibia's termination.  See Unemployment Hearing Transcript 30-33; 91-93.**

173.   Mr. Arencibia also testified at his unemployment hearing that he "knew that there was a hostile environment over my person since the September the 8th because I was sent home." (UC 113:17-29 (Arencibia).)          **Plaintiffs' Response: No Dispute**

174.   Following the unemployment hearing, the Administrative Law Judge found that Mr. Arencibia reasonably concluded that he had been terminated based on Chef Wiedmaier becoming angry at him following the discussion concerning having a meal tor a meal break and being told by colleagues that Chef Wiedmaier wanted to, was going to, or had fired him. Final Order, *Freddy Gonzales Arencibia v. 2401 Restaurant Corp.*, Case No. ES-P-08-11719 at 6-7 (Office of Administrative Hearings, Dec. 11, 2008). (Steinbach Dec. ¶9 and Ex. I.) **Plaintiffs' Response: No Dispute**

175.   This decision was later upheld by the D.C. Court of Appeals. *2401 Restaurant Corp. v. Freddy Gonzales Arencibia*, No. 09-AA-19 (D.C. Court of Appeals June 30, 2010). (Steinbach Dec. ¶10 and Ex. J.) **Plaintiffs' Response:     No Dispute**

176.   At his deposition nearly two years later, Mr. Arencibia changed his testimony somewhat, testifying first that Chef Wiedmaier fired him because he was speaking Spanish, but then speculating that he felt there were additional reasons, such as the fact that he had asked for a light meal; the fact that he was always wanting to know the real tips numbers; the fact that he was the only person not afraid of Chef Wiedmaier;

and "some other facts that Chef Wiedmaier may only know himself." (Arencibia 162:10-17.)  **Plaintiff's Response:    Plaintiff Arencibia's testimony during the unemployment hearing reflects that he testified about his statements to both Tome Burke and the Maitre d regarding the way tips were calculated.  The testimony of Tom Burke during the unemployment hearing reflects that Defendants were aware that Plaintiff Arencibia complained to Chef Wiedmaier about the ability of the employees to have a light snack and about his concerns regarding the calculation of tip income.  See UI Transcript pages 30-33; 91-93.**

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 323.  In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence"

in support of its position. *Id.* at 252. Thus, the nonmoving party cannot rely on mere speculation or compilation of inferences to defeat a motion for summary judgment. *See Hutchinson v. Cent. Intelligence Agency*, 393 F.3d 226, 229 (D.C. Cir. 2005).  Nor can the non-moving party rely on hearsay statements or conclusory statements with no evidentiary basis to establish a genuine issue of material fact.  *See Assoc. of Flight Attendants v. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).  Moreover, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. *See Celotex*, 477 U.S. at 322; *see also Anderson*, 477 U.S. at 252 (summary judgment appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]").

A.  **THERE ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE REGARDING WHETHER THE TIP-POOL WAS VALID AND IF SO, OPERATED CONSISTENT WITH DEFENDANTS' PRONOUNCMENT OF THE TIP ALLOCATION**

Tipped employees are those who customarily and regularly receive more than $30 per month in tips. Tips are the property of the employee. The employer is prohibited from using an employee's tips for any reason other than as a credit against its minimum wage obligation to the employee ("tip credit") **or in furtherance of a valid tip pool**.  See Department of Labor Fact Sheet #15,

(http://www.dol.gov/whd/regs/compliance/whdfs15.htm).

A "tip pool" is an arrangement whereby employees contribute a portion of their tips to a general pool to be shared by others.  For example, where waiters give a portion of their tips to employees who bus tables, both the amounts retained by the waiters and those given the bussers are considered to be the tips of the individuals who retain them in applying the provisions of Sections 3(m) and 3(t).  Similarly, where an accounting is made to an employee for his or her information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his or her own are counted as his or her tips for purposes of the Act. Fair Labor Standards Act pg. 9-36 (2011 BNA).  The Department of Labor ("DOL") has set forth the following requirements for a valid tip pool:

The employer must provide the following information to a tipped employee before the employer may use the tip credit:

1) the amount of cash wage the employer is paying a tipped employee, which must be at least $2.13 per hour;

2) the additional amount claimed by the employer as a tip credit, which cannot exceed $5.12 (the difference between the minimum required cash wage of $2.13 and the current minimum wage of $7.25);

3) that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee;

4) **that all tips received by the tipped employee are to be retained by the employee except for a <u>valid tip pooling arrangement</u> limited to employees who customarily and regularly receive tips;** and

5) that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions.

