# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

FREDDY GONZALES ARENCIBIA, *et al.*,

    Plaintiffs,

      v.

2401 RESTAURANT CORPORATION
d/b/a/ MARCEL'S RESTAURANT, *et al.*,

    Defendants.

**Civil Action No. 09-165 (CKK)**

---

## MEMORANDUM OPINION
(December 21, 2011)

Plaintiffs Freddy Gonzales Arencibia, Hamid Guerch, Khalid Chabar, Carlos E. Parra, and Wilson Martinez ("Plaintiffs"),[1] filed this action alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the District of Columbia Minimum Wage Act ("DCMWA"), D.C. Code §§ 32-1001 *et seq.*, and the District of Columbia Wage Payment and Collection Law ("DCWPCL"), D.C. Code §§ 32-1301 *et seq.* Defendants are 2401 Restaurant Corporation d/b/a/ Marcel's Restaurant ("Marcel's"), and the owner of Marcel's, Chef Robert Wiedmaier. Before the Court is Defendants' [44] Motion for Summary Judgment. Plaintiffs filed a [47] Memorandum in Opposition ("Pl.'s Opp'n"), and Defendants filed a [51] Reply. After considering the parties' briefs, the accompanying exhibits, and the applicable authorities, for the reasons explained below, Defendants' Motion for Summary Judgment is GRANTED.

---

[1] Plaintiff Farzad C. Pazawak filed a [48] Notice of Voluntary Dismissal on July 19, 2011. Wilson Martinez is not listed in the case caption, but submitted a Consent to Joint Collective Action along with the Complaint. ECF No. [1], at 12-13. Defendants have not contested Martinez's inclusion as a plaintiff in this case. *See* Defs.' Mot. at 3.

# I. BACKGROUND

*A.     Procedural History*

Before addressing the relevant factual background, the Court finds it is helpful to outline the claims that remain at issue in the case.  The first claim for relief in the Amended Complaint alleges violations of the FLSA, specifically: (1) failure to pay proper wages and overtime compensation; (2) inaccurate record keeping regarding the tip pool; (3) lack of transparency in the tip pool; (4) removal of tips from the pool by management; and (5) improper inclusion of a management employee in the tip pool.  Am. Compl. ¶¶ 65-69.  The first claim further alleges that Defendants "retaliated against Plaintiff Arencibia when he sought to enforce his rights under the FLSA," by terminating him, and contesting Arencibia's eligibility for unemployment benefits. *Id.* at ¶¶ 72-73.  The second claim for relief alleges violations of DC Code § 32-1003(c) for failing to properly pay overtime compensation.  *Id.* at ¶ 75.  The third claim for relief alleges Defendants violated the DCWPCL by (1) failing to pay all wages due within ten working days; and (2) if there is a bona fide dispute as to wages, failing to give written notice of the amount of wages conceded to be due and any deductions made.  *Id.* at ¶¶ 82-83.  The Amended Complaint also included claims for violations of the District of Columbia Human Rights Act, which were dismissed by the Court.  03/31/2010 Order, ECF No. [19].  The Court also dismissed the DCWPCL claim against Defendant Chef Wiedmaier.  *Id.*

Defendants moved for summary judgment on all remaining claims.  Plaintiffs concede that they lack sufficient evidence to support their overtime claims.  Pls.' Opp'n at 1.  Therefore Defendants are entitled to summary judgment on the overtime component of the first claim for relief and the entirety of the second claim for relief.  As to the first claim for relief, Plaintiffs

concede the only remaining disputes concern (1) documentation of tip calculation: (2) record

keeping for the tip pool; and (3) the participation of certain employees in the tip pool; and (4)

Arencibia's retaliation claim.  Plaintiffs further state that the only remaining issue under the third

claim for relief is the remedy available under the DCWPCL, should the Court find the tip pool

was improperly administered.  *Id.*  As explained below, based on the record and arguments

presented to the Court, the Court finds the tip pool was properly administered by Defendants,

and thus the Court does not reach this issue.  Accordingly, the only issues remaining for the

Court to resolve are Plaintiffs' three challenges to the tip pool articulated above, and Plaintiff

Arencibia's retaliatory discharge claim.

      B.     *Evidentiary Issues*

Defendant's Reply raises two evidentiary issues.  First, Defendants protest Plaintiffs'

lack of compliance with the requirements of Local Civil Rule 7(h) in responding to Defendants'

Statement of Facts.  The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly

Rule 56.1) when resolving motions for summary judgment.  *See Burke v. Gould*, 286 F.3d 513,

519 (D.C. Cir. 2002) (finding that district courts must invoke the local rule before applying it to

the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated

that it "assumes facts identified by the moving party in its statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition

to the motion."  [43] Scheduling and Procedures Order at 5 (Jan. 8, 2010).  The Court agrees that

Plaintiffs' Response is inadequate in many regards.  Plaintiffs often fail to cite any evidence in

the record to support their claim of a factual dispute (*see* Resp. Stmt. ¶¶ 19, 26, 47, 100, 119) and

in many cases cite to entire depositions rather specific excerpts (*see id*. at ¶¶ 18, 23, 41-42, 127-

29). Perhaps most troubling are the cites to 60 page spans of Plaintiff Arencibia's deposition that contain no mention of the issue purportedly "disputed" by Plaintiffs' evidence. *See id.* at ¶¶ 108, 109, 112, 113, 114, 120. It is Plaintiffs' duty to identify, not the Court's, *specific* facts that raise a triable issue in order to defeat summary judgment. *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). To be fair, Defendants do not follow the letter of Rule 7(h) by including facially disputed facts as undisputed. *See* Defs.' Stmt. at ¶¶ 65, 67. Ultimately the Court need not rule on the specific errors identified in Defendants' Reply, and will simply refer to Defendants' Statement where Plaintiffs' Response does not rise to the level of a genuine dispute.

Second, Defendants ask the Court to strike the Affidavit of Robert Almaraz (Pls.' Ex. B) on the basis that Mr. Almaraz was not disclosed as a potential witness during discovery. Defs.' Reply at 2. The Court notes Mr. Almaraz was mentioned by Plaintiff Arencibia during his deposition (Arencibia Dep. 96:16-25), but was not otherwise disclosed during discovery. *See* Arencibia Dep. Ex. 2 (Pls.' Resp. to Defs.' First Set of Interrogatories). The Court is inclined to agree with Defendants, but since Mr. Almaraz's Affidavit does not create a genuine dispute as to any material fact, it is not necessary for the Court to formally strike the Affidavit.