**The employer may provide oral or written notice to its tipped employees informing them of items 1-5 above.**  An employer who fails to provide the required information

cannot use the tip credit provisions and therefore must pay the tipped employee at least $7.25 per hour in wages **and allow the tipped employee to keep all tips received**.

(http://www.dol.gov/whd/regs/compliance/whdfs15.htm) (Emphasis added).

The evidence in this case consistently demonstrates that Defendants did not fulfill the requirements to maintain a valid tip pool. Plaintiffs' submit there are three failings: 1.) Improper notice of the nature of the tip pool; 2.) Participation of employees who do not customarily receive tips; 3.) Inconsistent Administration and Lack of Transparency.

### a. Defendants' Notices Do Not Fully Disclose The Nature of The Tip-Pool

Notwithstanding the exhibits to his Declaration, Mr. Burke fails to put forth evidence of Defendants publication—written of a tip pool. No doubt the FLSA and D.C. Government notices reflect that tipped employees will receive less than minimum wage in lieu of tips, but those same posters articulate the expectation that the employees will keep all of the tips they earn. That is not the case. In fact, it is quite the opposite. It was commonly understood that there was a tip pool. Further, it was commonly known that it was based upon a percentage of tips, pursuant to which the pooled tips were split between captains/servers and bussers and runners and the on a 70-30 basis. What was not commonly known was that there were adjustments to what was in the pool.[4]  However, there was never any written notice, and the oral notice was not full disclosure, as discussed below.

Defendants slightly mischaracterize Plaintiffs' arguments concerning the tip pool. Plaintiffs distinguish the tip-credit from the basic requirement of providing employees notice of how their wages can be determined. That requirement is governed by other

---

[4] Plaintiffs concede that an adjustment by the restaurant for credit card transactions was understood.

provisions of the FLSA and the District of Columbia Code.  In D.C., every time wages are paid, an employer must provide workers itemized statements of hours worked; gross and net pay, with the portions of wages from overtime hours or commission specified; and any deductions or additions to pay.  *See* D.C. Code § 32-1008(b).  Furthermore, under the DCWPCA, employers are required to bimonthly pay their non-exempt employees all wages.  *See* D.C. Code Ann. § 32-1302; *Fudali v. Pivotal Corp.*, 310 F. Supp. 2d 22 (D.D.C. 2004) (citing *Marsans v. Communications Workers of Am., 1*989 U.S. Dist. LEXIS 4316, 1989 WL 43831, *7 (D.D.C. Apr. 19, 1989)(internal citations omitted)).  Likewise, every employer subject to any provision of FLSA "**shall make, keep, and preserve such** records **of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him.**" *See* **29 U.S.C. § 211(c).**  Plaintiffs submit that the evidence in this case demonstrates that the Defendants did not keep records reflecting how the tip-pool allocations were determined.

When the employees asked for the documentation, they were told no, or shown a piece of paper that did not permit them to determine the total tips in the pool and who was participating in that weeks' pool.  See Almaraz Affidavit.   Plaintiffs Exhibit A reflects what was routinely kept by Defendant as the documentation of the tip-pool calculation.  Nothing in these sheets reflects the total amount of tips received for the period—one would need to back into the calculation, and assume there were no previous deductions.  More importantly, the sheets reflect other arbitrary allocations increasing amounts some employees would receive while deducting what other employees would receive, without explanation.  That is not consistent with a percentage of tips pool.