C.      *Factual Background*

Marcel's is a fine dining restaurant located in Washington, D.C. Defs.' Stmt. ¶ 1. Plaintiffs were employed by Marcel's at various times between October 2002 and September 2008.[2] *Id.* at ¶¶ 3-13. Plaintiff Arencibia worked as a server, or "Captain," at an hourly rate of

_____

[2] The statutes of limitation for Plaintiffs' FLSA and DCWPCL are two and three years respectively, though the limit under the FLSA is three years for willful violations. *See* 29 U.S.C. § 255(a); D.C. Code § 12-301(8). Since the Complaint was filed on January 29, 2009, the

$2.77 plus tips. *Id.* at ¶¶ 4, 15. Plaintiffs Guerch, Parra, and Chabar worked as bussers, or "Service Attendants," at an hourly rate of $6.15 plus tips. *Id.* at ¶¶ 8, 10, 12, 16. Opt-in Plaintiff Martinez worked as a food runner at an hourly rate of $12.00 plus tips. *Id.* at ¶¶ 13, 17. Defendant Chef Wiedmaier is the principal owner of Marcel's. *Id.* at ¶ 2.

### 1.   Basic Operation of the Restaurant

Throughout the relevant time frame, the managerial staff for each shift at Marcel's was typically composed of the Executive Chef de Cuisine, one Executive Sous Chef, and one Wine Sommelier, all of whom had the authority to hire, fire, and discipline employees. Defs.' Stmt. ¶¶ 21-22, 25. Prior to April 2007, Thomas Burke, the General Manager and Director of Operations, and Chef Wiedmaier were generally present at the restaurant during the afternoon and evening. *Id.* at ¶¶ 18, 26. Starting in late April 2007, Chef Wiedmaier was present at least two afternoons and evenings per week. *Id.* at ¶ 28. The parties dispute how often Mr. Burke was present after April 2007. Resp. Stmt. ¶ 27. During each shift, the service staff was generally composed of the Maitre d' Adnane Keiblar, at least four Captains, four bussers, one food runner, and one bartender, though there could be as many as seven captains, five bussers, two food runners, and two bartenders present on any given evening. Defs.' Stmt. ¶¶ 29-30.

### a.   Responsibilities of the Maitre d'.

Adnane Kebaier is the Maitre d' at Marcel's. Defs.' Stmt. ¶ 36. During the relevant time period, Mr. Kabier earned $8 per hour in addition to sharing in the tip pool with the other service staff, and did not have any ownership interest in Marcel's. *Id.* at ¶¶ 54-55. In addition to

---

relevant time period (assuming a willful violation of the FLSA) is January 26, 2006 through September 17, 2008 (the last working day for any Plaintiff).

assisting the Captains with their duties, Mr. Kebaier is responsible for organizing reservations, supervising the floor, ensuring the staffs' uniforms are clean, and generally accommodating the requests of guests, including seeing that "regulars" are seated at the tables they request. *Id.* at ¶ 36. Mr. Kebaier is responsible for two regular tables (sometimes up to four), and for waiting on specific patrons when they come into the restaurant. *Id.* at ¶ 38. He also directs food runners and bussers. *Id.* at ¶ 39. Though Plaintiffs "dispute" Mr. Kebaier's authority (*see id.* at ¶¶ 41-47), the record reveals there is no genuine dispute that Mr. Kebaier did not have the authority to hire, fire, suspend, or discipline employees. Plaintiffs argue that Mr. Kebaier "held himself out as hiring" the Plaintiffs and was "directly involved" with hiring employees. Even if true, this has no bearing on whether Mr. Kebaier actually had the authority to hire or fire employees. On that front, Plaintiffs argue that Mr. Kebaier must have had that authority as he interviewed and immediately hired Plaintiffs Chabar and Parra. The record indicates otherwise. Mr. Chabar testified that he filled out an application, and was later called by Mr. Kebaier who told Mr. Chabar he was hired. Defs.' Stmt. ¶ 59; Chabar Dep. 28:4-29:13. Mr. Kebaier testified that after speaking with Mr. Chabar, he took the application to Mr. Burke, who approved the hire. Defs.' Stmt. ¶ 60. Mr. Kebaier testified—and Plaintiffs do not dispute it in the Statement of Material Facts—that Mr. Kebaier did not hire Mr. Parra. Resp. Stmt. ¶ 61. Plaintiffs cite to no evidence in the record to indicate Mr. Kebaier in fact has the authority to hire employees without prior approval.

Plaintiffs further argue that Mr. Kebaier has the authority to discipline employees because he purportedly suspended Plaintiff Arencibia for being late on September 11, 2008, and later lifted Mr. Arencibia's suspension. Pls.' Opp'n at 45. First, it is important to note that the

Plaintiffs' Opposition confuses Mr. Arencibia's discipline history. Mr. Arencibia was told not to come in on September 11, 2008 when he telephoned the restaurant to indicate he was running 15 minutes late. Resp. Stmt. ¶ 160. Arencibia was not suspended at that time. In fact, Mr. Arencibia came into work the following day. *Id.* at ¶ 161. Mr. Arencibia was suspended in October 2007 over his alleged failure to serve a table with the amuse bouche. Defs.' Stmt. ¶ 144. However, Plaintiffs concede Arencibia was sent home by Chef Wiedmaier, and admit Mr. Kebaier said he needed approval from the Chef to lift Mr. Wiedmaier's suspension. Resp. Stmt. ¶ 144; Arencibia Dep. Ex. 13 (Arencibia's Appeal of Denial of Unemployment Benefits) at 2. Thus there is no evidence in the record to raise a genuine issue of material fact as to Mr. Kebaier's lack of authority to discipline employees. Plaintiffs also argue that Mr. Kebaier fired Plaintiffs Guerch and Chabar. However, Mr. Chabar testified that it was Ramon Narvaez who suspended him and sent him home, and he did not speak to Mr. Kebaier. Chabar Dep. 56:12-57:6. Mr. Kebaier likewise testified that it was Mr. Narvaez who sent Chabar home. Kebaier Dep. 33:3-34:4. Mr. Guerch, Mr. Stearman, and Mr. Kebaier did offer conflicting deposition testimony as to the events surrounding Mr. Guerch's termination. *See* Defs.' Stmt. ¶ 65. Guerch testified that Mr. Kebaier fired him after Guerch repeatedly asked to take a day off from work for the last day of Ramadan. Guerch Dep. 53:6-54:1. Mr. Kebaier testified that Guerch simply came in before his shift one day and resigned. Kebaier Dep. 36:20-37:12. Mr. Stearman and Mr. Narvaez also contend Guerch came into the restaurant and quit. Stearman Decl. ¶¶ 5-7 & Ex. A; Narvaez Decl. ¶¶ 9-11 & Ex. B.