### b. Certain Participants in the Pool Were Not Those Who Routinely and Customarily Receive Tips

As the Statement of Facts and response reflect, there is considerable dispute regarding whether certain participants in the pool are individuals who customarily receive tips. Plaintiffs first point to one obvious violation, the occasional inclusion of Ramon Naraez in the tip pool. This is inconsistent with his Declaration in which he states that as the Sommelier, he does not participate in the tip-pool. However, in at least two tip-out sheets that Defendant produced he was written in as an individual eligible to participate in the tip pool. See Exhibit A. Additionally, Plaintiffs challenge the inclusion of Julie Albert in the tip pool, as she is an outside sales person, who would not normally interact with customers in the capacity of serving food or bussing tables. Further, she was not greeting guest or performing hostess duties. Consequently, the inclusion of Ms. Albert is inconsistent with the definition of individuals who customarily receive tips.[5] More importantly, there is no notice that this classification would participate in the tip pool. The tip pool had been limited to those who service patrons in the restaurant inasmuch the Plaintiffs were informed that the busser, runners and captains contributed to and received income from the tip pool. There is no indication that Ms. Albert or Mr. Narez contributed to the tip pool from which they occasionally received tips.

The FLSA expressly prohibits employers from participating in employee tip pools. "Congress, in crafting the tip credit provision of section 3(m) of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share

---

[5] Many courts suggest that an employee's level of customer interaction is the most significant factor in evaluating whether he qualifies as a "tipped employee" under the FLSA. *See Roussell v. Brinker Int'l, Inc., 2008 U.S. Dist. LEXIS 52568, 2008 WL 2714079 at * 7, *10 (S.D. Tex. July 9, 2008)* (agreeing with the Sixth Circuit that the level of customer interaction is "highly relevant" and that the extent of an employee's interaction with customers is "critical" in determining whether an employee may participate in a valid tip pool) (citing *Myers v. Copper Cellar Corp., 192 F.3d 546, 550 (6th Cir. 1999)*; *Kilgore v. Outback Steakhouse of Florida, Inc., 160 F.3d 294, 300-02 (6th Cir. 1998))*.

employees' tips." The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The statutory definition of employer has been liberally construed to effectuate Congress' remedial intent. *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 194 (5th Cir. 1983); *Donovan v. Agnew* at 1513(noting that Congress broadly defined employer "to prevent employers from shielding themselves from responsibility for the acts of their agents."). Thus, where management employees participate in a tip pool, the pool is invalid. *See Ayres v. 127 Restaurant Corp.*, 12 F. Supp. 2d 305, 308-09 (S.D.N.Y. 1998) (finding employee who had authority to suspend, hire and fire employees and analyze payroll costs, was disqualified from participating in Defendants tip pool).

To determine whether an individual is an employer under the FLSA, Courts generally look to the economic realities test and inquire whether the alleged employer: (1) has the actual authority to hire and fire the employees; (2) supervised and con-trolled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990). In applying the economic reality test, courts look at "the totality of the circumstances." *Herman v. RSR Sec. Svcs, Ltd.*, 172 F.3d 132, 139 (2d Cir, 1999)(holding the economic realities test "does not require an employer to have full and absolute control over employees or the day-to-day management of the business; employers who have overall operational *or occasional control* may still be liable for FLSA violations." *Id*. at 139.

Thus, the ultimate question is whether the individual had "supervisory authority over the complaining employee" and is "responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987); *See also Lambert v. Ackerley*, 180 F.3d 997, 1012 ( 9th Cir. 1999) ("Where an individual exercises control over the nature and structure of the employment relationship, or economic control over the relationship, that individual is an employer within the meaning of the Act and is subject to liability"); and, *Zeheng v. Liberty Apparel Co*., 355 F.3d 61, 66-77 (2d Cir. 2003) (applying the "economic realities test" to determine whether an individual is an employer liable under the FLSA.