Mr. Burke was personally responsible for the schedule for most of the relevant period—until May 2007. Resp. Stmt. ¶ 49. After May 2007, Mr. Kebaier took over for Mr.

Burke in drafting the work schedule for the service staff. *Id.* at ¶¶ 48-49. Mr. Kebaier drafts an initial version of the schedule based on the standard work schedule (such as regularly scheduled days off), advance reservations, and historical averages. *Id.* at ¶ 50. Mr. Burke must approve the final schedule, though Plaintiffs dispute whether Mr. Burke's approval is required for all requests to take non-regularly scheduled days off, or whether Mr. Kebaier's could unilaterally deny such requests. Resp. Stmt. ¶ 51. Mr. Kebaier is not involved in determining hourly wages for employees, nor did he design or implement the tip pool system. Defs.' Stmt. ¶¶ 52-53.

        b.        Responsibilities of the Director of Sales.

Ms. Julie Albert works as the Director of Sales for Marcel's. Defs.' Stmt. ¶ 113. In this position, she is responsible for selling, booking, and planning private events at the restaurant, including negotiating the price, collecting the deposit and final payment, discussing the menu, and often attending the event. *Id.* Ms. Albert does not supervise any employees, has no ownership interest in Marcel's, and has no authority to hire, fire, or discipline employees. *Id.* All private events are charged a 20% service fee. *Id.* at ¶ 114. This service fee is comprised of a 3% commission for Ms. Albert, and 17% gratuity for the service staff. *Id.*

        c.        Responsibilities of the Captains.

Captains greet guests and take their coats, answer the telephone, escort guests to their tables, provide menus and explain the food. Defs.' Stmt. ¶ 31. Captains are also responsible for taking food and beverage orders, entering orders into the computer, opening wine, serving food and drinks, changing silverware, delivering the check and processing payments. *Id.* Generally they are responsible for ensuring a smooth service and seeing that all of the guests' needs are met. *Id.* Each captain is assigned specific tables, but all tables are considered the responsibility

of the entire service staff.  *Id.* at ¶ 32.  Captains may instruct food runners and bussers as necessary, but have no authority to hire, fire, or discipline staff members.  *Id.* at ¶ 33.

d.      Responsibilities of the Bussers and Food Runners.

Bussers bring water to the tables and ensure it remains full, serve bread to the tables, pick up plates and clean the tables.  Defs.' Stmt. ¶ 35.  Bussers also move tables and chairs as needed, change tablecloths, bring wine from the cellar, refill freezers, notify the Captains of any issues and generally help Captains and food runners with whatever is needed during service.  *Id.*  Food runners are responsible for ensuring plates are polished, picking up plates from the table, and notifying the Chef when the table is ready for the next course.  *Id.* at ¶ 34.  Food runners also take the food from the kitchen to a tray by the table, and inform the Captains that the food is ready to be served to the patrons.  *Id.*

2.      Hiring and Termination of Plaintiffs

At all relevant times, Thomas Burke was the general manager and director of operations for Marcel's.  Defs.' Stmt. ¶¶ 18, 20.  Mr. Burke's job responsibilities include hiring, firing, disciplining employees, dealing with emergency calls, overseeing workers' compensation claims, and supervising the Maitre d', Sommelier, and kitchen staff.  *Id.* at ¶ 19.  Mr. Burke, the Executive Chefs de Cuisine, and Chef Wiedmaier have the authority to hire, fire, or discipline employees.  *Id.* at ¶ 21.  The Executive Sous Chef and Sommelier also have the authority to suspend, discipline, and fire employees without checking with Mr. Burke.  *Id.* at ¶ 22.

a.      Plaintiff Arencibia.

Mr. Kebaier informed Arencibia that he was hired.  Defs.' Stmt. ¶ 62.  Mr. Kebaier indicated he told Arencibia he was hired after Mr. Burke decided to hire Arencibia on the

recommendation of another Captain. Defs.' Stmt. ¶¶ 63-64. On or about October 6, 2007, Chef Wiedmaier sent Arencibia home because of Arencibia's alleged failure to deliver an amuse bouche to a table of guests. Defs.' Stmt. ¶ 144. Mr. Arencibia testified that he was later told by Mr. Kebaier that Chef Wiedmaier had fired Arencibia, but was later informed by Mr. Kebaier that he could return to work the following Saturday. *Id.* at ¶¶ 145-46. Arencibia noted that Chef Wiedmaier generally did not like him, and had been known to yell at and insult him. *Id.* at ¶ 147. Arencibia further testified that he and other employees regularly asked for documentation regarding the allocation of tips from the pool, and complained that the pool was unfair, but never received documentation or a satisfactory explanation. *Id.* at ¶¶ 148-51.

During Marcel's daily briefing on or around September 8, 2008, Chef Wiedmaier informed the staff that Marcel's would no longer use an outside service to iron tablecloths, and the Captains would have to come to work thirty minutes early to iron the tablecloths themselves. *Id.* at ¶¶ 152-54. Chef further stated that anyone who arrived even one minute late would be sent home. *Id.* at ¶ 154. Arencibia allegedly asked if the restaurant would provide the service staff with a light meal or 15 minute break before service to obtain food. *Id.* at ¶ 155. Chef Wiedmaier responded that if the staff wanted lunch, they would have to arrive at 1 PM. *Id.* at ¶ 156. When Arencibia responded that was impossible, Chef Wiedmaier reportedly became angry and loud. *Id.* at ¶ 156. At least one other Captain verified Mr. Arencibia's claim, and further reported that Chef Wiedmaier stated his intention to get rid of Arencibia. *Id.* at ¶ 157-59. On September 11, 2008, Arencibia called Marcel's because he was running late for work. *Id.* at ¶ 160. Someone (Mr. Kebaier according to Arencibia) told Arencibia to go home. Resp. Stmt. ¶ 160. Arencibia returned to work the following day, even though he had previously requested it off, because he

felt Marcel's was looking for a reason to fire him. Defs.' Stmt. at ¶ 161. Within days, Arencibia began hearing rumors that he would be fired. *Id.* at ¶ 162-64. Arencibia testified that when he came into work on September 17, 2008, he met a new Captain, Josh Gonzalez, who indicated he had been sent to Marcel's from Brasserie Beck (another restaurant owned by Chef Wiedmaier) to replace Arencibia. *Id.* at ¶ 166. Arencibia approached Chef Wiedmaier and asked the Chef if he wanted to fire him. *Id.* at ¶ 168. Chef Wiedmaier purportedly replied "yes, and what's the problem with that?" *Id.* Arencibia then took off his tie and left the restaurant. *Id.* Arencibia testified at the hearing regarding his unemployment benefits that the reason Chef Wiedmaier became angry with him was because of his request for a family meal or meal break. *Id.* at ¶ 170.

b. Plaintiff Guerch.