In the restaurant context courts have reviewed the role of the maitre d'.  In  *Dole v. Continental Cuisine,* 751 F. Supp. 799, 801 (E.D.A.K 1990)(concluding maitre d' was not an "employer" within the meaning of the Act upon finding that Defendants Vice President was *solely* responsible for "hiring and firing employees, determining rates of pay, figuring payroll, and setting pricing, menu, and hours of operation."); *Baird v. Kessler* 172 F. Supp. 2d 1305, 1312 ( E.D. Cal. 2001) (declining to extend personal liability to Defendants managers when State had *absolute control* over disbursements of Plaintiff's paychecks.*); Rudy v. Consolidated Cuisine*, 2010 U.S. Dist. LEXIS 92764 at 18(concluding the degree of supervisory authority exercised by Defendant's maitre d' was insufficient to fall within the definition of employer under the FLSA because Defendants general manager was "present at the restaurant 95% of the time it was open…came in early before the restaurant opened if he needed to do paperwork…, and if he was out of the restaurant, was available by cell phone and expected the maitre d' to call him if a problem arose.").

44

In the instant case, Mr. Burke concedes that he was hardly present during service hours at Defendants restaurant, only visiting Marcel's approximately 3-4 afternoons a week.  While Mr. Kebaier testified that he did not hire anyone without prior approval, he certainly held himself out as hiring the Plaintiff's, as he never indicated that his decision was subject to review.  Mr. Kebaier was directly involved with hiring employees, despite Defendant's attempts to "shield themselves from the responsibility of their agents" by alleging that Mr. Kebaier only interviewed and recommended potential employees to Mr. Burke.  To the contrary, both Mr. Chabar and Parra testified that they not only interviewed for server positions with Mr. Kebaier, but was contemporaneously told by him that they could start work on the following day.  Additionally, Mr. Kebaier regularly disciplined employees without prior approval from any of Defendant's other managers.  For example, Plaintiff Arencibia testified that on September 11, 2008, Mr. Kebaier, without first discussing it with anyone, immediately suspended him when he called Mr. Kebaier to inform him that he would arrive to work 15 minutes late.  (Arencibia 136:1).  A few days later, it was also Mr. Kebaier who lifted Mr. Arencibia's suspension and allowed him to return to work.  Finally, Mr. Kebaier demonstrated the full weight of his authority when he clearly exercised he fired Mr. Guerch for asking for a day off and Mr. Chabar for wanting to take off on Christmas Eve.

Second, Mr. Kebaier drafted employees' schedules for Marcel's.  Mr. Burke was not solely responsible for the weekly scheduling of service employees.  Although he initially drafted the work schedule on his own, Mr. Burke acknowledges that after May 2007, Mr. Kebaier was responsible for drafting the employee schedule based on advanced reservations and historical patronage for the days and time of year.  This schedule would

also account for vacations, emergency leave, and subsequent changes in the schedule. Although Defendant asserts that schedules would have to be approved by Mr. Burke prior to becoming finalized, Mr. Burke admits that he only adjusted Mr. Kebaier's schedule if necessary.

Third, Mr. Kebaier was integral to the administration of the Defendant's tip pool, despite the fact that he did not establish it.  More to the point he was hands on in the reallocation of amounts on weekly tip sheets, as he turned in the sheets to the office after the captains stapled their table printouts to the tip out sheet.  See Arencibia Deposition Excerpt.  Exhibit B. Defendant admits that Mr. Kebaier was responsible for compiling nightly sales receipts from the Captains.  These receipts showed the total amount of tips charged to each table.  Copies of these receipts would also be stapled to a log titled "Marcel's Daily Tip Sheet" that listed Marcel employees.  Mr. Kebaier would then indicate which employees would participate in a given night's tip pool by marking a particular employees name with a check or by circling it.  Mr. Kebaier was also responsible for noting which bussers and food runners, if any, would be entitled to receive extra payments for exceptional service that night and indicating whether a customer had specifically directed their tips be made to certain individuals.  Upon Mr. Burke's approval, these payments would be processed by Defendants office manager. Finally, Mr. Kebaier was responsible for disbursing tip pool payments to Defendants employees every Friday.