Mr. Kebaier testified Plaintiff Guerch was hired after Mr. Kebaier recommended him to Mr. Burke and Mr. Burke instructed Mr. Kebaier to hire Guerch. Kebaier Dep. 23:17-25:18. Guerch himself testified he was hired by Mr. Burke. Guerch Dep. 30:2-32:4.[3] Mr. Kebaier had to obtain approval from Mr. Burke to re-hire Guerch when he asked to return to Marcel's after serving a jail sentence. Defs.' Stmt. ¶ 58. The parties disagree whether Guerch quit or was fired over his request to take a particular day off from work. *See supra,* at Section I.C.1.a.; Defs.' Stmt. ¶ 65. Guerch contends he was fired by Mr. Kebaier after requesting a day off from work. Guerch Dep. 53:6-54:1. Mr. Kebaier, Mr. Stearman, and Mr. Narvaez contend Guerch simply came in before his shift one day and resigned. Kebaier Dep. 36:20-37:12; Stearman Decl. ¶¶ 5-7 & Ex. A; Narvaez Decl. ¶¶ 9-11 & Ex. B.

---

[3]Guerch's testimony is unclear, but tends to indicate he was initially hired to work at Brasserie Beck. *See* Guerch Dep. 30:2-32:4. In any case, Guerch never worked at Brasserie Beck, and began working at Marcel's. *Id.* at 32:3-4.

c.      Plaintiff Parra.

The parties agree Mr. Kebaier did not hire Plaintiff Parra, but are not sure who did. Resp. Stmt. ¶ 61.  Parra claims he requested the Sunday before Christmas 2007 (December 23, 2007) to spend with his family, and was told by Mr. Kebaier to not come in to work any more. Parra Dep. 64:20-66:16.  Mr. Kebaier and Mr. Stearman claim Parra simply did not show up for work on December 23, and would have been fired except for the fact Parra indicated he was quitting when he returned to get his paycheck two weeks later.  Defs.' Stmt. ¶ 67.

d.      Plaintiff Chabar.

Mr. Kebaier interviewed Plaintiff Chabar at Mr. Burke's direction and hired him once Mr. Burke gave approval.  Defs.' Stmt. ¶ 60.  Plaintiffs dispute this account, alleging Chabar stopped by the restaurant on a whim, and thus Mr. Burke could not have instructed Mr. Kebaier to interview Chabar.  Resp. Stmt. ¶ 60.  Chabar in fact testified that he stopped by Marcel's, was told to come back the next day, filled out an application at some point, and was later told he was hired.  Chabar Dep. 28:24-29:13.  Chabar's testimony does not conflict with Mr. Kebaier's account that Chabar filled out an application, was interviewed the next day, and then was hired after Mr. Burke signed off.  Chabar was suspended and then terminated by Mr. Ramon Narvaez, the Sommelier, for refusing to bring a bottle of wine up from the cellar.  Chabar Dep. 56:12-59:15; Defs.' Stmt. ¶ 66.

e.      Plaintiff Martinez.

The parties do not indicate who hired Plaintiff Martinez, but neither party contends it was Mr. Kebaier, who did not become Maitre d' until 2003, after Martinez was hired.  Kebaier Dep. 4:17-20.  Chef Wiedmaier terminated Martinez's employment with Marcel's.  Defs.' Stmt. ¶ 70.

3.         <u>Payroll and Tips</u>

a.       Payroll procedures.

Marcel's employees clock in and out each day using a computer system called Micros. Defs.' Stmt. ¶ 71. If an employee fails to clock in or out, the payroll records are manually adjusted prior to transferring the information to the third party payroll vendor utilized by Marcel's. *Id.* at ¶ 72. Service employees receive their hourly wages every two weeks on a Friday, with each paycheck covering work performed in the two weeks ending the previous Sunday. *Id.* at ¶ 75. The pay stub the employees receive shows the employee's wages earned, credit card tips the employee receives from the tip pool (and/or directed tips if applicable), and tax deductions for the relevant pay period. *Id.* at ¶ 76. The tax deductions for Captains usually exceed the total hourly wages in each pay period, resulting in a "zero" paycheck for Captains. *Id.* at ¶ 77. Bussers and food runners usually receive an actual paycheck after deductions given their higher hourly rate and lower share of tips. *Id.* at ¶ 78.

b.       Overview of tips and service fees.

Marcel's collects two types of gratuities relevant to this case. Most patrons leave a tip on the credit card used to pay for their meal. Defs.' Stmt. ¶ 103. Larger parties are charged a mandatory service fee, which is usually paid for on a credit card. *Id.* Private parties are charged a 20% service fee. *Id.* at ¶ 114-15. Credit card tips and service fees (paid via credit card or in cash, *see id.* at ¶ 136) are tracked by Marcel's and later distributed to relevant employees as cash, according to the system described below. Tips are occasionally left in the form of cash. Captains are encouraged to share tips left in cash with food runners and bussers, but are not required to do so, and may keep the cash tips for themselves. *Id.* at ¶¶ 133-34. Marcel's does

13

not account for or require Captains to report their cash tip receipts. *Id.* at ¶ 135.

        c.        Marcel's Tip Pool.

In order to calculate the tips and fees due to each employee, Ms. Nelligan combines all credit card tips, all service fees for large parties, and all service fees for private events. She then deducts 3.5% as a credit card processing fee. Defs.' Stmt. ¶ 112a.[4] Ms. Nelligan then subtracts the tips for the bartender, Ms. Alberts' commission, and any amounts directed to specific individuals. Defs.' Stmt. ¶¶ 112b, 116, 119; Supp. Nelligan Decl. ¶ 3. The resulting amount is the pool of tips shared by the service staff. Thirty percent of the pool is divided evenly amongst the bussers and food runners, and seventy percent is divided evenly amongst the Maitre d' and Captains. The only exceptions to this formula are (1) that small amounts may be allocated to the food runners/bussers for good performance, as approved by Mr. Burke; and (2) Captains may designate a portion of their share from the tip pool to go to other employees. Defs.' Stmt. ¶ 117-18.        d.        Record keeping.