 Lastly, Mr. Kebaier involvement in maintaining Defendants employee records was not merely clerical, but integral to determining the weekly amount of tips for a given employee.  Indeed, Mr. Kebaier was responsible for noting which employees were

entitled extra compensation or tips directed by customers to be given to a particular
employee.

### c.   The Tip Pool Calculation Was Arbitrarily Modified Weekly And Suffered Abuses

Under the DOL's approved methods for calculating tip allocations, the
percentage-of-tips method does not take into account arbitrary manipulations of the tips
to be allocated between bussers and captains.  However the tip-out sheets reflect such
changes were made, and do not reflect that any member of the pool agreed to those
changes.  *See* ExhibitA.  However, Laura Nelligan's Declaration reflects that this was
something completed by the captains.  Again, there are no signatures on the document
that reflect which captains designated amounts to be reallocated.  It is Plaintiffs'
contention , in particular Arencibia, that the tip pool manipulations were completed by
Adnane Kebair after the captains closed out their nightly tickets and stapled them to the
tip-out sheet, as explained in Ms. Nelligan's Declaration.  *See* Arencibia Deposition
Excerpt.   Abuses were known at least to Burke, who testified at Arencibia's
unemployment hearing that someone had removed Arencibia's name from a tip sheet .
See Exhibit I.

As articulated above, the records regarding the tip pool allocation were not clear
and demonstrate lack of uniformity in the calculation of tips and sometimes <u>theft</u> from the
pool, inasmuch as at least one declared manager received tips from the pool.  Exhibit A,
demonstrates that there were individuals added to the tip out sheet each week.  The
calculation of the tip allocation appears to simply be a random allocation of amounts
some evenings.  The arbitrariness of the tip-out sheets, which follows-through in Ms.
Nelligan's report does not reflect any checks and balances to ensure that the 70-30

formula was being consistently applied.  The modifications came without notice to the employees about how it would impact the tip calculation formula and what adjustments were being made.  Finally, when asked for further explanation, some employees were informed that they could not see the information, and at least one employee was fired after making the inquiry.  See Almaraz Affidavit.

Consequently, there are genuine issues of fact in dispute about whether the percentage of tips method was appropriately followed by Defendants

**B.  THE DCWPCL DOES NOT LIMIT PLAINTIFFS' REMEDIES, BUT ENHANCES THEM TO THE EXTENT THERE IS NO VALID TIP POOL**

Under the D.C. Wage Payment and Collection Law, tips are considered to be wages, which are defined under the DCWPCL as "monetary compensation after "lawful" deductions, owed by an employer for labor or services rendered, whether the amount is determined by time, task, piece, commission, or other basis of calculation" D.C. Code § 32-1301(3).   Defendant's failure to adequately notify Plaintiffs about their tip-pool arrangement violated the DCWPCL.  Indeed, the D.C. Circuit routinely holds that an employer's failure to demonstrate the accuracy of its employment records is "sufficient evidence to show the amount and extent of [Plaintiff's damages] as a matter of just and reasonable inference." Arias v. U.S. Service Indus., Inc., 80 F.3d 509, 511-12 (D.C. Cir. 1996)(quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687-88, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946); See also *Ventura v. Bebo Foods, Inc*, 738 F. Supp. 2d 1 (D.C. 2010)(concluding Defendant's failure to provide Plaintiff's with accurate wage

records was sufficient to support "the reasonableness of the inference derived from Plaintiff's evidence.").

Having demonstrated that the tip pool is suspect to irregularities, lack of adequate record keeping, has included individuals who should not share tips, and has been modified arbitrarily to reallocate amounts among members of the pool, the question is what remedy the Plaintiffs should be able to seek. Plaintiffs' concede Defendants' articulation of the limitations that the FLSA remedy would be if the tip pool is determined to be invalid. However, that remedy would not be consistent with the local laws protecting employees' wages, pursuant to which Plaintiffs' have sought redress. First and foremost, a violation of the DCWPCL permits an employee to recover the amount of money he should have received. In this instance it would be the amount of tips he earned when waiting on the tables at the restaurant, less those amounts he received. Further, he would be entitled to the statutory remedies of liquidated damages and other consequential damages. See D.C. Code §32-1303(4). This is consistent with the purpose of the statute to make the employee whole.