At the end of each shift, each Captain prints two copies of a summary showing the net sales and tips for the tables he or she served during that shift. Defs.' Stmt. ¶ 104. One copy is stapled to the Captain's closed sales checks for that shift, and the other is given to Mr. Kebaier. *Id.* at ¶ 105. Mr. Kebaier's copy is stapled to "Marcel's Daily Tip Sheet," which lists all of Marcel's service employees. *Id.* at ¶ 106. That evening's date is written on the Tip Sheet, and the names of the service staff who worked that evening are marked in some way. *Id.* at ¶ 107. The Tip Sheet also indicates any tips that the customers directed to go to particular individuals,

---

[4] Defendants' Statement mistakenly numbers two different paragraphs as 112. To avoid confusion, the Court refers to these paragraphs as 112a and 112b respectively.

extra amounts awarded to bussers and servers based on performance, and amounts Captains may designate from their own share to go to kitchen employees. *Id.* at ¶ 108. The Maitre d' prints out a summary of all sales for the day, and attaches any gift certificates, complimentary meals, etc. *Id.* at ¶ 109. All of this information is then entered into the computer to generate the "Daily System Sales Detail" and "Credit Card Batch Detail." *Id.* at ¶ 110. The documents are then transferred to the Office Manager Lauren Nelligan, who calculates the total amount of tips or fees to be paid in cash to each employee. *Id.* at ¶ 111.

The calculation of the credit card fee, directed tips, and distribution of the tip pool is recorded on the Tip Sheet. *See* Pls.' Ex. A (select Marcel's Daily Tip Sheets). After each pay week, the amounts from that week's Tip Sheets are transferred by the Office personnel into an Excel spreadsheet indicating how much each person is owed. Defs.' Stmt. at ¶¶ 122-23. The Office uses accounting software to generate a check for the total amount of tips due to be paid out each week. *Id.* at ¶ 124. Copies of the check stub, journal entries for each day's tip receipts, and the spreadsheet of the week's tips are retained in Marcel's records. *Id.* at ¶ 125. The check is cashed and distributed to employees, sometimes in an envelope with the amount and name of the recipient written on the front of the envelope. *Id.* at ¶¶ 126-27. Sometimes the cash is simply handed directly to the employee. *Id.* at ¶ 128.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary

judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### III. DISCUSSION

Both Federal and District of Columbia law require employers to pay employees a minimum wage for work performed. *See* 29 U.S.C. § 206(a)(1); D.C. Code § 32-1003(a). As of January 1, 2006, the minimum wage in the District of Columbia was $7.00 per hour, or the federal minimum wage plus $1.00, whichever is greater. D.C. Code § 32-1003(a)(2). For the Plaintiffs in this case, the relevant minimum wage was $7.00 per hour from January 29, 2006 until July 24, 2008, and $7.55 from July 24, 2008 until September 17, 2008. Employers may pay less than the minimum wage to "tipped employees." 29 U.S.C. § 203(t) (defining "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips"); D.C. Code § 32-1002(4), 32-1003(f)-(g) (exempting "any employee who receives gratuities," which are "voluntary monetary contributions received by an employee from a guest, patron, or customer for services rendered"). The so called "tip credit" allows employers to pay a reduced minimum hourly wage ($2.77 per hour in the District of Columbia) to tipped employees so long as the employees earn enough in tips to earn the minimum wage when the hourly and tip income are combined. *See* 29 C.F.R. § 531.59(b); Burke Decl., Ex. A (notice of rights under the FLSA and DC Minimum Wage Posters). In order to utilize the tip credit, during the relevant time frame the employer was required to (1) inform

the employee that the tip credit was being claimed; and (2) allow the employee to retain all tips he or she received, "except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m); D.C. Code § 32-1002(g).

Plaintiffs challenge three aspects of Marcel's tip pool, which if improper, would invalidate Marcel's use of the tip credit. Specifically, Plaintiffs argue the tip pool is improper because (1) the pool included ineligible employees; (2) that the tip pool formula was arbitrarily modified; (3) Marcel's did not provide proper notice of how tips were allocated as part of the pool; and (4) Marcel's did not keep adequate records of the operation of the tip pool. Each argument is addressed in turn, but none have merit.

### A.     *Defendants Did Not Include Improper Employees in the Tip Pool.*

Plaintiffs argue that Marcel's improperly allowed certain employees to participate in the tip pool. Plaintiffs do not argue that deducting amounts from tips to recoup the credit card processing fees is invalid. *See* Pls.' Opp'n at 40, n.4; Resp.' Stmt. ¶ 96. Nor do Plaintiffs argue that Marcel's application of the 3.5% deduction is somehow improper. Plaintiffs' objection is simply that Mr. Kebaier, Ms. Albert, and Mr. Narvaez were improper participants in the tip pool.

Determining whether an employee is eligible to participate in a tip pool is a two part inquiry. The employee (1) must be one who "customarily and regularly receives tips," (29 U.S.C. § 203(m)); and (2) must not be an "employer" under the FLSA. Plaintiffs contend Mr. Kebaier and Mr. Narvaez are employers under the FLSA and cannot participate in the tip pool. Plaintiffs also argue Ms. Albert is not someone who "customarily and regularly receives tips." None of Plaintiffs' contentions have merit. Mr. Kebaier does not have sufficient supervisory

authority to be considered an "employer" under the FLSA. Plaintiffs' objections to Ms. Albert and Mr. Narvaez are premised on a false understanding of what is the relevant "tip pool." Neither Ms. Albert nor Mr. Narvaez participate in the tip pool. Finally, even if Ms. Albert did participate in the pool, her participation is valid in so far as she is in a position that 'customarily and regularly receives tips."

1. <u>Adnane Kebaier</u>

The primary dispute between the parties regarding participation in the tip pool centers around the participation of the Maitre d', Mr. Kebaier. Plaintiffs contend Mr. Kebaier is an "employer" within the meaning of the FLSA and thus is disqualified from participating in any valid tipping pool arrangement. The parties agree that in making this determination, the Court should apply the "economic reality test." This test considers whether the person in question: (1) had the authority to hire and fire employees; (2) supervised and controlled work schedules or the conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See, e.g., Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001). The Court is to consider the totality of circumstances, but "continuous monitoring" of employees is not necessary to classify someone as an employer. *Id.*

a. Mr. Kebaier had no authority to hire, fire, or discipline employees without prior authorization.