Defendants argue that there is a bona fide dispute about the amount of wages. Under the statute the bona fide dispute must be articulated in writing about the specific amount of wages conceded to be due, within the time limits set forth under D.C. Code §§ 32-1302 and 32-1303. That has not been done. In fact the written documents do not reflect that the amounts of wages are in dispute. The documents in this case reflect an allocation of amounts among various people who worked during a given week. There is barely an explanation of the math that was applied and why other people were included in the tip pool. The documents reflect that the Plaintiffs received some of their tips—

wages—but cannot be certain that what they received was consistent with the purported tip pool allocation.

Nothing in the FLSA prohibits the application of local or state law remedies that enhance the remedies available to employees whose wages have not been paid in full. Here, setting aside statutory penalties, Plaintiffs request that they be made whole and either be permitted to receive the tips they earned at each table served each week after deducting the amount of wages they received, or that the tip pools for each week be recalculated to provide only those who are eligible to participate the tip income less the amount they already received.  The Plaintiffs would also be eligible for the statutory damages.   Such a remedy for an invalid tip pool is consistent with the DCWPCL.

### C.  **PLAINTIFF ARENCIBIA HAS PRODUCED SUFFICIENT EVIDENCE TO SHOW THAT WIEDMAIER RETALIATED AGAINST HIM WHEN HE TERMINATED PLAINTIFF AFTER COMPLAINING ABOUT HIS WAGES AND CONDITIONS**

FLSA's anti-retaliation provision makes it unlawful for an employer to:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee. . . .

29 USCS § 215(a)(3)

In order to establish a **retaliation** claim under the **anti-retaliation provision** of FLSA**,** 29 U.S.C. § 215(a)(3), a plaintiff must show that "she engaged in protected expression." *Haile-Iyanu v. Cent. Parking Sys. of Va., Inc.*, 2007 U.S. Dist. LEXIS 48153 (D.D.C. July 5, 2007) (quoting *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999)).  The **anti-retaliation provision** states that it is unlawful for any person "to

discharge . . . any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).  The Supreme Court this year put to rest the notion that an oral or internal complaint was considered sufficient to trigger protection under this provision of the FLSA.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334-1335 (U.S. 2011).

Arencibia testified at this unemployment hearing that he had complained about wages and how they were determined at least a month prior to his termination, as he had been complaining several times.  The fact that the decision by the Administrative Law Judge focused upon Chef Wiedmaier's  anger toward Arencibia does not foreclose that one of the things that angered Chef Wiedmaier was Arencibia's constant nudging about wages and conditions at work.  The Administrative Law Judge concluded that Chef Wiedmaier's anger toward Arencibia transpired around the time that Arencibia had inquired about a meal break or on the premises meals because of the prep-time before service—a compensation issue protected under the FLSA.  Plaintiff submit that the close proximity of the protected activity—requesting an adjustment to the workplace and compensation arrangement to the Defendant's articulated legitimate reason should go to a jury, as these are material facts that remain in dispute.

### IV.    <u>CONCLUSION</u>

 For the reasons stated herein, Plaintiff request that the Motion for Summary Judgment be denied as to those issues not conceded by Plaintiffs.

Dated: June 29, 2011

Respectfully submitted,

_____/s/_____
Denise M. Clark (420480)
The Law Office of Denise M. Clark
1250 Connecticut Ave, N.W.
Suite 200
Washington, D.C. 20036
(202) 293-0015
dmclark@benefitcounsel.com


## CERTIFICATE OF SERVICE

I certify that I served a copy of Plaintiff's Opposition to Defendants' Motion for Summary Judgment was served upon opposing counsel via CM/ECF on June 30, 2011.


_____/s/_____
Denise M. Clark. Esq.