As explained above, the undisputed evidence in the record indicates Mr. Kebaier did not have the authority to hire employees. Plaintiffs' testimony that they perceived Mr. Kebaier to have hired them (to the extent even Plaintiffs testified as such) does not create a genuine dispute. At best, Plaintiffs can testify only to their *perception* of Mr. Kebaier's authority. None of the Plaintiffs have any personal knowledge of Mr. Kebaier's authority. While Mr. Kebaier

interviewed applicants and made recommendations to Mr. Burke, Mr. Burke's approval was required and obtained before informing any employee he was actually hired. *See supra*, at Section I.C.1.a. Being involved in the hiring process, by interviewing and making recommendations, does not make someone an employer. *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 800 (E.D. Ark. 1990). Nor is there any evidence in the record to suggest, much less raise a triable issue, that Mr. Kebaier had the authority to discipline employees. *See supra*, at Section I.C.1.a. With regards to Mr. Kebaier's authority to fire employees, the only dispute is whether Mr. Kebaier terminated Plaintiff Guerch. *See* Resp. Stmt. ¶ 65. Assuming Guerch's testimony is true, and he was fired by Mr. Kebaier after repeatedly asking for a day off from work, evidence of a single incident in which Mr. Kebaier terminated an employee is insufficient to create a genuine dispute regarding Mr. Kebaier's overall authority. Guerch's termination, in light of no other evidence in the record showing Mr. Kebaier hired, fired, or disciplined any other employees, is simply an aberration, and ultimately does not undermine the Court's conclusion that Mr. Kebaier did not have the authority to hire, fire, or discipline employees. Overwhelming evidence reveals that the "economic reality" of Marcel's is that Mr. Burke makes the final decision to hire or fire employees, even though those actions may have been carried out by Mr. Kebaier. *See Rudy v. Consolidated Restaurant Cos., Inc.*, No. 3:08-cv-904, 2010 WL 3565418, at *6-8 (N.D. Tex. Aug. 18, 2010). In sum, Mr. Kebaier did not have the authority to hire, fire, suspend, or discipline employees, and the first factor weighs against finding Mr. Kebaier is an employer for purposes of the FLSA.

    b.  Mr. Kebaier had little, if any, discretion in setting the work
        schedule.

  For most of the relevant time period, Mr. Burke was solely responsible for the work

schedule for the service staff.  Resp. Stmt. ¶ 49.  The record also indicates that while Mr.

Kebaier drafts the initial schedule, Mr. Burke often makes changes and must approve the final

schedule.  *Id.* at ¶ 50.  Drafting the initial schedule doe not make Mr. Kebaier an employer, even

in combination with his other jobs responsibilities.  *See Dole*, 751 F. Supp. at 800.  Plaintiffs are

correct that Mr. Kebaier's incident report indicates he told Mr. Guerch that two days notice was

insufficient time to request a day off, (*see* Stearman Decl. Ex. A).  And for purposes of summary

judgment, the Court will assume Guerch is correct and Mr. Kebaier denied his request for time

off.  However, a single incident is insufficient evidence that Mr. Kebaier has broad enough

authority over the schedule for him to be considered an employer.  The Plaintiffs concede Mr.

Burke had ultimate control over the service staff's work schedule, and they fail to identify any

other instance in which Mr. Kebaier granted or denied a request for time off.  One event, in light

of the other evidence conceded by Plaintiffs showing Mr. Kebaier lacked sufficient managerial

authority, does not create a genuine dispute regarding Mr. Kebaier's overall lack of supervisory

authority.

    c.  Mr. Kebaier was not involved in setting the rate or method of
        payment to employees.

  Plaintiffs argue Mr. Kebaier was "instrumental" in administering the tip pool because he

(1) printed out the daily reports and gave them to the office; (2) marked off who worked on the

relevant night; (3) indicated which bussers and food runners would receive extra tips; (4)

indicated who received directed tips; and (5) disbursed cash payments on Fridays.  Assuming

Mr. Kebaier performs each of these tasks (and it is only an assumption given Plaintiffs' failure to cite to any record evidence that Mr. Kebaier in fact performs these tasks), none involve anything more than non-discretionary, clerical tasks. Mr. Kebaier does not decide who receives extra tips; directed tips are allocated by the customer, and all extra amounts to food runners and bussers are approved by Mr. Burke. *See* Defs.' Stmt. ¶¶ 116-18. Mr. Kebaier does not set the rate or determine the method of payment for Marcel's employees.

d.      Mr. Kebaier did not maintain employment records.

Plaintiffs allege Mr. Kebaier maintained their employment records by noting who received directed tips or extra amounts. However, Mr. Kebaier merely records the tips the customer or Mr. Burke decided should be allocated to a specific staff member. *See supra*, at Section I.C.1.a. These notations have no bearing on the issue relevant to Plaintiffs' claim: who participated in the actual tip pool. By comparison, in *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 144 (2d Cir. 2008), the person at issue maintained the records on how many hours were worked by each employee, records directly relevant to the claims at issue, which were based on the alleged failure to pay proper overtime wages. Mr. Kebaier did indicate who was present on a given day, which is marginally relevant to a claim like Plaintiffs' that improper employees were included in the pool.

However, the totality of the circumstances demonstrate Mr. Kebaier was not an "employer." He has no authority to hire, fire, suspend, or discipline employees. Mr. Kebaier drafts the initial schedule, but all vacation had to be approved by Mr. Burke. Nor does he determine how much or in what form employees will be paid. On balance, the fact that Mr. Kebaier indicates who is present during each shift, and may have denied a single request for

vacation on short notice and terminated that same employee, does not show he has sufficient supervisory capacity to be considered an employer. *See Baird v. Kessler*, 172 F. Supp. 2d 1305 (E.D. Cal. 2001) ("Congress could not have intended to hold individuals personally liable for alleged violations of the FLSA when those individuals cannot even control crucial aspects of the work environment such as when and if paychecks will issue, how many employees are necessary, and whether or not more employees can be hired.").

2. Julie Albert and Ramon Narvaez

Plaintiffs argue that Ms. Albert and Mr. Narvaez were improper participants in the tip pool. As previously explained, in order to determine how much in tips each employee is entitled to, Ms. Nelligan first combines all credit card tips and all service fees, and then deducts 3.5% as the "credit card processing fee." *See* Nelligan Decl. ¶¶ 2-3. Plaintiffs do not argue that the manner and deduction of or calculation of this fee is in anyway improper. Rather, Plaintiffs object to the next step in which Ms. Nelligan subtracts directed tips, the bartender's tips, and Ms. Albert's commission from the total of all service fees and credit card tips. Pls.' Opp'n at 42. Plaintiffs seemingly argue that subtracting Ms. Albert's commission and any tips directed towards Mr. Narvaez at this stage makes them participants in the tip pool.

Defendants argue that Ms. Albert and Mr. Narvaez do not participate in the tip pool because they receive only the tips/fees specifically directed towards them. Defendants are correct. Tips directed to specific individuals, the bartenders' tips, and Ms. Albert's commission are paid out before the tip pool is calculated. Neither Ms. Albert nor Mr. Narvaez receive any amount of money contributed by the service staff. Nor do they receive a share of the thirty percent of the pool given to bussers and food runners or the seventy percent of the pool allocated

to the Maitre d' and Captains. *See* Nelligan Decl. ¶ 4. All undirected tips contributed by the service staff are redistributed to valid pool participants, as required by the applicable regulations. *See* 29 C.F.R. § 531.54. That Ms. Albert's and Mr. Narvaez's tips and service fees are listed on the same sheet as the pool participants does not broaden the scope of the pool as Plaintiffs imply. Therefore, Ms. Albert and Mr. Narvaez cannot be described as improper participants in the tip pool.

Even if Ms. Albert was considered to be participating in the tip pool, Defendants are correct that her inclusion would not invalidate the pool.[5] Plaintiffs allege Ms. Albert "is an outside sales person, who would not normally interact with customers in the capacity of serving food or bussing tables," and that she did not "greet[] guests or perform[] hosting duties." Pls.' Opp'n at 42. However, Ms. Albert need not serve food to guests to qualify as someone who "customarily and regularly receives tips." Rather, her direct interaction with customers in arranging and planning private parties is sufficient. In a very similar case, the court in *Garcia v. La Revise Associates LLC*, No. 08 Civ. 9356, 2011 WL 135009 (S.D.N.Y. Jan. 13, 2011) found that the defendant restaurant's "banquet coordinator" was properly included in the tip pool. *Id.* at *7. The employee at issue in *Garcia*,

> communicated with customers who chose to hold special events at the Restaurant, planning the events and assisting the customers in choosing food and drink menus, setting a date, and determining event seating. On the day of the event, the banquet coordinator greeted and seated guests, coordinated service timing with the kitchen and the waitstaff, and ensured that the event proceeded to the customers' and guests' satisfaction.

*Id.* at *2. The court concluded that the since the banquet coordinator dealt directly with the party

---

[5] Admittedly, Mr. Narvaez is considered an "employer" for purposes of the FLSA and could not participate in a valid tip pool.

in planning the event, and worked directly with the guests during the event, she had more than *de minimis* customer interaction.  Similarly here, Ms. Albert deals directly with private parties in negotiating prices, determining menus, collecting payment, and often attending the events themselves.  Defs.' Stmt. ¶ 113.  Moreover, Plaintiffs have not presented any evidence that Ms. Albert has any managerial authority that might disqualify her from participating in the pool.  To the contrary, Defendants indicate Ms. Albert had no authority to hire, fire, suspend, discipline, set payroll or manager employee files.  *Id.*

Plaintiffs rely on two cases in a footnote for the contention that "an employee's level of customer interaction is the most significant factor in evaluating whether he qualifies as a 'tipped employee.'"  Even under this standard, Defendants are correct that Ms. Albert would be considered a proper participant in Marcel's tip pool.  In *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301-02 (6th Cir. 1998), the Sixth Circuit concluded that restaurant hosts at Outback Steakhouse "perform important customer service functions," including greeting customers, providing menus, and seating them at tables.  Ms. Albert does far more.  She works directly with the customer to plan all aspects of the private party, and sometimes even attends the functions themselves.  Ms. Albert has more sustained contact with customers than the employees at issue in *Kilgore*, and likewise would not invalidate the tip pool on that basis.  Likewise, *Roussell v. Brinker International, Inc.*, No. 05-3733, 2008 WL 2714079 (S.D. Tex. July 09, 2008) does not support Plaintiffs' claim.  In *Roussell*, the Court found there was a genuine issue of a material fact as to the extent of the interaction between Quality Assurance employees at Chili's restaurant and customers.  Chili's Quality Assurance employees were responsible for checking on the quality of the food after it was prepared by the kitchen, but before it was picked

up on trays and served to the customer.  This does not compare to Ms. Albert's position, which by definition involves direct interaction with customers to arrange private events.  Plaintiffs do not otherwise challenge Ms. Albert's eligibility to partake in the tip pool.  Therefore, given the level of customer interaction Ms. Albert undisputably had in undertaking her role, the Court finds she would have been a proper participant in the tip pool.  Nevertheless, Ms. Albert does not actually participate in the tip pool.

B.     *Marcel's Tip Pool was not Arbitrarily Modified.*

Though not included in the list of issues still in dispute in the beginning of Plaintiffs' Opposition, Plaintiffs also include a section alleging there exists a genuine dispute regarding whether Defendants complied with the "percentage of tips" method for "calculating tip allocations."  Pls.' Opp'n at 47.  Plaintiffs fail to identify what this method is or any basis for a private cause of action to enforce it where there is no independent violation of the FLSA's minimum wage provisions.  Moreover, the relevant tip pool regulations do not reflect any percentage method, or otherwise preclude employers from making adjustments based on good performance or directed tips by customers.  Marcel's notified Plaintiffs of the "required tip pool contribution amount"—all of the employee's non-cash tips—and did not retain any of the tips for any other purpose.  *See* 29 C.F.R. § 531.54.  To the extent Plaintiffs raise a valid claim on this issue, Defendants are entitled to summary judgment.

C.     *Defendants Provided Proper Notice of the Tip Pool as Required by Law*

Plaintiffs' claim regarding violations of the FLSA's notice requirements is less than clear, but the Court understands the Opposition to include two alleged notice violations: (1) failure to disclose the use of a tip pool in the tip credit notices; and (2) failure to disclose the

formula underlying the distribution of the tip pool proceeds.  *See* Pls.' Opp'n at 39-41.

In terms of the first issue, the lack of notice regarding the use of a tip pool in combination with the tip credit, Plaintiffs rely on the Department of Labor, Wage and Hour Division Fact Sheet #15.[6]  Defs.' Reply Ex. 4. This Fact Sheet purports to require employers to provide notice to tipped employees that, among other things, all tips received by the employees are to be retained by the employees except in the case of a valid tipping pool arrangement.  Plaintiffs argue that the minimum wage and tip credit notices posted by Defendants did not adequately disclose that a tip pool would be used, and that the posters "articulate the expectation that the employees will keep all of the tips they earn."  Pls.' Opp'n at 40.  Plaintiffs' argument is incorrect.  The posters make no representations whatsoever as to the treatment of tips, and note only that if "an employee's tips" combined with the hourly wage do not equal the minimum wage, the employer must make up the difference.  *See* Burke Decl., Ex. A.  Moreover, Plaintiffs concede that the employees had notice that a tip pool would be used.  Pls.' Opp'n at 40 ("It was commonly understood that there was a tip pool."); *see also* Resp. Stmt. ¶ 94 (conceding there is no dispute that the tip pool is verbally explained at the time of hire and from time to time during employment).  The Fact Sheet provides that notice may be provided orally, as was done here. By Plaintiffs' own admission there is no violation of the Fact Sheet's requirements.

Plaintiffs' second notice argument contends that Marcel's did not provide adequate notice of the formula underlying the tip pool, that is, notice of how the tips are divided up amongst the participants of the pool.  In the paragraph before, though, Plaintiffs admit that the

---

[6] Defendants argue Plaintiffs should not be permitted to rely on the Fact Sheet because it was issued after the time period at issue in this case.  The Court need not reach this argument because, as explained below, Plaintiffs fail to show Defendants did not meet the disclosure requirements of the Fact Sheet.

70/30 split among the Captains, bussers, and food runners is "commonly known." Pls.' Opp'n at 40. Plaintiffs' concession aside, the problem with this claim is that Plaintiffs fail to identify any statutory or legal basis on which Defendants can be held liable for failing to disclose the formula underlying the dispersal of tips in the pool. Plaintiffs cite DC Code §32-1008, which provides that when wages are paid, the employer must provide the employee with an itemized statement showing "the date of the wage payment, gross wages paid, deductions from and additions to wages, net wages paid, hours worked during the pay period." The Plaintiffs' argument implies that the original credit card tips are part of an employee's gross wages, and thus the entire pooling and distribution process must be outlined on the pay stub. Plaintiffs cite no authority for this argument. Section 32-1002 of the DC Code defines "wage" as "compensation due to an employee by reason of the employee's employment." The tips on the credit card receipts are not "due to an employee" at Marcel's, only the portion of the tip pool is due to the employee, and therefore only distributed shares of the tip pool must be accounted for in the gross wages. Similarly with regards to the FLSA, under a tip pool system, the tips are not considered a specific employee's tips until *after* the pooled tips have been distributed:

> where an accounting is made to an employer for his information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his own are counted as his tips for purposes of the Act.

29 C.F.R. § 531.54. Defendants' pay stubs fully comply with the District's requirements. The gross wages, that is, tips received from the pool, deductions and additions, net wages, and hours are all provided. Defs.' Stmt. ¶ 76. Absent any other statutory basis for the requirement that Marcel's provide notice of the formula underlying the tip pool, Defendants are entitled to

summary judgment on this claim.

D.      *Defendants Maintained Adequate Records of Tips and Wages*

Plaintiffs contend Defendants maintained inadequate records of the tips and pool allocations in violation fo 29 U.S.C. § 211(c), which requires "[e]very employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." However, the FLSA does not provide for a private cause of action to enforce record keeping violations. *See* 29 U.S.C. § 216(b) (providing a private cause of action can be brought only to enforce violations of sections 206, 207, and 215(a)(3) of the FLSA). Even if statutorily authorized, Plaintiffs' claim would fail. Plaintiffs have not identified any record keeping requirement for tipped employees (as outlined in 29 C.F.R. §§ 516.2(a)(2) and 516.28) that would mandate Marcel's record the tip allocation scheme. Defendants complied with the record keeping provisions as relevant to this case and are entitled to summary judgment on this issue.

E.      *Plaintiff Arencibia was not Retaliated Against for Any FLSA Complaint*

The anti-retaliation provision of the FLSA provides it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). The Courts of Appeals and courts within this District have reached conflicting decisions as to whether this language encompasses informal complaints to an employer or supervisor as Arencibia alleges he made in this case. *See Cooke v. Rosenker*, 601 F. Supp. 2d 64, 75 (D.D.C. 2009). As explained below, the Court need not resolve that issue in this

case because even assuming informal complaints to a private employer were sufficient to trigger the anti-retaliation provision, Arencibia's claim fails.

The Amended Complaint alleges that Arencibia "was terminated from his employment due to his seeking to enforce his rights" under the FLSA. Am. Compl. ¶¶ 36, 72. Plaintiffs' Opposition clarifies that the protected conduct Arencibia alleges led to his termination is his inquiry as to whether the service staff would receive a lunch break or family meal when asked to come in early to iron tablecloths (an issue not raised in the Amended Complaint). *See* Pls.' Opp'n at 51. Arencibia even concedes that the Administrative Law Judge who heard Arencibia's unemployment benefits appeal concluded that "Chef Wiedmaier's anger toward Arencibia transpired around the time that Arencibia had inquired about a meal break or on the premises meals because of the prep-time before service." *Id.* However, Arencibia incorrectly asserts that meal breaks are "a compensation issue protected under the FLSA." Whether or not an employer is required to provide meal breaks is not an issue regulated by or addressed anywhere in the FLSA (*see* 29 U.S.C. §§ 201 *et seq.*), and thus a request for such breaks cannot form the basis for a retaliation claim under the FLSA.

Even if the Court construed the Amended Complaint to allege that Arencibia's complaints regarding the tip pool were the basis for the alleged retaliation as Defendants initially assumed, the claim would still fail. Arencibia does not contest the Defendants' argument that there is no evidence in the record to establish that Chef Wiedmaier—the person who actually terminated Arencibia—actually knew of Arencibia's complaints regarding the tip pool. Absent evidence that the decision maker knew of the protected activity, Arencibia failed to establish a genuine dispute of material fact as to the lack of any causal link between his FLSA complaint(s)

and his termination.  *See Walters v. Central States Coca-Cola Bottling Co.*, 51 F. App'x 969, 971 (7th Cir. 2002) (upholding the conclusion that plaintiff's termination was not retaliatory "because the individuals who terminated her could not have done so in retaliation for a complaint they did not know about").  Therefore Defendants are entitled to summary judgment on Arencibia's retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs have failed to establish a genuine dispute of material fact as to any remaining claim in the Amended Complaint.  Ms. Albert and Mr. Narvaez did not take part in the tip pool, and all of the employees who took part in Marcel's tip pool were proper participants.  Marcel's provided notice of the tip credit and tip pool as required by law.  Plaintiffs cannot bring a cause of action for improper record keeping, but even if they could, Defendants' records were adequate.  Finally, Plaintiff Arencibia failed to provide any evidence to support his claim that his complaints regarding Marcel's FLSA compliance are causally linked to his termination.  Rather, the complaint Arencibia argues for the first time in the Opposition led to his termination did not concern an issue of compensation under or related to the FLSA.  With no genuine dispute as to Defendants' violation of the FLSA, the Court need not reach the issue of the proper remedy.  Accordingly, the Court grants summary judgment in favor of Defendants on all remaining claims.  An appropriate Order accompanies this Memorandum Opinion.


_____*/s/*_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge